## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| NICOLE LAWTONE-BOWLES | ) | Case No.: 4:26-cv-00028-PPS-AZ |
| | ) | |
| Plaintiff(s), | ) | PLAINTIFF'S REPLY IN |
| | ) | SUPPORT OF MOTION FOR |
| vs. | ) | TEMPORARY RESTRAINING |
| | ) | ORDER |
| PURDUE UNIVERSITY | ) | |
| GLOBAL, PURDUE GLOBAL | ) | DATE: |
| LAW SCHOOL (FORMERLY | ) | TIME: |
| CONCORD LAW SCHOOL) | ) | |
| Defendant(s). | ) | |

# EXHIBITS

1: New York State Education Department Schedule A Letter, proof of Nicole Lawtone-Bowles's disability. Lost my eligibility for the Practical Training of Law Students Program

2. Letter of proof from Purdue Legal Counsel, FERPA proof of them not understanding my assistive technology.

3. Email from Purdue counsel denying settlement and threatening to charge me for their legal fees if I do not drop my case against them.

4. Emails between Dean Moody and me.

5. Proof of race discrimination and disability discrimination from plaintiff's response to TRO, including the instructors and appeal committee who denied my appeal and failed to accept my use of assistive technology and Dragon Legal for my disability.

6. Proof of satisfactory work and grades when instructors accepted my use of assistive technology, and disability documentation from the SAS office.

7. Proof of theft of government funds by Purdue, because my education was paid for by the government, scholarships, and student loans.

8. Case of John Doe v. University of Notre Dame, where a student accused of sexual assault was allowed to take his exams and finish his degree. I was accused of actions based on my assistive technology & disability. I request that I be awarded the same grace to complete my Juris Doctor degree while this case is pending. Please, Judge Simon. I know you are a good person. Please let me finish my degree, take my spring exams, and continue into summer so I can graduate. Please. I am begging you.



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

Adult Career & Continuing Education Services / Vocational Rehabilitation (ACCES / VR)
85 Crystal Run Road, Middletown, NY 10941
Tel. (845) 346-4289  Fax (845) 343-3358
TTY: (845) 452-2910  VP/VRS (845) 345-8420

July 18, 2025

To Whom It May Concern:

This letter serves as certification that **Nicole Lawtone-Bowles** is an individual with a documented disability, identified by the New York State Education Department, ACCES-VR policy and can be considered for employment under the Schedule A hiring authority 5 CFR 213.3102 (u) for people with intellectual disabilities, severe physical disabilities or psychiatric disabilities.

Thank you for your interest in considering this individual for employment. You may reach me via my contact information listed below.

Sincerely,

Kayleen Charles, MSEd, CRC
Vocational Rehabilitation Counselor
NYSED-ACCES-VR
85 Crystal Run Road, Suite 210
Middletown, NY 10941
Tel: 845-346-4289
Fax: 845-343-3358
Kayleen.charles@nysed.gov
Text only# 929-346-5064

## PTLS Notice of Student Certification Denial [ ref:!00Dt00TZax.!5008y0AYBVq:ref ]

From: State Bar of California - Special Admissions (special.admissions@calbar.ca.gov)

To:    nicolelawtone@aol.com

Date:  Wednesday, April 22, 2026 at 01:21 PM EDT



The State Bar
of California

**OFFICE OF ADMISSIONS**

**File #:** 499899

Dear Nicole Laura Alexis Lawtone-Bowles,

Your Practical Training of Law Students application has been denied for the following reason(s): As of April 7, 2026, you no longer meet the requirements to participate in the Practical Training of Law Students (PTLS) Program, as you are no longer in good academic standing at Purdue Global Law School. Accordingly, your application associated with Case Number 01050972 has been denied.

Sincerely,

**Office of Admissions**

The State Bar of California | 845 S. Figueroa Street | Los Angeles, CA  90017
(213) 765-1000 | www.calbar.ca.gov/Admissions

**OUR VALUES** | Clarity • Investing in Our People • Excellence • Respect • Growth Mindset

**Working to protect the public in support of the mission of the State Bar of California.**

Please consider the environment before printing this email.

LinkedIn | Twitter | Facebook | Instagram |YouTube

ref:!00Dt00TZax.!5008y0AYBVq:ref

#2

RE: FERPA Request for Education Records and Identification of Committee Members Involved in Academic Integrity Decisions

From: Office of Legal Counsel (legalcounsel@purdue.edu)

To:      nicolelawtone@aol.com

Date:   Friday, April 24, 2026 at 08:29 AM EDT

Ms. Lawtone-Bowles,

We were unaware that you require the use of screen reader assistive technology. While there are assistive technologies that integrate with Box, we have decided to make an exception to the policy. Your permissions have been updated, and you are now able to download the record set from Box.

Best,

Randee Treida
*Litigation Coordinator*

Purdue University Office of Legal Counsel
610 Purdue Mall | West Lafayette, IN 47907
**P** 765-494-0485 | **F** 765-496-0340 | kelly180@purdue.edu

**From:** Dr. Nicole Lawtone-Bowles <nicolelawtone@aol.com>
**Sent:** Wednesday, April 22, 2026 9:10 PM
**To:** Office of Legal Counsel <legalcounsel@purdue.edu>
**Subject:** Re: FERPA Request for Education Records and Identification of Committee Members Involved in Academic Integrity Decisions

---- **External Email:** Use caution with attachments, links, or sharing data ----

Dragon is dictation software that I use, and I use NaturalReader to read PDFs. You have it locked so that I cannot download it, and I need to be able to download it.

On Wednesday, April 22, 2026, 17:18, Office of Legal Counsel <legalcounsel@purdue.edu> wrote:

Hello Ms. Lawtone-Bowles,

My apologies for the delay. I was communicating with an individual who provides assistance with accessible technologies.

It is our understanding from Purdue Global that you use Dragon NaturallySpeaking, which I've been told works with Box. If there are accessibility issues with Dragon and Box, please let me know what you are experiencing so that I can better assist you.

Thank you,

Randee Treida
*Litigation Coordinator*
Purdue University Office of Legal Counsel

**From:** Dr. Nicole Lawtone-Bowles <nicolelawtone@aol.com>
**Sent:** Wednesday, April 22, 2026 4:21 AM
**To:** Office of Legal Counsel <legalcounsel@purdue.edu>

**Subject:** Re: FERPA Request for Education Records and Identification of Committee Members Involved in Academic Integrity Decisions

---- **External Email:** Use caution with attachments, links, or sharing data ----

Good morning, Randee Treida,

I use assistive technology due to my disability and need to be able to download the file in order to read it. I can't download it.

On Tuesday, April 21, 2026, 15:40, Office of Legal Counsel <legalcounsel@purdue.edu> wrote:

Dear Ms. Lawtone-Bowles,

I work for Purdue University's Office of Legal Counsel. Our office will be facilitating the inspection of your own education records, per your below request.

Our office has adopted a procedure which allows for electronic viewing through a file-share service called Box. You'll soon receive an invitation to access your records.

Pursuant to applicable Purdue University Global, Inc. policy, (found at the following link: https://catalog.purdueglobal.edu/policy-information/student-rights-responsibilities/ferpa/), your records will be made available for inspection and review. Please note that during the inspection and review of your education records, you are not permitted to make copies or take photographs of any documentation.

You will be granted viewing access for a period of one (1) week. Access to these records will be removed on Tuesday, April 28, 2026, at 5:00pm ET. **Please be advised that these records are confidential and are not to be copied or distributed to anyone.**

Thank you,

Randee Treida
*Litigation Coordinator*
Purdue University Office of Legal Counsel

---------- Forwarded message ---------
From: **Nicole Lawtone-Bowles** <nicolelawtonebow@student.purdueglobal.edu>
Date: Sat, Mar 7, 2026 at 3:22 AM
Subject: FERPA Request for Education Records and Identification of Committee Members Involved in Academic Integrity Decisions
To: PGLawAssociateDean <pglawassociatedean@purdueglobal.edu>

To whom it may concern,

I am writing to formally request the names of all individuals who served on or participated in the committee or decision-making body that reviewed and voted on the academic determinations made in my case. This request applies to both academic integrity matters that resulted in adverse academic decisions concerning my coursework.

I am requesting this information as part of my effort to fully understand the basis for the decisions made and to ensure that I have a complete record of the individuals involved in the review process. I am currently compiling documentation related to these matters, including materials relevant to disability accommodations and academic integrity proceedings.

This request is also necessary as I prepare materials for submission to federal authorities regarding a potential failure to accommodate and related concerns. In particular, I am assembling documentation

4/24/26, 8:45 AM     AOL Mail - RE: FERPA Request for Education Records and Identification of Committee Members Involved in Academic Integrity De...

USDC IN/ND case 4:26-cv-00028-PPS-AZ     document 27-3     filed 04/30/26     page 11 of 156

that may be provided to the United States Department of Justice and other appropriate agencies.

Under the Family Educational Rights and Privacy Act (FERPA), students have the legal right to inspect and review their education records maintained by an educational institution. FERPA requires that institutions provide access to such records within forty-five (45) days of receiving a written request.

Accordingly, I respectfully request access to any education records identifying the individuals who participated in the review, deliberation, or voting related to the academic integrity findings or academic sanctions issued in my case. This includes the names and titles of committee members, administrators, or faculty involved in those determinations, as well as any records reflecting the review process.

Please treat this correspondence as my formal FERPA request for inspection and review of the relevant education records. I would appreciate confirmation that my request has been received and information regarding when the requested records will be made available.

Thank you for your attention to this matter.

Sincerely,
Nicole Lawtone-Bowles


Nicole Lawtone-Bowles
Certified Law Student
The State Bar of California's Practical Training of Law Students Program
Purdue Global Law School (formerly Concord Law School)
Juris Doctor August 25, 2026
Pronouns: She/Her
Adrains Place Inc
Nicole Lawtone-Bowles SSRN
Nicole Lawtone-Bowles LinkedIn
"Master your mind because a thought can ruin your whole day."


On Wed, Mar 4, 2026 at 16:31 PGLawAssociateDean <pglawassociatedean@purdueglobal.edu> wrote:

Hello 2601L students-

As we are now in week 9 of the 2601L term, here are a few key reminders:


**Grading Rubrics**

Check each of your individual courses for specific rubrics for assignments, but most timed essays follow this self-reflection guide and standard grading rubric, which serves as the foundation for grading. It also includes tips on self-reflection to help improve performance and prepare for discussions with professors. You can find the rubric under *Course Resources > Self Reflection Guide* and on the last tab of the ARC.


**Grading Scale**

Purdue Global Law applies a rigorous grading scale. An 80 earns an A- (superior performance), not a B- at other institutions. There is no curve or grade inflation and grades reflect individual merit. Grades in the 60-70 range are common, with a 70 indicating proficiency. Understand the scale and measure your work accordingly.

4/24/26, 8:45 AM AOL Mail - RE: FERPA Request for Education Records and Identification of Committee Members Involved in Academic Integrity Do...

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 12 of 156

For more resources on grading, please check these materials.

- Understanding Essay Scores and Grading Scale & Transcript

- Understanding Rubrics & Transcript

- Module Zero

**Reminder:** Academic Support Professor David Cook is available for guidance beyond instructor feedback. Please do not ask for feedback on assignments before receiving a grade. Focus on asking specific questions to help make the most of these meetings. You can use this **sign-up link** to schedule an appointment.

- Review the final exam announcement and get those exam dates onto your calendar.

- Check out the term's academic success webinars. Though designed for second term students, they are valuable to all.

| TOPIC | LEADER | Module | Dates/Links: (Wed: 5 pm PT/8 pm EST) * |
|-------|--------|--------|----------------------------------------|
| Study strategies: case briefing/time mgmt. | Larasz Moody | 2 | Jan 14 -Recording |
| Calibration / Self-critique [contracts] | Dave Cook | 4 | Jan 28 -Recording |
| Preparing outlines / Studying for finals | Jim Dodge | 6 | Feb 11 -Recording |
| Essay Writing: Contracts | Dave Cook | 8 | Feb 25: CL601-02: Meeting Link |
| Essay Writing: Torts | Dave Cook | 11 | March 18: CL601-02: Meeting Link |
| MCQ approach: Torts | Steve Bracci | 12 | March 25: CL601-02: Meeting Link |
| MCQ approach: Contracts | Quentin Huff | 14 | April 8: CL601-02: Meeting Link *9pmEST |

-Purdue Global Law School

Purdue Global Law School

2029 Century Park East, Suite 400

Los Angeles, CA 90067

pglawassociatedean@purdueglobal.edu

www.PurdueGlobalLawSchool.edu

Community Resources Site

**Schedule Office Hours:**

CLICK HERE to schedule with Assistant Dean Moody

CLICK HERE to schedule with Jen Fishman, Sr. Student Ops Mgr.

CLICK HERE to schedule with Maria Dougherty, Sr. Student Ops Mgr.

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 13 of 156



**Law School**

*Purdue University Global holds itself
accountable to foster a culture that
promotes inclusion and belonging,
offering an environment that is fair,
accessible, and engaging for all.*

Logo from the Princeton Review ©2025 TPR Education. All rights reserved. Used under license.

--
**Student Relations**
**Purdue University Global**
2550 Northwestern Avenue, Suite 1100
West Lafayette, IN 47906

T: 877-836-5813
E: studentrelations@purdueglobal.edu



*Purdue University Global holds itself
accountable to foster a culture that
promotes inclusion and belonging,
offering an environment that is fair,
accessible and engaging for all.*

- Close Window
- Print This Page
- Expand All | Collapse All

# Case: C-6449123

## Case Summary

| | | | |
|---|---|---|---|
| Case Record Type | Academic Engagement | Product Family of Case | |
| Case Type | Student Concern | Case Number | C-6449123 [View Hierarchy] |
| Case SubType | Plagiarism Charges | Case Owner | JoAnna Navarro |
| Formal Approval Process? | No | Status | Closed |
| Prefix for Course | | Campus | 848 Purdue Global Law School |
| | | Campus From Campus Lookup | 848 Purdue Global Law School |

## Case Information

**Estimated Credits Remaining**

## Case Account Information

| | | | |
|---|---|---|---|
| Account Name | Nicole Lawtone-Bowles | Opportunity | |
| Academic Engagement | | Contact Name | Nicole Lawtone-Bowles |
| Desired Program | Juris Doctor (Part Time) | CVUE Student Number | 40055989 |
| Desired Program of Interest | | Instructor Name | |
| Emphasis Area | | Course Code | |

## Description

**Subject**    Academic Dishonesty - 2nd Breach - Nicole Lawtone-Bowles

**Description**    Nicole Lawtone-Bowles
Term: 2601L
Class: CL760-01 Community Property
Assignment: Modules 4, 10, and 11 Essay Quiz & Module 11 Discussion
Instructor Name: Brian Victor

Reason: Falsification of Authorship.

Student has completed all of the essay quizzes for the entire course and the module 11 discussion within less than two weeks of starting class.

Her answers to the essay quizzes showed a high level of answering without any mistakes. Additionally, it only took her 28 minutes to complete the module four essay quiz, 22 minutes to complete the module 10 essay quiz, and 38 minutes to complete the module 11 essay quiz. Student was allowed two hours to complete these quizzes. I am extremely concerned that she was able to complete all of this material with such completeness of answers in such a short amount of time.

During my phone call with the student, I questioned how she was able to complete all of the material in this class in less than two weeks. She said she has been studying law school since 2019 and uses the Bar Max program. She said she starts looking at class material during preview week.

I asked if she had a word document of the worksheet she was using to complete the quizzes, so I could see it, but Student mentioned she studied this topic before so she did not have a word document. She stated that she took the fact pattern and pasted into the Dragon Voice to Text software and read it so this is why she was able to complete the quizzes in such a short time. According to the student, she has to complete an essay in 30 mins for the NY bar so she has practiced completing essays quickly. She stated that she outlines the question first then picks out parts of the rules to use. The student stated that she has 7 classes now and has finished the material in all of her classes already. She also stated that she has listened to all my recorded lectures.

I asked the student if she could answer a question regarding how pensions are divided in California at time of divorce, and after providing a brief answer of how it works in New York, and repeating tangents, she was unable to provide the answer or even any theory as to how to obtain the answer. This would have been material she should have studied in advance of completing these quizzes.

She then later sent me an email with the link to Audible and Bar Exam Essay Rules by Ed Aruffo and stated that is where she learned the rules.

**Close Case Reason**     Completed

**Case Closure Comments**     Dear Nicole Lawtone-Bowles,

This letter confirms your second Academic Dishonesty breach of the Student Code of Conduct. The consequence of this second breach is failure of the course in which the action occurred. The following information summarizes your breaches:

First Breach
Term: 2505L
Class: CL685-01: Criminal Procedure
Assignment: Modules 6 and 10 Essay
Instructor Name: Victoria Vidt

Second Breach
Term: 2601L
Class: CL760-01 Community Property
Assignment: Modules 4, 10, and 11 Essay Quiz & Module 11 Discussion
Instructor Name: Brian Victor

All reports of academic dishonesty are recorded in Purdue Global's database and remain there permanently. All breaches you accumulate while completing a program will be carried over to any subsequent program at Purdue Global.

If you disagree with these findings and wish to appeal this breach, you must complete the following steps:
Discuss the breach with your instructor, providing a thorough explanation and evidence of why you believe the suspicion of academic dishonesty to be inaccurate.
If the dispute is still unresolved and you wish to pursue an appeal of the report of academic dishonesty, you must submit an Academic Appeal Form to the Office of the Provost. The appeal form can be found on your student portal under quicklinks.
The appeal form should include an explanation and evidence to support your position.
Please note all appeals must take place in writing within 10 days of receiving this letter. Submissions made more than 10 days after notification of the breach will not be accepted.

If you breach Purdue University Global's Academic Dishonesty Code of Student Conduct a third time, the consequence will be expulsion from the University. For more information, please refer to the Code of Student Conduct Policy, which can be found in the Purdue University Global catalog.

We want you to be successful; therefore, encourage you to take advantage of the following resources:
Plagiarism Information Page
Writing Center located in the Academic Success Center section of Purdue Global Campus.
Thank you.

JoAnna Navarro
Pronouns: she, her, hers
On behalf of the Office of the Provost

| | |
|---|---|
| **Action Taken** | Failed course |
| **Case Evaluation Result** | |

## International Background Check

| | | | |
|---|---|---|---|
| **Programs** | | **BG Cost** | |
| **Permanent State and Country** | New York<br>United States of America | **BG Code** | |
| **BG Notes** | | | |

## System Information

| | | | |
|---|---|---|---|
| **Created By** | JoAnna Navarro, 1/26/2026 1:03 PM | **Last Modified By** | JoAnna Navarro, 1/26/2026 1:08 PM |
| **Portal Submitted By** | | **Date/Time Opened** | 1/26/2026 1:03 PM |
| **Parent Case** | | **ODI Link** | |
| **Parent Case Date Opened** | | | |

## Contact Information

### Open Case and Task

# # OF OPEN CASES: 4
# # OF OPEN TASKS: 1

### Account Information

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 18 of 156

**PURDUE GLOBAL**

PG Provost <provost@purdueglobal.edu>

## Re: Nicole Lawtone-Bowles - Academic Dishonesty

1 message

**Brian Victor** <brian.victor@purdueglobal.edu>                Thu, Jan 22, 2026 at 2:02 PM
To: PG Provost <provost@purdueglobal.edu>
Cc: Shaun Jamison <sjamison@purdueglobal.edu>

Hi JoAnna,

Thank you for the follow-up. To clarify the basis of this report, my primary concern is that the work submitted is not the student's own, whether it was sourced from another individual or generated by AI.

I am basing this submission on two key factors:

1. Production Timeline: The student completed the entire course curriculum in only six days. Most notably, all required essays, which require significant research and reflection were submitted on the same day. Producing this volume of detailed work in such a short window is highly unusual and, when combined with the student's lack of familiarity with the content, prompted my report.

2. Lack of Subject Mastery: When I questioned the student directly regarding the material she had supposedly mastered, she was unable to demonstrate even a basic understanding of the content. Additionally, in subsequent emails, she has asked me to explain the subject matter she supposedly studied and wrote about. For example, she has asked me about how equitable distribution differs from community property, which was the subject matter of the first essay she wrote.

This disconnect between the high quality of the submitted writing and the student's inability to discuss the material is a concern regarding authorship of her essays.

Regarding your question about sources, my concern is less about specific fabrications and more about the totality of the circumstances. The sheer speed of completion, combined with the student's lack of familiarity with their own "work," makes me question that these submissions do not represent her own intellectual effort.

Please let me know if you need any further information to move forward with the case.

Brian

Brian A. Victor
Adjunct Professor of Law
Purdue Global Law School
Phone: 858-633-3529
Email: brian.victor@purdueglobal.edu

On Thu, Jan 22, 2026 at 7:42 AM PG Provost <provost@purdueglobal.edu> wrote:

Greetings Professor,

I'm following up on your Academic Dishonesty submission for Nicole Lawtone-Bowles.

Per the submitted breach (attached), the student is being reported for Falsification of Authorship. However, it appears that the student may have used AI to complete the work. Additionally, I am unclear on the supporting documentation provided (attached). Did the student omit sources? If sources were included, were they fabricated? Any additional details regarding the reported breach will be greatly appreciated.

Thank you in advance.

**JoAnna Navarro**
Pronouns: she, her, hers
On behalf of the Office of the Provost

www.PurdueGlobal.edu

USDC IN/ND case 4:26-cv-00028-PPS-AZ     document 27-3     filed 04/30/26     page 19 of 156

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 20 of 156

**PURDUE GLOBAL.**                                              PG Plagiarism <plagiarism@purdueglobal.edu>

## Re: Nicole Lawtone-Bowles: Academic Dishonesty Appeal Received

1 message

**Brian Victor** <brian.victor@purdueglobal.edu>                                Wed, Jan 28, 2026 at 7:12 PM
To: PG Plagiarism <plagiarism@purdueglobal.edu>
Cc: Shaun Jamison <SJamison@purdueglobal.edu>

Hi JoAnna,
I am including information for the Essay Quiz for Modules 4,10,11. As far as Discussion for Module 11, I am not including that as a concern at this time. Please let me know if there is anything else you require from me.

I included the following documents:

- A short narrative of the situation, including a timeline of events
- The student's work as submitted and the Essay Questions
- Term syllabus
- Assignment instructions
- All email communication with the student regarding this matter and additional emails asking questions about the material.

Brian

On Wed, Jan 28, 2026 at 1:24 PM PG Plagiarism <plagiarism@purdueglobal.edu> wrote:
Dear Brian Victor,

Nicole Lawtone-Bowles has filed an appeal for the Academic Dishonesty violation of the Code of Student Conduct (CL760-01 Community Property, Modules 4, 10, and 11 Essay Quiz & Module 11 Discussion); attached.

To understand the situation better, thoroughly investigate the student's concern, and fully inform the Academic Appeals Committee, we would like additional documentation and background information from you.

You may submit a number of documents, which include, but not limited to, the following:

- A short narrative of the situation, including a timeline of events (required)
- The student's work as submitted
- TurnItIn report where applicable
- Term syllabus
- Assignment instructions
- Assignment Grading Rubric
- Gradebook comments (including both commentary and points awarded)
- Any remediation you offered
- All email communication with the student regarding this matter

Please submit the requested documentation within the next 5 business days. The Academic Appeals Committee will review the appeal and supporting documentation.

Please let me know if you have any questions.

Thank you.

**JoAnna Navarro**
Pronouns: she, her, hers
On behalf of the Office of the Provost

www.PurdueGlobal.edu

—
**Brian A. Victor**
Adjunct Professor of Law
Purdue Global Law School
**Phone:** 858-633-3529
**Email:** brian.victor@purdueglobal.edu



Purdue University Global holds itself
accountable to foster a culture that
promotes diversity and inclusion,
offering an environment that is fair,
equitable, and accessible for all.

Logo from the Princeton Review. ©2023 TPR Education. All rights reserved. Used under license.

---

**14 attachments**

📄 **Community Property Questions Emails to and from Student.docx**
34K

USDC IN/ND case 4:26-cv-00028-PPS-AZ   document 27-3   filed 04/30/26   page 22 of 156

**Email From Nicole her response 1-15-2026.docx**
30K

**CL760Syllabus.pdf**
262K

**Email From Nicole her fourth response 1-16-2026.docx**
32K

**Email From Nicole her second response 1-15-2026.docx**
30K

**Email From Nicole her third response 1-15-2026.docx**
27K

**Email to Nicole 1-14-2026 Request for Phone Call.docx**
20K

**Email to Nicole 1-15-2026 Clarification of Concerns.docx**
22K

**Email to Nicole 1-15-2026 Notice of Report.docx**
21K

**Modue 4 Essay Quiz Questions and Answers.docx**
24K

**Modue 10 Essay Quiz Questions and Answers.docx**
24K

**Module 11 Essay Quiz Questions and Answers.docx**
25K

**Module 4, 10, 11 Essay Quiz Assignment Instructions.docx**
15K

**Narrative of the Situation.docx**
20K

**Narrative of the Situation**

On January 14, 2026, I was reviewing the grades of all of my students in the CL-760 Community Property class and I noticed that Nicole Lawtone-Bowles had completed all of the course curriculum in only six days. Most notably, all required essays, which require significant research and reflection were submitted on the same day. Producing this volume of detailed work in such a short window is highly unusual.

I emailed Shaun Jamison and informed him of my concerns. He instructed me to have a conversation with the student.

I then emailed the student asking for a phone call with her and she wrote me back quickly saying I could call her now. I had a telephone conversation with the student on January 14 and informed her of my concerns. I asked if she had a Word document of the worksheet she was using to complete the quizzes, but she mentioned she studied this topic before, so she did not have a word document. I also asked her a question about how pensions get divided in California at time of divorce, which is something she would have studied to prepare to take the essay quizzes. She provided a brief answer of how it works in New York, and after repeating tangents, she was unable to provide the answer or even any theory as to how to obtain the answer. She was unable to demonstrate even a basic understanding of the content.

I discussed this phone call and my concerns with Shuan Jamison and he informed me I should make a report.

On January 15, 2026, I made a report of Academic Dishonesty. Later that day, I informed the student via email that I made the report. I sent her another email clarifying the issues I was concerned about. She has sent me 4 emails about this situation, which I have included in this documentation. She also sent me subsequent emails, asking me to explain the subject matter she supposedly studied and wrote about. For example, she has asked me about how equitable distribution differs from community property, which was the subject matter of the first essay she wrote. I have included these emails herein.

CL760 Community Property:

Inbox



**Brian Victor**

Wed, Jan 14, 2:31 PM

to me

From: "Brian Victor"
Subject: CL760 Community Property:
To: "Nicole Lawtone-Bowles"
Cc:
Bcc:

Hi Nicole,

I see that you have gone ahead all the way through the entire course in the span of a week. I would like to have a phone call with you to discuss that and see if you have any questions in any other aspects of the class material.
Let me know some days and times at work so we can have a brief call.

Professor Victor

CL760 Community Property:

Inbox



**Brian Victor**                                                    Thu, Jan 15, 9:11 AM
                                                                   (13 days ago)

to me

From: "Brian Victor"
Subject: CL760 Community Property:
To: "Nicole Lawtone-Bowles"
Cc:
Bcc:

Nicole,

I am writing to inform you that I have submitted a formal report to the Office of the Provost regarding your performance in Community Property. This is a standard procedural requirement when certain patterns are identified.

The report was initiated following a review of your course progress, specifically noting that all coursework including timed essay exams was completed in less than two weeks.

After consulting with the Associate Dean of Academics, I was advised that the speed and nature of this completion requires a formal review to ensure compliance with our institutional academic integrity standards.

The Provost's Office will contact you to discuss the next steps and any potential findings. Once you receive the official communication from their office, you will have the opportunity to appeal the decision.

Please understand that this is a standard procedural requirement when such patterns are identified. I encourage you to wait for the official notification from the Provost's Office for further guidance on the review process.

Professor Victor

Re: CL760 Community Property:

Inbox



**Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>** Thu, Jan 15, 9:29 AM

(13 days ago)

to me

Professor,

Unfortunately, this has been a recurring challenge for me as a student managing a documented disability, including obsessive-compulsive disorder. I am seeking clarification because I am struggling to understand how the course pacing policy is being applied in practice. When I fall behind, I understand and accept that there may be penalties, but I am confused as to why working ahead also appears to result in negative consequences when the course materials state that students may work at their own pace.

I want to be clear that my intention is not to circumvent course requirements, but to manage my workload responsibly in light of my disability-related limitations. The ambiguity surrounding pacing expectations has made it difficult for me to determine how best to stay compliant while also maintaining my health and academic performance. I would appreciate any guidance you can provide regarding how pacing flexibility is meant to function and whether accommodations apply in this context.

Thank you for your time and consideration.

Respectfully,

Nicole Lawtone-Bowles


Nicole Lawtone-Bowles

Certified Law Student

The State Bar of California's Practical Training of Law Students Program

Purdue Global Law School (formerly Concord Law School)

Juris Doctor August 25, 2026

Pronouns: She/Her

Adrains Place Inc

Nicole Lawtone-Bowles SSRN

Nicole Lawtone-Bowles LinkedIn

"Master your mind because a thought can ruin your whole day."

CL760 Community Property:

Inbox



**Brian Victor**                                                    Thu, Jan 15, 2:52 PM
                                                                   (13 days ago)

to me

From: "Brian Victor"
Subject: CL760 Community Property:
To: "Nicole Lawtone-Bowles"
Cc:
Bcc:

Nicole,

Based on your question, I sense it would be better to clarify the academic integrity issues while you wait to hear from the provost.

As I mentioned, your rapid progress through the course is what attracted a closer review of your work. In reviewing your work, I determined that it was not credibly your work based on a number of factors:

1. Completion of everything in the course within 6 days.

2. Completion of Module 4 essay quiz on 1/12/26, Module 10 essay quiz on 1/12/26, Module 11 essay quiz on 1/12/26, and Module 11 discussion on 1/12/26, which means you only had 6 days to study for all of the above work.

3. Despite the rapid and unlikely speed through the modules, the essays have detailed and mostly accurate rule statements. Meaning that, in each case, without knowing what the essay was on, you were able to recall the rule statements in detail.

4. Despite being able to rapidly complete each essay; Module 4 in 38 minutes with 575 words, Module 10 in 22 minutes with 760 words, Module 11 in 28 minutes with 896 words, you were able to complete the essays with logical organization and near perfect grammar and spelling. You were able to draft longer essays than most students in about half the time.

5. Despite having near perfect recall of the rules on the essay quizzes, you were unable to satisfactorily demonstrate knowledge of the rule regarding the division of pensions in California which I inquired about during our phone call.

6. Despite likely having drafted the exams in MS Word, you said you did not have any documentation or ability to show the properties of the files to me to demonstrate that you drafted and edited the documents.

I hope this clarifies the concerns.

Professor Victor

Re: CL760 Community Property:

Inbox

**Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>** Mar 15, 2026, 2:57 PM (13 days ago)

to me

Professor,

You only have a problem with how I work because I am a Black woman, specifically a Black disabled woman. I know exactly what this is, because I have been through this before. You are not the first white person who has taken issue with how I complete my work. For some reason, you believe that Black people are incapable or unintelligent, when in reality I am fully capable of reading, understanding, and comprehending complex material. There is nothing you can teach me that I cannot read and comprehend on my own.

Nicole Lawtone-Bowles

Certified Law Student

The State Bar of California's Practical Training of Law Students Program

Purdue Global Law School (formerly Concord Law School)

Juris Doctor August 25, 2026

Pronouns: She/Her

Adrains Place Inc

Nicole Lawtone-Bowles SSRN

Nicole Lawtone-Bowles LinkedIn

"Master your mind because a thought can ruin your whole day."

On Thu, Jan 15, 2026 at 17:52 Brian Victor <Brian.Victor@purdueglobal.edu> wrote:

Nicole,

Based on your question, I sense it would be better to clarify the academic integrity issues while you wait to hear from the provost.

As I mentioned, your rapid progress through the course is what attracted a closer review of your work. In reviewing your work, I determined that it was not credibly your work based on a number of factors:

1. Completion of everything in the course within 6 days.

2. Completion of Module 4 essay quiz on 1/12/26, Module 10 essay quiz on 1/12/26, Module 11 essay quiz on 1/12/26, and Module 11 discussion on 1/12/26, which means you only had 6 days to study for all of the above work.

3. Despite the rapid and unlikely speed through the modules, the essays have detailed and mostly accurate rule statements. Meaning that, in each case, without knowing what the essay was on, you were able to recall the rule statements in detail.

4. Despite being able to rapidly complete each essay; Module 4 in 38 minutes with 575 words, Module 10 in 22 minutes with 760 words, Module 11 in 28 minutes with 896 words, you were able to complete the essays with logical organization and near perfect grammar and spelling. You were able to draft longer essays than most students in about half the time.

5. Despite having near perfect recall of the rules on the essay quizzes, you were unable to satisfactorily demonstrate knowledge of the rule regarding the division of pensions in California which I inquired about during our phone call.

6. Despite likely having drafted the exams in MS Word, you said you did not have any documentation or ability to show the properties of the files to me to demonstrate that you drafted and edited the documents.

I hope this clarifies the concerns.

Professor Victor



**Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>** 6:05 PM

(13 days ago)

to me

Professor,

Explain this to me. The Virtual Office says this: "This space is set aside for you to ask questions about the course. However, **this is not a place to discuss graded assessments such as quizzes or essays that you have started or finished as students work at their own pace** and sharing information on assessments is a violation of the Student Conduct Code."



**Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>** Mar 16, 2026,
2:40 AM (12 days ago)

to martin.pritikin, jfishman@purdueglobal.edu, Monica, Toni, studentrelations, me

Dear Professor Victor,

Thank you for outlining the concerns regarding my coursework while I await further guidance from the Provost. I take academic integrity extremely seriously, and I want to respond clearly and directly to each point you raised so there is no misunderstanding regarding my work, my process, or my accommodations.

First, my completion of the course within six days reflects my documented learning style and disability-related work patterns rather than misconduct. I have obsessive-compulsive disorder, which makes it extremely difficult for me to leave assigned tasks unfinished once they are available. When coursework opens, I work continuously until it is completed, as leaving work undone causes significant cognitive distress. This approach has been consistent throughout my academic career and is not new to this course.

Second, completing multiple modules and assessments within a short timeframe does not mean I only studied for six days. I study continuously and cumulatively through listening to audiobooks, watching recorded lectures, reviewing outlines, and repeated exposure to the material over time. I also intentionally use law school coursework as structured practice for bar examination preparation, which requires writing under severe time constraints. My ability to move quickly reflects prior preparation and repetition, not the absence of study.

Third, my ability to recall rule statements accurately is the result of memorization through repeated exposure and structured review, not artificial intelligence. I do not answer questions without understanding the law, and I rely heavily on pattern recognition developed through extensive practice. That said, recall under exam conditions and recall during spontaneous oral questioning are not the same cognitive task.

Being unable to immediately answer a pension-division question during a phone call does not negate my demonstrated written mastery across multiple assessments. That phone questioning caused me significant distress and PTSD-related symptoms because it occurred after I had finished a full workday while I was driving home in traffic. Under those

circumstances, the questioning was stressful, inappropriate, and should not have occurred.

Fourth, my writing speed, organization, grammar, and spelling are directly related to my approved accommodations. I use Dragon speech-to-text software because of my disability, which allows me to dictate rather than type. Dictation produces fluent, grammatically correct text more quickly than manual typing, particularly for someone trained in structured legal writing. This is not unusual for dictation users and should not be interpreted as evidence of AI use.

Fifth, with respect to file documentation, I did not intentionally withhold information. I draft my work through dictation software integrated with accessibility tools, and I was not previously informed that I would need to preserve or extract metadata from those files. I am willing to cooperate fully with any reasonable request to demonstrate my drafting process going forward, provided such requests account for disability accommodations and assistive technology.

Finally, I am deeply concerned that my pace of work, use of approved accommodations, and demonstrated competence are being treated as indicators of misconduct rather than diligence. I am committed to transparency and fairness, and I respectfully request that my work be evaluated based on evidence rather than assumptions about how long learning "should" take or how a student "should" perform.

I appreciate the opportunity to clarify these issues and remain available to provide any additional information requested through the appropriate academic integrity process.

Sincerely,

Nicole Lawtone-Bowles

CL760 Community Property: Question

Inbox



**Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>** Jun 18, 4:06 PM

(10 days ago)

to me

Professor,
How does California's community property system, as influenced by Spanish civil law traditions, differ in both theory and practical outcomes from common law marital property systems when it comes to ownership, control, and division of property acquired during marriage?

Nicole Lawtone-Bowles

Certified Law Student

The State Bar of California's Practical Training of Law Students Program

Adrains Place Inc 501(c)(3)

Phi Alpha Delta

Bar Exam Essay Rules

Free Themis Outlines from LexisNexis

TestMax BarMax Bar Prep

National Conference of Bar Examiners
Studicata



**Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>** Jun 18, 4:16 PM

(10 days ago)

to me

Professor,

Given that California does not apply community property principles to unmarried cohabitants, how should courts balance freedom of contract under Marvin v. Marvin with equitable doctrines such as constructive and resulting trusts when one partner contributes income to jointly managed finances but title to major assets and retirement accounts remains solely in the other partner's name, particularly upon the titled partner's death?



**Brian Victor <brian.victor@purdueglobal.edu>**　　　　Mon, Jan 19, 9:02 AM (9 days ago)

to Nicole

It sounds like you are asking what is the difference between equitable distribution states and community property states as a relates to distribution of assets at divorce. We will discuss this in much more detail in module four. However, the differences are basically that in an equitable distribution state, they don't divide assets by what is 50-50, they do it by is equitable and fair, and just. Therefore, the division at time of divorce of marital property may be 50-50, less, or more or whereas in community property states it is going to be 50-50 unless there is a reason it shouldn't be.

Brian A. Victor
Adjunct Professor of Law
Purdue Global Law School
Phone: 858-633-3529
Email: brian.victor@purdueglobal.edu



**Brian Victor <brian.victor@purdueglobal.edu>**　　　　Mon, Jan 19, 10:05 AM (9 days ago)

to Nicole

We will study Marvin V Marvin and cohabitants much later this semester. The bottom line is that if there are cohabitants in California that are not married and they buy property then they will be distributed outside of Family court in civil court via contract law. Retirement accounts may be different, because if you are allowed to have a beneficiary as part of the plan, you can name anyone you want as a beneficiary and the court is not going to get involved in that matter

Brian A. Victor
Adjunct Professor of Law
Purdue Global Law School
Phone: 858-633-3529
Email: brian.victor@purdueglobal.edu

**Nicole Lawtone-Bowles**                                          Mon, Jan 19, 11:40 AM (9 days ago)

to me

Professor Victor,

Thank you for the clarification regarding the distinction between equitable distribution states and community property states, particularly the default 50–50 division in California absent a statutory or equitable basis to deviate. That framework is helpful in situating the discussion.

My remaining question is more narrowly focused on how California reconciles that rigid equal-division rule with Family Code § 2641, which treats education and training acquired during marriage as non-property, yet permits reimbursement based on equitable considerations. Specifically, when community funds were used for one spouse's education but the community realized little or no benefit before separation, is reimbursement best understood as a limited equitable remedy operating within the community property system rather than a deviation from equal division? I am trying to understand whether § 2641

functions as an exception grounded in equity, or simply as a statutory reimbursement mechanism that leaves the 50–50 property division formally intact.

Thank you again, and I look forward to exploring this further in Module Four.

Respectfully,

Nicole Lawtone-Bowles

**Nicole Lawtone-Bowles**                                    Jan 19, 2026,
                                                             11:42 AM (9 days
                                                             ago)

to me

Professor Victor,

Thank you for the clarification regarding unmarried cohabitants and the distinction between family law and civil remedies in California. Your explanation that property disputes between nonmarried cohabitants are resolved in civil court under contract principles, rather than through community property rules, is very helpful.

I also appreciate the clarification regarding retirement accounts and beneficiary designations, particularly that valid beneficiary elections generally operate outside court involvement. That distinction helps frame how far Marvin-based claims can realistically extend in practice.

Thank you again for the guidance, and I look forward to covering Marvin v. Marvin in greater depth later in the semester.

Respectfully,

Nicole Lawtone-Bowles

CL760 Community Property: Question

Inbox



**Module 4 Essay Quiz**

Use the three-step source, actions, presumptions (SAP) approach to help you spot the issues and organize your answer. Within the SAP approach, the IRAC writing method is used to discuss each issue and sub-issue raised by the facts. You start by reading the hypothetical below:

Harold purchased 100 shares of ABCDE stock for $20 a share in 1991. He met Wendy in 1994, and they dated for three years. In 1997, Harold and Wendy were married in Florida. At the time of their marriage, ABCDE stock was worth $40 a share.

Harold and Wendy had two children, James and Tania. Wendy was an accountant, and she and Harold decided Wendy would stop working and raise the children. Harold was a loan officer and continued to work while Wendy was responsible for taking the children to all of their activities, helping them with homework, and taking them to medical appointments.

In 2005, Harold sold 20 shares of ABCDE stock at $50 a share for $1,000. He then purchased 50 shares of Acument stock at $20 a share. Instead of using the $1,000 from his sale of ABCDE stock, he used his business earnings for the week to purchase it.

In 2015, Wendy decided she was tired of being married to Harold since he never helped out with the children, and she filed for divorce in Florida. Wendy is asking the court to provide her with the $1,000 Harold sold ABCDE stock for as well as 50% of the ABCDE stock, and she is requesting the entire Acument stock.

What are Harold and Wendy's respective rights in the following?

1. The ABCDE stock, which is now worth $40,000? Discuss.

2. The Acument stock, which is now worth $20,000? Discuss.

Answer according to equitable distribution law.

1. ABCDE Stock (Now Worth $40,000)

Source

Harold acquired the 100 shares of ABCDE stock in 1991, several years before his marriage to Wendy in 1997. Because the stock was acquired prior to marriage, it is initially classified as nonmarital property under equitable distribution law. The increase in value of the stock before marriage does not alter its classification, as premarital appreciation remains nonmarital.

Actions

During the marriage, Harold sold 20 shares of ABCDE stock in 2005 for $1,000, while retaining the remaining 80 shares. There is no indication that marital funds were invested into the ABCDE stock or that Wendy directly participated in managing or enhancing the stock as an asset. Wendy's contributions during the marriage were primarily domestic and caretaking in nature, which supported the marital household but did not directly affect the stock's performance.

Presumptions

Nonmarital property is presumed to remain nonmarital unless it is transformed through commingling, transmutation, or active appreciation attributable to marital efforts. Passive market-driven appreciation remains nonmarital. Here, there is no evidence that Harold's labor as a loan officer or Wendy's domestic contributions caused active appreciation of the ABCDE stock.

Conclusion as to ABCDE Stock

The ABCDE stock retains its nonmarital character because it was acquired before marriage and was not altered by marital actions. Wendy is therefore not entitled to 50% of the remaining ABCDE stock now valued at $40,000. The $1,000 proceeds from the sale of 20 shares likewise retain their nonmarital character because they are directly traceable to Harold's premarital asset and were not commingled or converted. Accordingly, Wendy has no ownership interest in either the remaining ABCDE stock or the sale proceeds, though her contributions may be considered elsewhere in equitable distribution.

2. Acument Stock (Now Worth $20,000)

Source

The Acument stock was acquired in 2005, well after the parties were married. Property acquired during marriage is presumptively marital property under equitable distribution principles. Although Harold had nonmarital funds available from the ABCDE stock sale, those funds were not used to acquire the Acument stock.

Actions

Harold used his business earnings for the week to purchase 50 shares of Acument stock at $20 per share. Income earned by either spouse during marriage is marital property, regardless of which spouse earned it. As a result, the funds used to purchase the Acument stock were marital in nature.

Presumptions

There is a strong presumption that property acquired during marriage with marital earnings is marital property. That presumption is not rebutted here because Harold cannot trace the purchase to a nonmarital source. There is also no evidence of an agreement designating the Acument stock as Harold's separate property.

Conclusion as to Acument Stock

The Acument stock is entirely marital property and subject to equitable distribution. Wendy is therefore entitled to an equitable share of its $20,000 value. In determining the appropriate division, the court may consider Wendy's decision to leave her accounting career, her role as primary caregiver, and Harold's limited involvement in childcare. While Wendy's request for the entire Acument stock may be excessive, the court could reasonably award her at least 50%, and potentially more, depending on its assessment of fairness.

Overall Conclusion

Harold retains full ownership of the ABCDE stock and the $1,000 proceeds as nonmarital property. The Acument stock is marital property, and Wendy is entitled to an equitable portion based on the

circumstances of the marriage. The court's ultimate division will balance property classification with fairness considerations inherent in equitable distribution law.

**Module 10 Essay Quiz**

Use the three-step source, actions, presumptions (SAP) approach to help you spot the issues and organize your answer. Within the SAP approach, the IRAC writing method is used to discuss each issue and sub-issue raised by the facts. You start by reading the hypothetical below:

Hap and Winnie were married in Los Angeles in 2000. Hap was working as a lawyer in a large law firm at the time. Winnie had been working as Hap's secretary in the same law firm, and in 2000, at Hap's encouragement, she returned to school to get a law degree. Winnie graduated in 2004, passed the bar exam that same year, and by 2005, the couple opened their own firm, Hap taking several of his biggest clients with him.

In 2001, Winnie perfected and sold a computer program that she had been working on for the prior two years, which was of great use to law firm lawyers and was thus quite profitable.

The couple lived from the time they were married until they were divorced (in December 2007) in the large Los Angeles home Hap bought in 1999, though they often worked remotely from the condo they bought in 2002 in Ventura, CA.

What are Hap's and Winnie's respective rights to the following?

1.  Winnie's computer program profits

2.  The couple's law practice

3.  The Los Angeles house

4.  The Ventura condo

5.  Hap's claim to reimbursement of expenses for Winnie's legal education

Discuss each and answer according to California law.

1. Winnie's Computer Program Profits

Source.
Winnie began working on the computer program two years before the marriage, meaning the initial idea and development originated before marriage. However, the program was perfected and sold in 2001, after the marriage began. Intellectual property is characterized by when the right to receive income arises, not merely when the idea is conceived.

Actions.
Winnie continued development during marriage and completed the program during marriage, at which point it became marketable and generated profits. The labor, skill, and effort expended during marriage are presumptively community efforts. The profits arose because the program was finalized, sold, and exploited during marriage.

Presumptions and Conclusion.
Property acquired during marriage is presumed community property unless traceable to a separate source. Although the idea predated marriage, the profits were generated by substantial community labor during marriage. Accordingly, the computer program itself may be treated as a mixed asset,

but the profits generated during marriage are community property, to be divided equally between Hap and Winnie upon divorce.

2. The Couple's Law Practice

Source.
The law firm was opened in 2005, well after the marriage began. Any business formed during marriage is presumptively community property unless established with separate property and insulated from community efforts.

Actions.
Hap contributed existing clients from his prior employment, and both spouses worked in the firm. Winnie contributed her labor as a newly licensed attorney, and Hap contributed his professional reputation, experience, and client relationships. Both spouses' time, skill, and effort during marriage were devoted to the practice.

Presumptions and Conclusion.
Because the firm was created during marriage and operated using community labor, it is community property. Even if Hap argues that some client relationships predated marriage, the income and goodwill generated during marriage are attributable to community efforts. The law practice, including any goodwill developed during marriage, is subject to equal division.

3. The Los Angeles House

Source.
Hap purchased the Los Angeles house in 1999, before marriage. Property acquired before marriage is separate property by source.

Actions.
The couple lived in the home throughout the marriage. There are no facts indicating that community funds were used to pay down principal on a mortgage, nor that title was changed. Mere use of separate property as the family residence does not change its character.

Presumptions and Conclusion.
The house remains Hap's separate property. However, if community funds were used to reduce principal on a purchase-money mortgage, the community would acquire a pro rata ownership interest under Moore. Absent such facts, the community has no ownership interest, though it could potentially claim reimbursement if community funds were used for principal reduction. Based on the facts given, Hap retains sole ownership.

4. The Ventura Condo

Source.
The Ventura condo was purchased in 2002, during the marriage. Property acquired during marriage is presumptively community property.

Actions.
The condo was used by both spouses and purchased while the marital community was intact.

There is no indication that separate property funds were used for the purchase or that title was taken in a manner rebutting the community presumption.

Presumptions and Conclusion.
Because the condo was acquired during marriage and no tracing to separate property is provided, it is community property, to be divided equally between Hap and Winnie at divorce.

5. Hap's Claim for Reimbursement of Winnie's Legal Education

Source.
Winnie pursued her law degree during marriage, beginning in 2000 and completing it in 2004. Educational degrees and professional licenses are not property and are not divisible at divorce.

Actions.
Community funds were presumably used to pay for Winnie's tuition and related educational expenses. Winnie obtained the degree during marriage and shortly thereafter used it to practice law in the community firm.

Presumptions and Conclusion.
Under California law, the exclusive remedy for a supporting spouse is reimbursement to the community for community contributions to education that substantially enhance earning capacity. Hap may claim reimbursement of community funds used for tuition, fees, books, and related costs, with interest. However, reimbursement may be reduced or eliminated if the community has substantially benefited from the education. Because Winnie practiced law for several years before divorce and contributed to the community law practice, a court may find that the community substantially benefited, potentially reducing or eliminating reimbursement. The claim is therefore available but subject to reduction based on the community benefit.

Overall Conclusion

Winnie's computer program profits: Community property to the extent generated during marriage.

The law practice: Community property, including goodwill developed during marriage.

Los Angeles house: Hap's separate property, absent evidence of community principal payments.

Ventura condo: Community property, divided equally.

Reimbursement for legal education: Available in principle but subject to reduction if the community substantially benefited.

**Module 11 Essay Quiz**

Use the three-step source, actions, presumptions (SAP) approach as it will help you spot the issues and organize your answer. Within the SAP approach, the IRAC writing method is used to discuss each issue and sub-issue raised by the facts. You start by reading the hypothetical below:

All of the following events occurred in California.

In 2000, Harriet's grandfather died and left her a 100-acre parcel known as Goldenacre. Goldenacre was undeveloped land located in a rural area. In 2002, Harriet met Walter through an online dating service. In 2005, Harriet and Walter were married.

Harriet and Walter have been living on Harriet's earnings from her job as a college professor. Walter's earnings from his job as a mechanic for Urban Motors were placed in a savings account in his name alone.

In 2008, Walter's uncle, who was also a mechanic, died and left him ownership of his auto repair shop. Walter immediately quit his job at Urban Motors and began sole management of the auto repair shop. Because of Walter's expertise, the auto repair shop flourished.

In 2010, Harriet contracted in her name alone with a builder to construct a cabin on Goldenacre. Harriet paid the builder $1,000 per month for 10 months from her earnings.

In 2013, Harriet and Walter decided to separate. An independent analysis determined that Goldenacre was worth $100,000 in its undeveloped state and that the cabin built in 2010 had increased the value of Goldenacre by $25,000. The analysis also determined that the auto repair shop was worth $50,000 in 2008 and is now worth $100,000.

What are Harriet's and Walter's respective rights in:

1.  Goldenacre? Discuss.

2.  The savings account? Discuss.

3.  The auto repair shop? Discuss.

Answer according to California law.

I. Goldenacre

Goldenacre was acquired by Harriet in 2000 through inheritance from her grandfather, which establishes its character by source as Harriet's separate property. Property acquired by gift or inheritance before or during marriage is separate property, and this characterization is fixed at acquisition. Walter has no ownership interest in Goldenacre itself because he did not contribute separate property to its acquisition, and no transmutation occurred. The community property presumption does not apply because the land was not acquired during marriage by onerous title. Accordingly, Goldenacre remains Harriet's separate property unless community actions give rise to reimbursement or apportionment rights.

The construction of the cabin in 2010 raises an actions issue involving community property used to improve one spouse's separate real property. Harriet paid the builder $1,000 per month for ten

months using her earnings, and earnings during marriage are community property. When community funds are used to improve one spouse's separate real property, the community does not acquire an ownership interest due to the law of fixtures. Instead, the community is entitled to reimbursement.

Under California law, when community property improves separate property, the community is entitled to reimbursement for either the amount of community funds expended or the increased value attributable to the improvement, but not both. Here, the community paid $10,000 toward construction, and the cabin increased Goldenacre's value by $25,000. The community is therefore entitled to reimbursement of $25,000, the greater amount. That reimbursement is community property and must be divided equally between Harriet and Walter, giving each spouse $12,500.

Thus, Goldenacre itself remains Harriet's separate property, now valued at $125,000, subject to a $25,000 community reimbursement claim. After reimbursement, Harriet retains the land and cabin as her separate property, while each spouse receives $12,500 as their respective shares of the community reimbursement.

II. The Savings Account

Walter's earnings from his job at Urban Motors were placed into a savings account titled in his name alone. Earnings during marriage are presumptively community property under California law, regardless of which spouse earned them or how they are titled. Title in one spouse's name alone does not rebut the community property presumption for earnings. There is no evidence that Walter's earnings were separate property, nor that they were traceable to a separate source.

The fact that the savings account is in Walter's name alone is relevant only to management and control, not characterization. California Financial Code provisions limit access to accounts titled in one spouse's name, but they do not alter the underlying character of the funds. No evidence suggests a valid transmutation converting the earnings to Walter's separate property, as no express written declaration exists.

Accordingly, the savings account is community property in its entirety. Upon separation, Harriet and Walter are each entitled to one-half of the account balance, regardless of Walter's unilateral control during marriage.

III. The Auto Repair Shop

Walter acquired ownership of the auto repair shop in 2008 by inheritance from his uncle. By source, the shop is Walter's separate property because it was acquired by inheritance during marriage. Harriet has no ownership interest in the business based on acquisition alone. However, the significant increase in value of the business during marriage raises an actions issue involving value enhancement of a separate property business through community effort.

After acquiring the shop, Walter quit his job and devoted his full time, skill, and labor to managing the business. Under California law, the time, skill, and efforts of a spouse during marriage are community property. When a separate property business increases in value during marriage due to the owner-spouse's efforts, the business becomes a mixed asset, and the increased value must be apportioned between separate and community property.

The auto repair shop was worth $50,000 in 2008 and is worth $100,000 at separation, reflecting a $50,000 increase in value. Two apportionment methods apply: Pereira and Van Camp. Pereira is used when the increase is primarily attributable to the owner-spouse's labor, while Van Camp applies when the increase is primarily due to the inherent nature or capital of the business.

Here, the facts indicate that the shop flourished because of Walter's expertise and personal management. This suggests that community labor was the primary cause of the appreciation, making Pereira the appropriate method. Under Pereira, the court allocates a reasonable rate of return on the original separate property investment to Walter's separate estate, with the remaining appreciation characterized as community property.

Although the facts do not provide sufficient numerical detail to calculate a precise reasonable rate of return, the analysis requires that Walter receive the original $50,000 value plus a reasonable return as his separate property. The remaining portion of the $50,000 appreciation is community property, to be divided equally between Harriet and Walter. Thus, Harriet is entitled to one-half of the community share of the appreciation, while Walter retains his separate property interest plus his one-half share of the community portion.

Conclusion

Goldenacre is Harriet's separate property by inheritance, subject to a $25,000 community reimbursement claim for improvements made with community funds, resulting in $12,500 payable to each spouse. The savings account is community property because it consists entirely of Walter's earnings during marriage, entitling each spouse to one-half. The auto repair shop is Walter's separate property by inheritance, but its appreciation during marriage must be apportioned, with the community entitled to a share of the increased value attributable to Walter's marital labor.

1. ABCDE Stock (Now Worth $40,000)

Source

Harold acquired the 100 shares of ABCDE stock in 1991, several years before his marriage to Wendy in 1997. Because the stock was acquired prior to marriage, it is initially classified as nonmarital property under equitable distribution law. The increase in value of the stock before marriage does not alter its classification, as premarital appreciation remains nonmarital.

Actions

During the marriage, Harold sold 20 shares of ABCDE stock in 2005 for $1,000, while retaining the remaining 80 shares. There is no indication that marital funds were invested into the ABCDE stock or that Wendy directly participated in managing or enhancing the stock as an asset. Wendy's contributions during the marriage were primarily domestic and caretaking in nature, which supported the marital household but did not directly affect the stock's performance.

Presumptions

Nonmarital property is presumed to remain nonmarital unless it is transformed through commingling, transmutation, or active appreciation attributable to marital efforts. Passive market-driven appreciation remains nonmarital. Here, there is no evidence that Harold's labor as a loan officer or Wendy's domestic contributions caused active appreciation of the ABCDE stock.

Conclusion as to ABCDE Stock

The ABCDE stock retains its nonmarital character because it was acquired before marriage and was not altered by marital actions. Wendy is therefore not entitled to 50% of the remaining ABCDE stock now valued at $40,000. The $1,000 proceeds from the sale of 20 shares likewise retain their nonmarital character because they are directly traceable to Harold's premarital asset and were not commingled or converted. Accordingly, Wendy has no ownership interest in either the remaining ABCDE stock or the sale proceeds, though her contributions may be considered elsewhere in equitable distribution.

2. Acument Stock (Now Worth $20,000)

Source

The Acument stock was acquired in 2005, well after the parties were married. Property acquired during marriage is presumptively marital property under equitable distribution

principles. Although Harold had nonmarital funds available from the ABCDE stock sale, those funds were not used to acquire the Acument stock.

Actions

Harold used his business earnings for the week to purchase 50 shares of Acument stock at $20 per share. Income earned by either spouse during marriage is marital property, regardless of which spouse earned it. As a result, the funds used to purchase the Acument stock were marital in nature.

Presumptions

There is a strong presumption that property acquired during marriage with marital earnings is marital property. That presumption is not rebutted here because Harold cannot trace the purchase to a nonmarital source. There is also no evidence of an agreement designating the Acument stock as Harold's separate property.

Conclusion as to Acument Stock

The Acument stock is entirely marital property and subject to equitable distribution. Wendy is therefore entitled to an equitable share of its $20,000 value. In determining the appropriate division, the court may consider Wendy's decision to leave her accounting career, her role as primary caregiver, and Harold's limited involvement in childcare. While Wendy's request for the entire Acument stock may be excessive, the court could reasonably award her at least 50%, and potentially more, depending on its assessment of fairness.

Overall Conclusion

Harold retains full ownership of the ABCDE stock and the $1,000 proceeds as nonmarital property. The Acument stock is marital property, and Wendy is entitled to an equitable portion based on the circumstances of the marriage. The court's ultimate division will balance property classification with fairness considerations inherent in equitable distribution law.

Module 4 Module 10 and Module 11 Essay Quiz Assignment Instructions

This Essay Quiz includes a hypothetical. You will write an essay answer, and then after you submit your completed Essay Quiz, you will receive a model answer.



# Course Syllabus

## CL760 Community Property

## COURSE INFORMATION

**Course Title:**     Community Property

**Credit Hours:**     2

**Prerequisites:**    None

## COURSE DESCRIPTION

This course covers the Law of Community Property and Division of Marital Assets in California as well as equitable distribution of property as applied in other jurisdictions. Specific topics include the characterization of property as separate or community, creditors' rights, third-party transfers, and the resolving of disputes upon the termination of a relationship or the death of a party.

## LEARNING OUTCOMES

By the end of this course, you should be able to:

**CL760-1:**    Analyze community property fact patterns using applicable authority to determine the appropriate division of marital property under California law.

**CL760-2:**    Analyze community property fact patterns using applicable statutory and case authority that governs apportionment of enhanced value of a separate property business during marriage between separate property and community property.

**CL760-3:**    Use IRAC format to write in a clear, organized, professional manner.

**CL760-4:**    Analyze fact patterns utilizing applicable statutory and case authority that governs the distribution of property during the divorce process to determine how equitable distribution varies from community property.

**PC-3.2:**    Interact with others in a professional manner using appropriate communication and presentation skills.

## COURSE MATERIALS

**Access Instructor Contact Information**

Contact the bookstore for a list of required textbooks.

## TEXTBOOK INFORMATION

MediaType:   Physical
Title:       Community Property in California
Edition:     8th (2021)
Author:      Blumberg, Grace
Publisher:   Wolters Kluwer
Book ISBN:   978-1543804409
Ebook ISBN:

## SOFTWARE REQUIREMENTS

The following software requirements are required in this course beyond the ones listed in the catalog:

**No additional technology requirements beyond those in the Purdue Global Catalog.**

## GRADING CRITERIA/COURSE EVALUATION

| Gradebook | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 | M13 | M14 | M15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Discussion | | | | | | | | | | | 44 | | | | | 44 |
| Seminar | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 26 |
| Quiz | | 10 | 10 | 60 | 40 | 10 | 10 | 10 | 10 | 140 | 160 | 10 | 10 | | | 480 |
| Final | | | | | | | | | | | | | | | 450 | 450 |
| Total | 0 | 12 | 12 | 62 | 42 | 12 | 12 | 12 | 12 | 142 | 206 | 12 | 12 | 2 | 450 | 1000 |

## SPECIFIC PROGRAM/COURSE REQUIREMENTS

Page 2

**Course Outline**

Each module may include readings, one or more video presentations and learning activities, graded assignment and quizzes, a discussion (graded or ungraded), and a Seminar. The learning activities are non-graded activities that will help you apply what you learned about in the presentations.

Download the Course Outline

# PURDUE UNIVERSITY GLOBAL GRADING SCALE

| Grade | Points | Percent | Grade Point |
|---|---|---|---|
| A | 83-100 | 83%-100% | 4.0 |
| A- | 80-82 | 80%-82% | 3.7 |
| B+ | 78-79 | 78%-79% | 3.3 |
| B | 73-77 | 73%-77% | 3.0 |
| B- | 70-72 | 70%-72% | 2.7 |
| C+ | 68-69 | 68%-69% | 2.3 |
| C | 63-67 | 63%-67% | 2.0 |
| C- | 60-62 | 60%-62% | 1.7 |
| D+ | 58-59 | 58%-59% | 1.3 |
| D | 53-57 | 53%-57% | 1.0 |
| D- | 50-52 | 50%-52% | 0.7 |
| F | Below 50 | Below 50% | 0.0 |

# INSTRUCTOR'S GRADING CRITERIA/TIMETABLE

Interim essays and other short assignments will typically be graded within approximately 6 days of submission. Other Assignments may take longer to grade.

Page 3

<u>Final course grades are not rounded</u>

For more information about grading, please review the following videos:

<u>Understanding Essay Scores and Grading Scale</u>

<u>Understanding Rubrics</u>

## POLICIES

Students who wish to review current policies (academic appeals, attendance/tardiness, etc.) should refer to the <u>Policy Information</u> in the current Purdue University Global's Catalog.

Purdue University Global's Artificial Intelligence (AI) Policy and Resources can be found on the <u>PG Center for Teaching and Learning's website</u>. Students are encouraged to review the posted policy and refer to course materials for detailed guidance on AI use within each individual course.

As a student, you work hard to earn your degree. Protect the integrity of your work. Do not share your assignments, papers, quizzes, tests, etc. with other students. Do not directly or indirectly share your work by posting it to a third party website. Do not make use of another student's work in any academic activity. Unless specifically instructed to work in groups, do not collaborate with your classmates on assignments or tests. These actions violate the Purdue University Global <u>Code of Student Conduct</u> policy and, as a result, carry consequences. In some cases, students who are found in violation of these policies are dismissed from the University. You can also review the Writing with Integrity document located in Academic Tools in your course.

If you have questions about these policies, please review these policies in the catalog and contact your instructor.

**ACADEMIC ACCOMMODATIONS** - If there are any academic accommodations you feel would be helpful to you in your classes, please do not hesitate to reach out to <u>Student Accessibility Services</u> (SAS) for assistance.

*NOTE: The contact information below is to request academic accommodations only and should not be used to contact your instructor. You can contact your instructor through the Brightspace classroom.*

Tel: 317-208-1686

Fax:866-422-4773 (Toll Free)
TTY: TTY users may dial 711 from their TTY phone, at no charge, to be connected with a
Telecommunications Relay Services (TRS) operator who will assist with the call.

Accommodations cannot be granted retroactively and you are required to submit supporting
documentation needed to process the request.

## COURSE SPECIFIC POLICIES

**Standard Late Policy**

The following policies are designed to balance the flexibility inherent in an online program with
the need to incentivize students not to fall so far behind that they jeopardize their learning or
withdraw from the course. These policies only apply to professor-graded essay quizzes or other
major Assignments (i.e., those worth 50 points or more) (collectively, "Submissions"), unless
otherwise specified by the professor.

An assignment is considered "due" on the Module Completion Date of the module in which it is
assigned as set out in the Standard Progress Module Calendar for the course (i.e., the Due
Date).

If a student submits a Submission within 14 days (two modules) after the Due Date, there will be
no late penalty.

If a student submits a Submission from 15 through 28 days (three to four modules) after the Due
Date, it will be accepted but assessed a penalty of 10% off the total possible points.

For example: For a Submission worth 100 points, if a student submits it 15 days after the Due
Date and it would have received a 70 if timely submitted, the student will instead receive a
grade of 70 less 10 = 60. To be clear, the percentage deduction is based on the total number of
points in the assignment, not the student's grade (i.e., in the current example, 70 less [10% of
70] = 63 is not the correct calculation).

Page 5

If a student submits a Submission more than 28 days (five or more modules) after the Due Date, it will be accepted but assessed a penalty of 50% off the total possible points.

For example: A Submission worth 100 points submitted 29 days after the Due Date, which would have received a 70 if timely submitted, will instead receive a grade of 70 less 50 = 20.

The above policies are subject to the general rule that professor-graded Submissions must be received no later than 7 days before the scheduled final exam in order to receive any credit.

Example: Module 15 has a scheduled final exam on April 30. Suppose Module 12 has a scheduled assignment with a Due Date on March 31, which is 30 days before the final exam. A Submission due in Module 12 but received 15 days later on April 15 would receive a 10% penalty, but if not received until 25 days later on April 25, it would receive a zero, even though it is within 28 days past the Due Date, because it is submitted less than 7 days before the final exam in Module 15, i.e., April 23.

For those courses that don't have a scheduled final exam, please check with your professor through the classroom announcements in regard to final due dates. Late work will not be accepted after the last day of the term.

To view the Standard Module Progress Calendar, please view your course announcements.

## LATE POLICY

Please refer to the course specific late policies.

For those courses that don't have a scheduled final exam, please check with your professor through the classroom announcements in regard to final due dates. Late work will not be accepted after the last day of the term **unless there is a completed** Incomplete Grade **approval.** To view the Standard Module Progress Calendar, please view your course announcements.

## TUTORING

order to earn points. Refer to the grading rubric for awarding points for the live seminar or alternative assignment.

Seminar topics and/or pre-work, if applicable, can be found in Course Resources.

Your professor may also schedule ungraded seminars such as final reviews. These seminars may be taken into consideration for general participation credits (if applicable in your course), but are not graded or required unless so indicated by the instructor.

**Seminar Participation**

Attending Seminars or reviewing the recording of the Seminars if you cannot attend is a required part of this course. You are responsible for any information presented in the seminar. The seminar lasts about one hour. If you are not able to attend, please review the recording. If you have questions or concerns, please send them to your professor in an email.

**How to Access the Seminar**

You can view scheduled Seminars for each individual class in the Seminar option under More Tools in the Navbar. We recommend you add your Seminars to your own calendaring system at the beginning of the term, and as you watch, either live or archive, check them off to create your attendance record.

For more instructions on accessing Seminar, please use the Brightspace Help Resources under the Help menu in the course.

# DISCUSSION BOARDS

Some courses include asynchronous discussions. If your course includes discussions, a description of the discussion topics and participation expectations can be found under the relevant modules in the course.

If the Discussion Board is used in this course, it will provide an opportunity for you to discuss issues related to the course, and to apply the concepts included in the course to real-world problems, scenarios, and case studies. Your classmates bring diverse perspectives and

Page 11

experiences to discussion topics—another valuable learning source. The instructor will interact with students within the Discussion Board. If the discussion is graded, grades will be posted as indicated in the Grades section of the course.

## RUBRICS

Grading rubrics are used to outline the grading criteria for your assignments.

## NETIQUETTE

Interactions in an online classroom can be in written form as well as in audio or video. Your comfort level with expressing ideas and feelings in writing will add to your success in an online course. The ability to write is necessary, but you also need to understand what is considered appropriate when communicating online.

The word "netiquette" is short for "Internet etiquette." Rules of netiquette have grown organically with the growth of the Internet to help users act responsibly when they access or transmit information online. As a student, you should be aware of the common rules of netiquette for the web and employ a communication style that follows these guidelines.

- Wait to respond to a message that upsets you and be careful of what you say and how you say it.
- Be considerate. Rude or threatening language, inflammatory assertions (often referred to as "flaming"), personal attacks, and other inappropriate communication will not be tolerated.
- Never post a message that is in all capital letters — it comes across to the reader as SHOUTING! Use boldface and italics sparingly, as they can denote sarcasm.
- Keep messages short and to the point.
- Always practice good grammar, punctuation, and composition. This shows that you have taken the time to craft your response and that you respect your classmates' work.
- Keep in mind that Discussion Boards are meant to be constructive exchanges, and it is important to respect those views that are different from yours.
- Be respectful and treat everyone as you would want to be treated yourself.
- Use spell check before sending a written message

Using a webcam in an online meeting room requires thought and consideration for the netiquette environment. Keep your surroundings free of clutter and distraction. Do not allow

Page 12

-Do one final review of your exam prior to hitting "submit". Make sure that all of your multiple choice answers are filled in and complete.

-Do not wait until the last second to submit your exam.

-If you are booted from Brightspace while trying to complete or upload your exam, try to log back in. Do not wait until you get a hold of Tech Support to attempt this.

-If you encounter tech issues during the exam, but still have access to the questions and are able to continue by using a Word document, please wait to contact Tech Support until immediately after the exam so that you do not lose time. Please also email your answers in an MS Word doc to your professor. If you cannot work around your tech issues during the exam, please contact tech support and notify your professors immediately.

-Should Tech Support be unable to assist you with submitting the answer, contact your professor immediately to request that they accept your answer. (Do NOT discuss the substance of your essay in any way.)

-Professors can accept late assignments at their sole discretion with either full credit, partial credit, or no credit. If you do not have proof of your answer, including the metadata in the Microsoft Word document, the professor will not grant your request.

**Document Upload for Assignments**- Unless you are instructed to use another program, submit your uploads in MS Word to assure your professor can open it and provide feedback.

**Contact Tech Support**- Call 866-522-7747 if you have technical problems. Retain the incident number given to you.

## SEMINARS

Seminars provide you with an opportunity to converse with your instructor and peers, to practice applying the materials you have learned, and to resolve questions about the courses. You must either attend the live seminar or complete the alternative assignment in

-If your computer crashes during a final exam: You will NOT back up your essay in MS Word during the final exam. Respondus will save your work up to the point when you disconnect. You must re-enter the exam and use the time left on the clock.

-Please make sure to **save** and **submit** your work before the allowed time runs out.

-Do one final review of your exam prior to hitting "submit." Make sure that all of your multiple-choice answers are filled in and complete.

-Do not wait until the last second to submit your exam.

**Timed Assessment Policy - For any graded assignment (other than final exams administered using Respondus)** - Students must retain a Microsoft Word copy of written answers and multiple choice answers submitted to the system until they successfully receive a grade for the assessment. Students are responsible for making sure they submit timed assessments such as essay quizzes and final exams within the time allowed. **For any graded assignment (other than exams administered using Respondus), please adhere to the following policies:**

-Type directly into the boxes or answer the multiple choice questions in the Brightspace exam area.

-Save individual portions of the exam as you complete them. For example, if there is more than one essay, save the first essay as you complete it.

-Prior to the allowed time running out, you **must** copy and paste your entire essay answer into a MS Word document so that if you have trouble submitting for some reason, you have a backup of your answers. Do not alter the document in any way. If there is a problem with the submission, the professor will ask for the unaltered Word document to review the metadata to verify the answer was completed within the appropriate amount of time. If you choose to type in Word initially and copy and paste your answers into Brightspace when you are finished, you are responsible for making sure they are timely pasted and submitted correctly.

-Please make sure to save and submit your work before the allowed time runs out. You must click on **both** "Save" **and** "Submit." Clicking "Save" alone is not sufficient.

**Time Zone** - Everything is on Eastern Standard Time (EST) in Brightspace. Please note this for deadlines to submit assignments, post attendance, seminar times, final exam times, etc.

**Final Exam** - Students **MUST** be available on the DAY of the scheduled exams. **Students who do not take the exam on the scheduled date will receive ZERO points for the final exam.**

**Respondus Lockdown Browser** - Most of your courses will require the use of the Respondus Lockdown Browser and webcam Monitor for the Module 15 Final Exam and, in some cases, one or more of the interim essay quizzes. Prior to a graded exam using Respondus, you will have a Respondus Practice zero-point quiz in Module 13. The Lockdown Browser will prevent you from accessing unauthorized websites, using a second monitor, using other applications, copying, and printing. You will also be required to show a photo identification and your workspace and meet other requirements before starting the exam. You will not be able to access the final exam with a standard web browser. Download the instructions and software needed for the Lockdown Browser. The non-graded practice Respondus Lockdown Browser quiz in is a chance to work out any kinks prior to the exam day. You are responsible for ensuring that you have the necessary software installed before you begin your timed final exam. -You will not be able to access the web or any application, such as MS Word, while using Respondus Lockdown Browser. You must have a working video camera and microphone, and use your personal computer. Chromebooks and iPads will not work with the lockdown browser. -If the program identifies possible cheating, a link will be sent to your professor for review. Your professor will only reach out to do further investigation if it appears that there was a violation of the student conduct code. If your computer crashes during an exam which uses Respondus: You will NOT back up your essay in MS Word during the final exam. Brightspace will save your work, up to the point when you disconnect. You must re-enter the exam and use the time left on the clock.

-You will not be able to access the web or any application, such as MS Word, while using Respondus Lockdown Browser.

-You must have a working video camera and microphone, and use your personal computer. Chromebooks and iPads will not work with the lockdown browser.

-If the program identifies possible cheating, a link will be sent to your professor for review. Your professor will only reach out to do further investigation if it appears that there was a violation of the student conduct code.

Tutoring and many other resources are available in the Academic Success Center section of the **My Studies** tab on the **Campus home page**.

For writing help, visit Writing Resources.

For case citation format information (Blue Book), visit the Library

To review the full calendar of academic success webinars, visit the Academic Success Center  Webinar Calendar.

For technology help, webinars, and resources, visit Technology Resources.

The Purdue Global Law School has its own Academic Support faculty who will be available to provide guidance and feedback to ALL PGLS students regarding case briefing, outlining, essay writing, time management, and related topics. This service is in addition to the feedback you may receive from your course instructors or meetings you may have with them. (Please **do not** contact our Academic Support faculty for feedback on graded assignments before a grade is received.) Please use this sign-up link for an appointment.

The Law School has a dedicated tile in the PG411 Student Success Connection. By signing up for the course, you can learn how to submit assignments to Turnitin before submitting them for grading. PG411 also provided access to tutoring and the academic integrity course. Please note that students may only receive feedback or tutoring assistance on assignments that have already been graded.

## ASSIGNMENTS

A description of all assignments to be completed can be found under each of the modules in the course.

**Tech Tips & Additional Policies**

**Brightspace** - Make sure to interact with the Brightspace platform to avoid being timed out for inactivity. That timer is set for 100 minutes, but to be on the safe side, click into the class about every hour. If you need to set a timer on your phone or otherwise to help remind you, please do so.

Page 7

others in your setting to enter the webcam view. Be sure your attire and background are appropriate for a classroom setting. If in doubt, turn off your camera. When using a microphone be mindful of your mute button - stay on mute until it is an appropriate time to speak - then enable your mute button again when you have finished sharing. Also, be mindful of how you reply to differing opinions or course content that you may not agree with. Feel free to express your views and ask questions in a calm and respectful way.

You should also review and refer to the section on Responsible Use of University Technology contained in the most recent Purdue Global Catalog.

## OTHER POLICIES

1. **Module Progress** – you must complete 100% of the required work in each module in order to sit for your scheduled final examination. (e.g., in a 15-module course, you must complete all tasks within the 15 modules).
2. **Do not submit work before term start date** - any work submitted prior to the term start will receive zeros and may not be resubmitted.
3. **Deadline to Complete All Course Work** - In courses with a final exam, any work not received 7 calendar days prior to the day of the exam, by midnight (EST), will be given zero credit (e.g., if the exam is on a Friday, you must submit your work on the preceding Friday). This policy does not alter or limit a professor's discretion to publish and enforce deadlines in any course.
4. **Bluebook** - Purdue Global Law School does not use APA style, rather we use the Bluebook for citation format. As you read the University's plagiarism policy, substitute Bluebook for APA. Regardless of style of citation, plagiarism is not allowed.
5. **Students must read communication** - Students are responsible for readings and understanding announcements, emails, and announcements made in seminars. For example, final exam dates are posted in the announcements and students are responsible for knowing and calendaring those dates.

### Student Assistance Program

HealthAdvocate is the Provider for the Student Assistance Program. You can find more information on the Student Assistance Program page in your PG Campus homepage, under Community Center. Health Advocate's staff helps you with: Anxiety, Debt management, Grief and loss, Healthy work/life balance, and Managing stress.

Call Health Advocate at 855-384-1800 or visit the Health Advocate <u>website</u>. Once there, begin typing "Purdue University Global," then select "Purdue University Global, Inc. - Students" from the results that appear to get started.

*Note:  This syllabus is subject to change during this term/session or in future terms/sessions. This syllabus was published for course content as of 2505L.*

Lawtone-Bowles v. Purdue University Global et al Settlement Offer – Immediate Reinstatement and Resolution

From: Maley, John (john.maley@btlaw.com)

To: nicolelawtone@aol.com

Cc: Amanda.Gallagher@btlaw.com; Cathy.Reed@btlaw.com; John.Maley@btlaw.com

Date: Saturday, April 18, 2026 at 06:06 PM EDT

Dear Nicole,
The settlement proposal is declined. In response, if the lawsuit is promptly dismissed with prejudice and with a full release of claims our clients will not seek defense costs and attorneys' fees. Our clients are not interested in settlement discussions otherwise.
Thank you.
Best regards,
*John*

**Barnes & Thornburg**

**John Maley**, Partner
**Mobile:** (317) 432-5509 | **Email:** John.Maley@btlaw.com
11 South Meridian Street, Indianapolis, IN 46204

Atlanta | Baltimore | Boston | Chicago | Dallas | Delaware | Denver | Florida | Indiana | Los Angeles | Michigan | Minneapolis
Nashville | New Jersey | New York | Ohio | Philadelphia | Phoenix | Raleigh | Salt Lake City | San Diego | Washington, D.C.

**From:** Dr. Nicole Lawtone-Bowles <nicolelawtone@aol.com>
**Sent:** Saturday, April 18, 2026 1:34 PM
**To:** Maley, John <John.Maley@btlaw.com>
**Cc:** Gallagher, Amanda <Amanda.Gallagher@btlaw.com>; McCarthy, Alison <Alison.McCarthy@btlaw.com>; Reed, Cathy <Cathy.Reed@btlaw.com>; Scott, Dawn <Dawn.Scott@btlaw.com>
**Subject:** [EXTERNAL] Lawtone-Bowles v. Purdue University Global et al Settlement Offer – Immediate Reinstatement and Resolution

Dear John,

I write to propose a good-faith resolution of the pending dispute involving my removal from Purdue Global Law School and the associated academic integrity determinations.

As you are aware, courts reviewing university disciplinary actions apply a limited but clear standard: whether the institution acted in accordance with its own procedures and whether its determination was rationally based or instead arbitrary and capricious. See *Matter of Newby v. Adelphi Univ.*, 2026 NY Slip Op 26021 (Sup. Ct. Nassau County Jan. 28, 2026).

In *Newby*, the court annulled an academic integrity finding where the determination was predicated on unsupported conclusions and where the record undermined the

basis for the violation. The court held that actions taken "without sound basis in reason or regard to the facts" are arbitrary and capricious, and further found the university's determination to be "without valid basis and devoid of reason." The court ordered that the violation be annulled, the record expunged, and all sanctions rescinded.

The same concerns are present here. The determinations against me rely on conclusory reasoning and fail to demonstrate a rational basis grounded in the record. As in *Newby*, the process reflects deficiencies in the evaluation of evidence and the application of institutional procedures.

Rather than proceed with continued litigation, I am willing to resolve this matter immediately under the following terms:

- Immediate restoration of full access to all courses;
- Permission to complete all remaining coursework and final examinations;
- Evaluation of my work in accordance with standard academic rubrics;
- Confirmation that I will be permitted to graduate on August 25, 2026;
- Removal and expungement of any academic integrity findings related to this matter.

This proposal is narrowly tailored to restore the status quo and avoid further proceedings. It reflects the same relief granted by the court in *Newby* where an academic determination lacked a rational basis.

If these terms are accepted, I am prepared to resolve this matter without further litigation. If not, I will continue to pursue all available remedies including financial damages as suggested by Judge Simon on April 16, 2026.

I request a prompt response.

Respectfully,
Nicole Lawtone-Bowles
Pro Se Plaintiff
(347) 538-5386

Sent from the all new AOL app for iOS

CONFIDENTIALITY NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

USDC IN/ND case 4:26-cv-00028-PPS-AZ      document 27-3      filed 04/30/26      page 67 of 156

## Satisfactory Academic Progress Appeal Denied

From:  Larasz Moody-Villarose (larasz.moodyvillarose@purdueglobal.edu)

To:      nicolelawtone@aol.com

Date:  Friday, April 17, 2026 at 05:05 PM EDT



Dear Nicole Lawtone-Bowles:

After careful review of your personal statement and prior academic record, we regret to inform you that your appeal to return to Purdue Global Law School in the Juris Doctor (Full Time) program has been denied.

If you have any questions, please contact your admissions advisor. We wish you all the best in your future endeavors.

Sincerely,

**Office of the Dean,
Purdue Global Law School**
www.PurduegloballawSchool.edu

Purdue Global Law School is a part of Purdue University Global,  an Indiana nonprofit, public benefit corporation controlled by The Trustees of Purdue University

For comprehensive consumer and gainful employment information, visit
https://www.purduegloballawschool.edu/about/accreditation

This email account is not monitored; please do not reply to this email. To contact Purdue Global Law School, click here <<https://www.purduegloballawschool.edu/request-information>> or call 866-522-7747.

Privacy Policy | Unsubscribe |

Purdue Global Law School - Administrative Offices | 2029 Century Park East, Suite 400, Los Angeles, CA 90067

© Purdue Global Law School

## Re: Satisfactory Academic Progress Appeal Denied

From:  Dr. Nicole Lawtone-Bowles (nicolelawtone@aol.com)

To:    larasz.moodyvillarose@purdueglobal.edu

Date:  Saturday, April 18, 2026 at 03:25 AM EDT

Dean Moody, please see the attached documentation. I believe this situation can be resolved by allowing me to return to school and complete my degree. On my assistive technology. If that is not possible, I am prepared to take further action to move this forward.

Sent from the all new AOL app for iOS

On Friday, April 17, 2026, 17:05, Larasz Moody-Villarose <larasz.moodyvillarose@purdueglobal.edu> wrote:



Dear Nicole Lawtone-Bowles:

After careful review of your personal statement and prior academic record, we regret to inform you that your appeal to return to Purdue Global Law School in the Juris Doctor (Full Time) program has been denied.

If you have any questions, please contact your admissions advisor. We wish you all the best in your future endeavors.

Sincerely,

**Office of the Dean,**
**Purdue Global Law School**
www.PurduegloballawSchool.edu

Purdue Global Law School is a part of Purdue University Global, an Indiana nonprofit, public benefit corporation controlled by The Trustees of Purdue University

For comprehensive consumer and gainful employment information, visit
https://www.purduegloballawschool.edu/about/accreditation

This email account is not monitored; please do not reply to this email. To contact Purdue Global Law School, click here <<https://www.purduegloballawschool.edu/request-information>> or call 866-522-7747.

Privacy Policy | Unsubscribe |

Purdue Global Law School - Administrative Offices | 2029 Century Park East, Suite 400, Los Angeles, CA 90067

© **Purdue Global Law School**

 13 Filed & Entered- 04:17:2026 Docket Text NOTICE of a Lawsuit and Request to Waive Service of Summons.pdf
1.5 MB

USDC IN/ND case 4:26-cv-00028-PPS-AZ      document 27-3      filed 04/30/26      page 71 of 156

Re: Satisfactory Academic Progress Appeal Denied

From:  Dr. Nicole Lawtone-Bowles (nicolelawtone@aol.com)

To:    larasz.moodyvillarose@purdueglobal.edu

Date:  Saturday, April 18, 2026 at 03:56 AM EDT

Dean Moody,
The people listed in the picture said I lacked intelligence and don't know law. That is why I'm Prose to show you how much law I know and how I'm gonna protect my rights as a disabled student that has been violated by Purdue Global Law School



Sent from the all new AOL app for iOS

On Saturday, April 18, 2026, 03:25, Dr. Nicole Lawtone-Bowles <nicolelawtone@aol.com> wrote:

Dean Moody, please see the attached documentation. I believe this situation can be resolved by allowing me to return to school and complete my degree. On my assistive technology. If that is not possible, I am prepared to take further action to move this forward.

Sent from the all new AOL app for iOS

On Friday, April 17, 2026, 17:05, Larasz Moody-Villarose <larasz.moodyvillarose@purdueglobal.edu> wrote:



Dear Nicole Lawtone-Bowles:

After careful review of your personal statement and prior academic record, we regret to inform you that your appeal to return to Purdue Global Law School in the Juris Doctor (Full Time) program has been denied.

If you have any questions, please contact your admissions advisor. We wish you all the best in your future endeavors.

Sincerely,

**Office of the Dean,
Purdue Global Law School**
www.PurdueglobalLawSchool.edu

Purdue Global Law School is a part of Purdue University Global, an Indiana nonprofit, public benefit corporation controlled by The Trustees of Purdue University

For comprehensive consumer and gainful employment information, visit
https://www.purdueglobalLawschool.edu/about/accreditation

This email account is not monitored; please do not reply to this email. To contact Purdue Global Law School, click here <<https://www.purdueglobalLawschool.edu/request-information>> or call 866-522-7747.

Privacy Policy | Unsubscribe |

Purdue Global Law School - Administrative Offices | 2029 Century Park East, Suite 400, Los Angeles, CA 90067

© Purdue Global Law School

 PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER April 16, 2025.pdf
20.1 MB

USDC IN/ND case 4:26-cv-00026-PPS-AZ    document 27-3    filed 04/30/26    page 73 of 156

  

**PURDUE GLOBAL**
Campus



( ACCOMMODATIONS )  ( DEGREE PLAN )  ( GRADES )  ( DOCUMENTS )  ( APPEAL )

## GRADE REPORT

**DOWNLOAD PDF**

**Filter By:**

Program
All Programs

Term/Session
Show All

## STUDENT INFORMATION

**Student ID:**
42122638

**Name:**
Nicole Lawtone-Bowles

**Address:**
56 Center Street
Highland Falls, NY, 10928

## ACADEMIC STATUS

**Status:**
Dismissal

**Program:**
Juris Doctor

**Cumulative GPA:**
3.02

**Cumulative Credits:**
62.00

**Enrollment Date:**
07/22/2025

**Start Date:**
09/03/2025

**Graduation Date:**
08/25/2026

**Last Date of Activity:**
04/05/2026

## SCHOOL INFORMATION

www.purdueglobal.edu

**Main Campus:**
Purdue University Global
2550 Northwestern Ave., Ste. 1100
West Lafayette, IN 47906

**Office of the Registrar:**
Purdue University Global
2550 Northwestern Ave., Ste. 1100
West Lafayette, IN 47906
Phone: 866-522-7747
Email: Registrar@PurdueGlobal.edu
Fax: 800-588-4127 (Toll Free)
V:

## 2601L SPRING 2026 LAW TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|
| CL651 | 01 | Constitutional Law II | 3 | 01/07/2026 | 04/28/2026 | * IP | 0.00 | 0.00 | -- |
| CL701 | 01 | Corporations and Business Organizations II | 2 | 01/07/2026 | 04/28/2026 | * IP | 0.00 | 0.00 | -- |
| CL735 | 01 | Professional Responsibility | 2 | 01/07/2026 | 04/28/2026 | * IP | 0.00 | 0.00 | -- |
| CL760 | 01 | Community Property | 2 | 01/07/2026 | 04/28/2026 | F | 0.00 | 0.00 | -- |
| CL780 | 01 | Capstone I | 2 | 01/07/2026 | 04/28/2026 | * IP | 0.00 | 0.00 | -- |
| CL805 | 01 | Federal Taxation | 4 | 01/07/2026 | 04/28/2026 | * IP | 0.00 | 0.00 | -- |
| CL850 | 01 | Education Law | 4 | 01/07/2026 | 04/28/2026 | * IP | 0.00 | 0.00 | -- |

7 total

## 2509L FALL 2025 LAW TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|

| CL631 | 02 | Criminal Law II | 3 | 09/03/2025 | 12/23/2025 | B+ | 3.30 | 3.00 | 9.90 |
|-------|----|-----------------|---|------------|------------|----|------|------|------|
| CL650 | 01 | Constitutional Law I | 3 | 09/03/2025 | 12/23/2025 | A | 4.00 | 3.00 | 12.00 |
| CL700 | 01 | Corporations and Business Organizations I | 2 | 09/03/2025 | 12/23/2025 | B+ | 3.30 | 2.00 | 6.60 |
| CL710 | 01 | Evidence I | 3 | 09/03/2025 | 12/23/2025 | A- | 3.70 | 3.00 | 11.10 |
| CL750 | 01 | Estates, Wills, and Trusts I | 2 | 09/03/2025 | 12/23/2025 | B | 3.00 | 2.00 | 6.00 |
| CL772 | 02 | Remedies | 2 | 09/03/2025 | 12/23/2025 | B- | 2.70 | 2.00 | 5.40 |
| CL830 | 01 | Health Law | 4 | 09/03/2025 | 12/23/2025 | A | 4.00 | 4.00 | 16.00 |

7 total

**Term Honors:**

- Distinguished Scholar

## STUDENT INFORMATION

**Student ID:**
42122638

**Name:**
Nicole Lawtone-Bowles

**Address:**
56 Center Street
Highland Falls, NY, 10928

## ACADEMIC STATUS

**Status:**
Transfer To Other Program

**Program:**
Juris Doctor

**Cumulative GPA:**
2.93

**Cumulative Credits:**
43.00

**Enrollment Date:**
03/19/2024

**Start Date:**
05/01/2024

**Graduation Date:**
12/22/2026

**Last Date of Activity:**
08/23/2025

## SCHOOL INFORMATION

www.purdueglobal.edu

**Main Campus:**
Purdue University Global
2550 Northwestern Ave., Ste. 1100
West Lafayette, IN 47906

**Office of the Registrar:**
Purdue University Global
2550 Northwestern Ave., Ste. 1100
West Lafayette, IN 47906
Phone: 866-522-7747
Email: Registrar@PurdueGlobal.edu
Fax: 800-588-4127 (Toll Free)
V:

## 2505L SUMMER 2025 LAW TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|
| CL630 | 02 | Criminal Law I | 3 | 05/07/2025 | 08/26/2025 | A- | 3.70 | 3.00 | 11.10 |
| CL661 | 02 | Real Property II | 4 | 05/07/2025 | 08/26/2025 | A- | 3.70 | 4.00 | 14.80 |
| CL671 | 01 | Civil Procedure II | 3 | 05/07/2025 | 08/26/2025 | B | 3.00 | 3.00 | 9.00 |
| CL685 | 01 | Criminal Procedure | 4 | 05/07/2025 | 08/26/2025 | B- | 2.70 | 4.00 | 10.80 |
| CL729 | 01 | Advanced Legal Analysis and Writing - Litigation | 2 | 05/07/2025 | 08/26/2025 | B- | 2.70 | 2.00 | 5.40 |

5 total

**Term Honors:**

- Dean's List

## 2501L SPRING 2025 LAW TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|
| CL660 | 01 | Real Property I | 4 | 01/08/2025 | 04/29/2025 | B | 3.00 | 4.00 | 12.00 |
| CL670 | 01 | Civil Procedure I | 3 | 01/08/2025 | 04/29/2025 | B | 3.00 | 3.00 | 9.00 |
| CL727 | 02 | Legal Analysis and Writing | 2 | 01/08/2025 | 04/29/2025 | B- | 2.70 | 2.00 | 5.40 |
| CL730 | 01 | Electronic Legal Research | 2 | 01/08/2025 | 04/29/2025 | B | 3.00 | 2.00 | 6.00 |

## 2408L FALL 2024 LAW TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|
| CL601 | 02 | Introduction to Legal Analysis II | 1 | 08/28/2024 | 12/17/2024 | A | 4.00 | 1.00 | 4.00 |
| CL611 | 02 | Contracts II | 4 | 08/28/2024 | 12/17/2024 | B- | 2.70 | 4.00 | 10.80 |
| CL624 | 02 | Torts II | 3 | 08/28/2024 | 12/17/2024 | B | 3.00 | 3.00 | 9.00 |

3 total

**Term Honors:**

- Micro-credential: Legal Analysis

## 2405L SUMMER 2024 LAW TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|
| CL600 | 04 | Introduction to Legal Analysis I | 1 | 05/01/2024 | 08/20/2024 | B- | 2.70 | 1.00 | 2.70 |
| CL610 | 02 | Contracts I | 4 | 05/01/2024 | 08/20/2024 | C+ | 2.30 | 4.00 | 9.20 |
| CL623 | 02 | Torts I | 3 | 05/01/2024 | 08/20/2024 | C+ | 2.30 | 3.00 | 6.90 |

3 total

## SELF PACED TERM

| Course Code | Section | Name | Credit | Start Date | End Date | Grade | Grade Points | Earned | Quality Poir |
|---|---|---|---|---|---|---|---|---|---|
| CL550 | 2408L | Fundamentals II | 0 | | 12/23/2024 | Scheduled | -- | -- | -- |

1 total

Privacy Statement | Terms of Service | Contact Us

Copyright © 2026, Purdue University Global, Inc., a public, nonprofit institution. v3.03.0

USDC IN/ND case 4.26-cv-00028-PPS-AZ document 27-3 filed 04/30/26 page 83 of 156



**ACCOMMODATIONS**  **DEGREE PLAN**  **GRADES**  **DOCUMENTS**

**APPEAL**

## ACCOUNT FINANCES

**BEGIN TOUR**

Site Feedback

### FILTERS

View by:

Academic Year ?

All

Term ?

All

**APPLY**

**ANTICIPATED FUNDING**
for period selected
$79,349 ⁵⁰

**FUNDING RECEIVED**
for period selected
$79,349 ⁵⁰

**AMOUNT PAST DUE**
as of 04/24/2026
$0 ⁰⁰

**NEXT SCHEDULED PAYMENT**
$0 ⁰⁰

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 85 of 156



**MAKE A PAYMENT**

PAYMENT ADVISORY

## FUNDING OFFER ⑦

## FUNDING & DISBURSEMENTS ⑦

## TRANSACTION HISTORY ⑦

Purdue Global is committed to finding ways for you to save on tuition and graduate sooner. Visit **Paying for School** for more information on funding your education.

If you apply for and are approved to use federal financial aid, dollar amounts of any federal student loans and/or Pell Grants you receive will be displayed here once disbursed.

Dollar amounts will only display after funds have been disbursed.

The amount of Title IV funds a student may receive over his or her lifetime is limited by federal law. For more information on lifetime aid, visit **studentaid.gov**.

# You are considered INDEPENDENT.⑦

## IMPORTANT FORMS ⑦

## USEFUL LINKS ⑦

USDC IN/ND case 4:26-cv-00028-PPS-AZ document 27-3 filed 04/30/26 page 87 of 156



USDC IN/ND case 4:26-cv-00028-PPS-AZ document 27-3 filed 04/30/26 page 87 of 156

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 88 of 156

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JOHN DOE,                                )
                                         )
          Plaintiff,                     )
                                         )
     vs.                                 )     3:17CV298-PPS/MGG
                                         )
UNIVERSITY OF NOTRE DAME,                )
                                         )
          Defendant.                     )

AMENDED OPINION AND ORDER

A senior at the University of Notre Dame who brings this action as "John Doe"

was dismissed from the university this spring, mere weeks before graduation, after

being found guilty of violations of four Notre Dame Standards of Conduct. John now

challenges his dismissal from Notre Dame on a number of legal theories, but only two

of those theories are presently before me on his motion for a temporary restraining

order and a preliminary injunction—a breach of contract claim and a claim under Title

IX. The relief he seeks at the moment is narrow. He is *not* seeking the conferral of his

degree at this time; he is *not* seeking to participate in the upcoming commencement

ceremonies; and he is *not* seeking to set aside the other components of the discipline

meted out by Notre Dame. Instead, John only seeks an order instructing Notre Dame to

allow him to take the two final examinations that he needs to complete his coursework

for the semester. Exam week begins today and runs through May 12, so time is of the

essence.

## Preliminary Injunction Standards

John's motion is for both a temporary restraining order and preliminary injunction. Parties (and judges) often have difficulty distinguishing between the two similar remedies. "'The essence of a temporary restraining order is its brevity, its ex parte character and ... its informality.'" *Wheeler v. Talbot*, 770 F.3d 550, 556 (7th Cir. 2014) (Ripple, J., dissenting), quoting *Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs. S.C.*, 964 F.2d 599, 600 (7th Cir. 1992). Notre Dame has been served with the complaint and the motion and has responded in writing. Notre Dame has also appeared twice in my court on the motion, including for a full-blown evidentiary hearing. In these circumstances, I consider the matter to be a request for a preliminary injunction rather than a temporary restraining order.

To obtain a preliminary injunction, John Doe must demonstrate that (1) he will suffer irreparable harm in the period before the case is decided on the merits; (2) traditional legal remedies are inadequate; and (3) his claim has some likelihood of success on the merits. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016). "If the plaintiffs make this showing, we then will weigh the factors against one another, assessing whether the balance of harms favors them or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Id.* The Seventh Circuit has "said repeatedly that the plaintiff's chances of prevailing need only be better than negligible." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). And there is an inverse sliding scale as between a plaintiff's likelihood of success and

2

his irreparable harm: "even though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of harms would weigh heavily against him if the relief were not granted." *Id.*, quoting *Curtis v. Thompson*, 840 F.3d 1291, 1296 (7th Cir. 1988).

Notre Dame has invoked the notion of an "affirmative" injunction, which some courts call a "mandatory" injunction. This term signifies an injunction that compels an action rather than merely maintains the *status quo*. *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Given that the *status quo* is that John is currently dismissed from the university, an injunction compelling Notre Dame to permit him to sit for his two final exams is technically an affirmative injunction, although just barely so. It won't cost Notre Dame a red cent to allow John to sit for the two exams. So while I take seriously the Seventh Circuit's admonition that a "preliminary injunction ordering the defendant to take an affirmative act rather than merely refrain from specific conduct is 'cautiously viewed and sparingly issued,'" *Knox v. Shearing*, 637 Fed.Appx. 226, 228 (7th Cir. 2016), quoting *Graham*, 130 F.3d at 295, the "affirmative" nature of what is being asked of Notre Dame is just not that burdensome. In all events, in the Seventh Circuit, the standards for obtaining such an affirmative injunction are the same as in any other case, but the balance of hardships factor simply "takes on heightened importance." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). This is in recognition that "[a] mandatory injunction imposes significant burdens on the

3

defendant and requires careful consideration of the intrusiveness of the ordered act[.]"
*Id.*

Notre Dame cites cases from the Ninth and Tenth Circuits that apply different and more stringent standards for the grant of an affirmative injunction, such as that a court should deny such relief "unless the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotations marks and citations omitted). But of course I will apply the standards enunciated by the Seventh Circuit, which does not appear to embrace this particular heightened standard for mandatory injunctions.

## Factual Background

The facts set forth below relevant to the preliminary injunction analysis are either undisputed or have been established by a preponderance of the evidence in the preliminary injunction proceedings. John Doe and Jane Roe, both seniors this year at Notre Dame, began a dating relationship in the fall of 2015. During the summer of 2016, John developed serious depression while doing an externship in New York City and that led to thoughts of suicide. As John's depression worsened, his relationship with Jane became more tumultuous, as the couple "broke up" and reconciled more than once. By the Fall of 2016, John began making frequent statements about wanting to commit suicide and he repeatedly communicated this desire to Jane via text message. It is these text messages that would come back to haunt John five months later in his disciplinary hearing. But the relationship between John and Jane seems to have

4

continued throughout the tumult. Indeed, the record is replete with a steady stream of text messages going back and forth between John and Jane even after she first reported him to the University. Some involve talk of mental health issues and, indeed, suicide, but many do not.

On October 14, 2016, Jane met with Heather Ryan, Notre Dame's Deputy Title IX Coordinator in the Division of Student Affairs. Jane reported that she was concerned about John's safety because of the messages he had been sending her about wanting to kill himself. She was bothered by the volume of texts she was receiving and felt that they were manipulative, but at that point Jane was principally concerned about John receiving help. By going to the Title IX Coordinator, whether she knew it or not, Jane was invoking Notre Dame's policies and process relating to complaints of sexual harassment. In response, the University referred Jane to a number of resources, and assigned Jane a Resource Coordinator, Annie Eaton, as a contact for support relating to her issues with John. Eaton works generally as a "Care Consultant" at the University, a person who works with students experiencing difficulty or needing assistance with resources.

Jane's October 14 report to Ryan also prompted Associate Vice President Dr. Bill Stackman to meet with John and identify ways John could receive assistance if he was considering harming himself. The record doesn't reflect what mental health resources John was offered or apprised of, but Ryan's focus — and that of the Administrative Investigation in Notre Dame's process — is on behavior, not assessment of psychological

5

or emotional causes for behavior. In his email requesting a meeting with John, Dr. Stackman requested that John break off all forms of communication with Jane. This is a standard step for the administration to take when a student registers a complaint about interaction with another student.

Notre Dame's student handbook, known as *du Lac*, contains Community Standards and Standards of Conduct and is colloquially known as the "Red Book." The Red Book is issued annually, and in it, Notre Dame compiles the University's policies and procedures regarding sexual harassment, a category which includes sexual assault, sexual misconduct, dating violence, domestic violence, stalking and conduct that creates a hostile environment. Ryan concluded that John's behavior, as reported by Jane, could be a violation of these policies.

Jane made it clear to Ryan that she did not want a formal Administrative Investigation, but Jane did not have the final say on the matter. Ryan referred the matter to the University Tripartite Board, which makes a determination whether an investigation will be pursued even if it is against the complainant's wishes. After considering factors including John's lack of any disciplinary history, the absence of threats of violence to the complainant, and that the parties were not minors, the Tripartite Board agreed to Jane's request that an Administrative Investigation not proceed at that time. Jane was notified of that decision, and advised that she had six months, to April 27, 2017, to notify Ryan if she wished to initiate an Administrative Investigation of the matters she had reported.

6

As noted above, the persistent contact between John and Jane continued after the initial complaint by Jane. What we now know, although it wasn't revealed in Notre Dame's Administrative process, was that Jane and John continued a nearly daily discussion with one another. On October 31st they planned to meet up after work. [DE 39 at 4.] She told him to "Come overrrrrr." [*Id.*] He proposed that they "take a nap" and she responded that "I'M SO PUMPED." [*Id.* (emphasis in original).] The following week, on November 7th, Jane asked John if he could sleep over. [DE 39 at 5.] Jane then implored John to "Come to champaign" (sic), which seems to have been a reference to him meeting her in Champaign, Illinois. [*Id.*] She also offered to meet him in Chicago. [*Id.*] Jane then asked John to come over that day because "she was having a really bad week already and I just wanna cuddle." [DE 39 at 7-8.] The following day they planned to get together again. Jane asked John "where you at (sic)" and he responded that he would "be there in 15 minutes." [DE 39 at 9.] Jane's response demonstrated that she was happy to be seeing him. She said "yayyy." [*Id.*] The next day they planned to meet up again at Chipotle around the noon hour. [*Id.*] And then later that night they must have planned another get-together because Jane told John that she was coming "to pick him up." [*Id.* at 9-10.] A week later, on November 15, Jane told John to "sleep overrrrrrrrrrr." [*Id.* at 10.] She later had a change of mind and cancelled because she needed to study and he responded that that was no problem. [*Id.* at 10.] John told her that he loved her and Jane responded that "I LOVE YOU TOO." [*Id.* at 11 (emphasis in the original).]

7

This cozy back and forth was never revealed during Notre Dame's investigation of John. It only came to light once this litigation was filed. But in any event, less than two weeks after Jane and John were planning sleepovers and expressing their love for one another, Jane evidently had a change of heart and decided to go forward with the complaint she previously lodged against John. The complaint was re-instituted on November 28, and the University issued a No Contact Order by letter to both parties dated the following day, November 29. Pursuant to that Order, both John and Jane were directed not to have contact with one another. The University considers the November 29 letter to have served as the "notice of charges" to John, but rather than any specific allegations, it merely advises John that "the incident alleged may be a violation of the University's policies related to sexual assault, sexual misconduct, dating and domestic violence, stalking, and/or conduct that creates a hostile environment." [Def. Exh. 118 at 1.]

An important thing happened after the No Contact Order was issued. John deleted Jane from his phone and, in the process, also permanently deleted the hundreds of text messages that they had sent to one another. Jane took a different tack. She decided to retain all of the text messages, and candidly this gave her the upper hand because it enabled her to control what texts would be produced and considered in the administrative process.

After Jane re-instituted the complaint, Heather Ryan met separately with both John and Jane, who were offered the opportunity to submit documentation to be

8

considered in the process. An investigator, Lynn Kalamaros, was assigned to the case. As just described, John had no text messages to share with the Investigator Kalamaros because he had deleted them from his phone. Jane, on the other hand, provided Kalamaros with some, but not all, of the text exchanges between the two. The ones she shared with Kalamaros placed John in a very bad light and without context. Kalamaros, for example, had no idea that Jane had invited John to Champaign two weeks earlier, that they were having sleepovers and meeting up for "naps," or that Jane expressed her love for John in no uncertain terms.

The first thing Kalamaros did was schedule a meeting with John as the respondent in the matter. Both parties were advised of the opportunity to identify witnesses who might be interviewed in the Administrative Investigation. John and Jane were told that under the University's policies, they could have a "non-speaking" advisor in attendance with them at any hearing and other meetings, but third-party representation is not allowed to actively participate in the process.

Notre Dame's process is for the investigator, in this case Investigator Kalamaros, to do an investigation of the charges and then submit an Investigative Summary Report to Ryan. Ryan then reviews the report to determine whether it appears that any Notre Dame policy may have been violated. If she thinks so, Ryan again consults the complainant about whether to move forward with the process. The next step is referral of the matter to Notre Dame's Office of Community Standards, which conducts a hearing on the charges of misconduct.

9

Shortly after the re-institution of the complaint by Jane, things started to really get nasty. On November 30, Jane reported to Ryan that John had supposedly followed her to a class, and Ryan viewed this as a potential violation of the No Contact Order. Similarly, on February 3, 2017, John sent Ryan an email in which he alleged that Jane herself had violated the No Contact Order by following him and taking pictures of him with her cell phone after an initial contact in a stairwell that was entirely inadvertent on his part. There was yet another incident wherein John was hauled out of class by University police officers based on an allegation by Jane that he had violated the No Contact Order in an academic building. But credible testimony at the preliminary injunction hearing from another student established that the interaction between John and Jane that day was merely a happenstance encounter making the claimed violation of the No Contact Order utterly spurious.

For some of these complaints, specifically the complaint from February 3rd, John and Jane reversed roles. John was the complainant and Jane the respondent. Yet it appears that Ryan never responded to John with the same references to resources as she had provided to Jane as a complainant.

The pattern of charge and counter-charge continued into mid-February. Jane made an allegation of retaliation by John involving sharing her confidential medical information with other people, and an administrative investigation was opened. Shortly thereafter, John also lodged another complaint about Jane. In mid-April, John used an online process to submit reports that Jane had violated the No Contact Order

10

and had intimidated witnesses in the disciplinary process. Heather Ryan confirmed receipt of those complaints and initiated an investigation by meeting with the individuals who might have been intimidated.

Notre Dame sometimes consolidates the handling of countercomplaints between parties. That seems like the sensible thing to do when back-and-forth complaints are made by people in a long-term relationship. In such a situation, there is the possibility that the parties are abusing the process. In any event, in this instance, Notre Dame did not consolidate the dueling complaints between John and Jane, and the allegations against her were largely omitted from the Investigative Summary Report and the Administrative Hearing of John.

In the meantime, action was occurring on another front. On November 30th, Jane obtained an order of protection from the state court in St. Joseph County, and provided a copy to Ryan that day. Jane initially asserted that the Circuit Court order required John to stay off campus entirely. But later an amended Ex Parte Order for Protection issued January 30, 2017 expressly provides that "Respondent is to be allowed to continue attending Notre Dame University until further action from the Court." [Pltf. Exh. 26, p.2.] At some point in time in the state court litigation, John requested discovery. He was seeking the entirety of his text exchanges with Jane. Jane balked, and instead of producing the text stream, she decided to dismiss her request for the restraining order and in the process frustrated John's efforts to get the full exchange

11

between the two so that he could tell the story of their tumultuous relationship in full context.

There is yet another thread that was dangling while the University's investigation was moving forward, and this one involved Jane's mother, who is an attorney. She sent a number of irate emails to Ryan, highly critical of Notre Dame's handling of Jane's complaints, and accusing the University of failing to protect Jane. In one of these, Jane's mother alleges that John's conduct threatening suicide was a particularly cruel exploitation of Jane's emotional vulnerability, knowing that she was coping with the recent deaths of three high school classmates. The emails that Jane's mother peppered the University with crescendoed to a January 25, 2017 message in which she referred to "the mounting evidence of Title IX violations and blatant disregard of court orders by [the Notre Dame Security Police]!" [Pltf. Exh. 30.] The same email invoked the name of Lizzie Seeberg, a young woman who committed suicide after she was allegedly sexually assaulted by a Notre Dame football player, an incident for which Notre Dame was widely condemned for the manner in which it handled the complaint.

Although Jane's complaint focused on the habitual and unwelcome frequency of John's communication to her after she had told him to stop, Ryan acknowledged that the investigation disclosed that at times Jane encouraged John to reach out to her if he felt suicidal. Kalamaros's investigative report, dated February 5, 2017, does reflect the tumultuous back-and-forth nature of John and Jane's relationship, but it doesn't tell the

12

whole story because, to repeat, Kalamaros only had selected text messages — indeed, selected by Jane — of the back-and-forth between the two.

Ultimately, Ryan reviewed the Administrative Investigation Report prepared by Kalamaros and concluded that there were possible policy violations of dating violence, stalking and harassment. With Jane's agreement, the matter was referred to what Notre Dame calls the "conduct process," that is, toward an Administrative Hearing conducted by the Office of Community Standards (OSC). At Jane's request, the disciplinary process was "paused" to allow her to obtain and provide additional information to be considered with the Investigative Summary Report.

John received a letter dated February 13 advising him that a hearing was scheduled for February 24. This letter is known as the "administrative hearing notification letter." The letter provided a list of four potential violations alleged against John that the hearing panel would consider: 1) Stalking; 2) Willful damage to the reputation or psychological well-being of another; 3) Dating violence, and 4) Abusive or harassing behavior, including unwelcome communication. [Pltf. Exh. 105 at 1.] Dating violence is defined in the Red Book as physical violence or the threat of physical violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with an individual. [Def. Exh. 107 at 6.] Stalking is defined as knowingly or intentionally engaging in a course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel

13

terrorized, frightened, intimidated, or threatened and that actually causes the individual to feel terrorized, frightened, intimidated, or threatened. [*Id.* at 7.]

The notification letter explained that John could come to the OCS office during business hours to review, but not photocopy or otherwise duplicate, the Administrative Investigation documents (over 350 pages) prior to the hearing. OCS identified in the letter witnesses it would invite to participate. Pursuant to Notre Dame's policies, John could submit questions in writing for the Hearing Panel to consider asking witnesses. Under the Red Book, John could also invite additional witnesses, although not "character witnesses." The only witnesses allowed to testify were those who met the University's definition of "witness to the incident," meaning a person who had contact with one of the parties "before, during or after the incident." Whether a witness meets this criteria was a matter left to the sole discretion of the Hearing Panel. But given that the allegations against John involved repeated contact with Jane, a person with whom he had an 18-month relationship, deciding precisely what comprised "the incident" presented a bit of a challenge to John. The notification letter also referred to the Red Book's provisions that an advisor is permitted to be present, but not allowed to "make comments, pass notes, or otherwise disrupt the Administrative Hearing or meetings" and that the parties could confer with their respective advisors during the hearing only on breaks, taken entirely at the discretion of the Hearing Panel. [Def. Exh. 107 at 28.]

Additional documentation could be submitted by February 20, four days in advance of the hearing, and would be made available to the other side for review two

14

days before the hearing. Both John and Jane submitted additional documentation, but Jane's was a substantial volume of new material, which after being processed by OCS, John had two-and-a-half days to review before the Administrative Hearing. Ryan Willerton, the Director of OCS and member of the Hearing Panel, testified at the preliminary injunction hearing that John identified two additional witnesses who couldn't participate in person – one declined and the other, unable to attend due to travel plans, provided an affidavit that was considered.

After the Administrative Hearing, John requested a delay in its decision to allow him to try to obtain from Jane the full history of their text communications, and arguing that at the hearing Jane had made several false allegations for the first time, including allegations of sexual coercion. John advised Willerton that his efforts to obtain the text messages through a subpoena in the St. Joseph County proceedings had been thwarted by Jane's motion to dismiss the action, which John suggested was proof that Jane did not feel threatened by John and that the additional text messages would support his defense in the Notre Dame proceedings. Willerton responded that "[t]he Hearing Panel does not consider information submitted after the Administrative Hearing." [Pltf. Exh. 43, p.1.]

The Hearing Panel announced its decision in a March 20 letter, finding that John violated all four University Standards of Conduct that were identified in the administrative hearing notification letter. [Pltf. Exh. 9.] The decision letter is 16 pages in length and the majority of it is simply a series of quotes from the text messages that Jane

15

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 27-3    filed 04/30/26    page 118 of 156

decided to send to the investigator. The full extent of the texts between John and Jane were never consider by the Hearing Panel. What's more, the Hearing Panel seems to have accepted at face value the following testimony from Jane which was quoted verbatim in the Decision Letter:

> "It was pretty much anytime that I was not doing what (John) wanted . . . he started to invade my physical safety. . . and made me feel very physically unsafe. Terrorized me. Frightened me. And threatened me multiple times. For instance, even starting in August, whenever I would not go to Chic-Fil-A with him. . .he would show up places. It was that level of if he (sic) did not do what he wanted me to do, he would terrorize me for the rest of the week. It happened repeatedly, and that is what bothered me the most. Near the end of the relationship, I wasn't just worried he was just going to kill himself if I didn't do what he wanted me to do. . . I was worried that he was going to harm me. Show up in my apartment, or kill me, honestly. That was where my focus was at the end."

Decision Letter, DE 24-5 at 14.

John did not get an opportunity at the hearing to call this testimony into question. He didn't have the text messages that the Court now has showing, at the very end of the relationship, that Jane was inviting John to Champaign, wanting to meet him in Chicago, having sleepovers, meeting him for lunch and telling him that she loves him. The Hearing Panel would reasonably have looked askance at Jane's testimony if it had this fuller picture of the relationship. At the very least this type of evidence certainly would have put Jane's testimony in a totally different light. But John didn't have access to these texts messages because it was Jane who selectively chose which texts would be produced during the investigation.

16

In all events, John was immediately dismissed from the university through the Fall 2017 semester, with an opportunity to apply for readmission for the Spring 2018 semester. The notation "Dismissal with the Opportunity to Apply for Readmission" was placed on John's permanent academic record. The University forbade John from any contact — direct, indirect or through third parties — with Jane Roe for the remainder of his enrollment, and indicated that any contact would be considered if John applied for readmission. John was prohibited from entering any University-owned property.

Willerton testified that the dismissal decision was reached based on two factors. The first was that the behavior was a course of conduct in which John persisted even after Jane had told him it was abusive and harassing. The second was that John had suggested his suicide would be her fault. Dismissal with the opportunity to reapply reflected the conclusion that John understood the issues and could seek help to be able to return without posing any threat to the Notre Dame community.

John challenged the Hearing Panel's decision by appealing for a "case review" under Notre Dame's process. "Case review" is granted only on a finding that there's been a procedural defect or that there is new information substantial enough to change the outcome of the decisional process. John submitted two briefs in support of his request, making a number of arguments for reconsideration. Most significantly, John offered video clips of Jane, recorded February 12 on a friend's phone, just twelve days before she testified at the administrative hearing. In the video clips, which were played at the preliminary injunction hearing, Jane can be heard saying what her real intentions

17

were relating to the dispute with John: "I want to fuck up his reputation; I want him to never have a girlfriend here at Notre Dame or St. Mary's or anywhere; I want him to never be able to have a social life at St. Mary's or Notre Dame." This kind of admission would have seriously undermined Jane's testimony at the hearing.

In his appeal, John also addressed efforts by Jane to pressure potential witnesses not to support John in the proceedings, and how Jane had evaded production of the entire text history between them (which, as we now know, John had destroyed after receiving the No Contact Order). John offered new witness statements in response to serious allegations made for the first time by Jane at the Administrative Hearing, and argued that the Hearing Panel had refused evidence pertinent to Jane's credibility generally and her claims of feeling threatened by John. The Conduct Case Review Board issued a summary denial of case review, dated April 13, 2017, and at that point, John was formally removed from Notre Dame.

Heather Ryan testified that approximately 90% of the complaints Notre Dame receives in the sexual harassment category are by women against men, and that a portion of the 10% of complaints made by men are actually countercomplaints against women complainants. Mediation efforts are never attempted when sexual assault or other nonconsensual contact is alleged. According to Willerton, some universities are using a form of "restorative justice," especially in the context of dueling complaints by people in long term relationships. Notre Dame is currently researching and considering

18

this paradigm but the University has not yet employed that approach in its Title IX disciplinary process.

Willerton also testified that he could remember two situations in which female respondents were dismissed by Notre Dame as a disciplinary sanction. In one, a dating violence case, the woman had filed an initial report, there was a counter-complaint, and ultimately both students were dismissed. In the other matter, both parties were female. Willerton could not recall a single case in which a male complainant's charge of stalking or harassment or sexual violence resulted in the dismissal of a female complainant.

## Likelihood of Success on the Merits

I will first consider John Doe's breach of contract claim. Under Indiana law, "the relationship between a student and an education institution is contractual in nature." *Chang v. Purdue University*, 985 N.E.2d 35, 46 (Ind.Ct.App. 2013) (internal quotation marks and citations omitted); *Gordon v. Purdue University*, 862 N.E.2d 1244, 1248 (Ind.Ct.App. 2007). *See also Sung Park v. Indiana University School of Dentistry*, 692 F.3d 828, 830-31 (7th Cir. 2012) (and cases cited therein). Because of the contractual nature of the relationship, a college obviously can't just throw a student out of school. Rather, there are duties conferred upon both the college and the student "which cannot be arbitrarily disregarded and may be judicially enforced." *Ross v. Creighton University*, 957 F.2d 410, 416 (7th Cir. 1992).

There are some actions taken by universities that are not cognizable in court. For example, "courts are not competent to hear claims that involve 'second-guessing the

19

professional judgment of the University faculty on academic matters." *Bissessur v. Indiana University Board of Trustees*, No. 1:07-CV-1290-SEB-WTL, 2008 WL 4274451 at *9 (S.D.Ind. Sept. 10, 2008), quoting *Ross*, 957 F.2d at 417. So, for example, students who are dismissed from a university for academic reasons can't run to court and claim their professor gypped them on a grade. But if the dismissal is for conduct other than poor academic performance—like the dismissal of John Doe—then it is subject to review. *Id.* It is also true that the contractual relationship between a student and a university is recognized to be a looser concept than contracts of other sorts. As one court put it, "The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly." *Chang*, 985 N.E.2d at 46.

Notre Dame promises its students a "prompt, fair and impartial investigation and resolution" of disciplinary complaints involving sexual violence, stalking and dating violence. [DE 8-2 at 5.] This constitutes an "identifiable contractual promise that the defendant [allegedly] failed to honor." *Ross*, 957 F.2d at 417. The parties here agree that on a contract theory, the standard for reviewing the university's disciplinary actions is not *de novo*, but only to determine "whether the educational institution acted, illegally, arbitrarily, capriciously, or in bad faith." *Id.* at 47. And at this preliminary injunction stage, the question is only whether John Doe has a better than negligible chance of succeeding on his breach of contract claim to trigger consideration of his irreparable harm and other factors. *D.U.*, 825 F.3d at 338. Applying that standard, I readily find that John Doe has more than a negligible chance of prevailing on his

20

contention that Notre Dame's disciplinary process as applied in his case was arbitrary and capricious in a number of respects.

First, the lack of meaningful notice to John of the allegations against him, so as to be able to adequately prepare his defense, has a more than negligible chance of being found to render the disciplinary process capricious. As shown above, this disciplinary matter was not, for example, the result of a sexual assault during a college hook-up or other single encounter between the complainant and respondent, but arose instead in the context of a long term relationship with literally hundreds of contacts between the parties. To focus his defense, John reasonably needed to know what contacts and conduct was being scrutinized for possible violation of which policies.

At the beginning of Jane's formal complaint process, the University's November 29 letter merely advised John that "the incident alleged may be a violation of the University's policies related to sexual assault, sexual misconduct, dating and domestic violence, stalking, and/or conduct that creates a hostile environment." [Def. Exh. 118 at 1.] This amounts to no notice at all. It doesn't tell him what he is alleged to have done wrong nor when the wrongdoing was alleged to have taken place. Instead, it is merely general language parroting the laundry list of offenses identified on the cover of the University's Red Book on sexual harassment. [Def. Exh. 107.] This so-called "notice of charges" could not be further from revealing particular policy violations implicated, much less specific allegations of John's objectionable conduct.

21

Later, the "administrative hearing notification letter" provided the most specific allegations of misconduct John would receive in the process, consisting only of a list of the four Standards of Conduct the Hearing Panel would determine whether John violated. But again, even at this juncture, with the hearing less than two weeks away, John was not put on notice of what he was alleged to have done that violated Notre Dame policy, and (important in the context of a long-term relationship) when he allegedly did it. The University points to John's access to the Investigative Summary Report ten days prior to the hearing. Although a sizeable volume of over 350 pages, its 18 page report from Investigator Kalamaros and 300+ pages of exhibits do not provide John with a statement of the particular conduct alleged to have been a violation of particular Notre Dame policies. And even if it did, ten days' notice might be found insufficient for this volume of material, particularly with John's graduation both at stake and on the immediate horizon.

Second, Jane's complaints were principally based on text communications between herself and John. Indeed, the 16-page Notice of Decision is largely a collection of those text messages. The University's investigation might have been arbitrary and capricious for failing to obtain and review the entire context of the couple's texting history. As described above, Jane has now produced to the parties in this litigation a much greater volume of text communications between herself and John, and acknowledges that this production contains more texts than were "produced in response to the processing of the Title IX matter by the University of Notre Dame" and

22

that "the University did not request the full extent of texts" between her and John. [Pltf. Exh. 14 at ¶8.]

At least some of that additional texting history discloses Jane's voluntary engagement with John on the subject of his mental health taking place the very day before her initial meeting with Heather Ryan. [Pltf. Exh. 17.] More generally, the larger texting history, as described in part above, might well have called into question Jane's credibility. She testified that John's communications were unwelcome, their contact was non-consensual, and that she felt intimidated or threatened by John. Yet the text messages that have been produced in this litigation but which were not available to the Hearing Panel—text messages showing sleepovers, naps together, invitations to go on trips, and lunch dates—strongly suggest that Jane did not feel threatened or intimidated by John. [*See* DE 39 & 40.]

Third, the University's limits on hearing testimony—particularly the application of its narrow witness standard—might be found to be arbitrary or capricious in several respects. In a disciplinary matter concerning behavior in a long-term existing relationship, context matters, and the motive of the complainant (as it relates to credibility) bears more scrutiny than in some other cases. The Hearing Panel heard testimony from Jane and other witnesses about incidents in which John had angry outbursts in the past. But what did that have to do with the charges? Jane was essentially able to offer character evidence about John at the hearing. For example, the Hearing Panel elicited testimony about what John supposedly did when he was in New

23

York City the previous summer. But what was sauce for the goose was not sauce for the gander because John was prohibited from offering prior acts of Jane — what the University deemed inadmissible "character" evidence concerning her. The utter rejection of evidence shedding light on Jane's behavior, as relevant to her bias and credibility, including evidence that Jane had herself threatened suicide and had falsely claimed that John had violated the No Contact Order, might be thought to contribute to a process that was ultimately arbitrary or capricious in adjudicating John's responsibility for policy violations that cost him the remainder of his senior year, the conferral of his degree, his timely graduation and approximately $30,000 in tuition money.

Fourth, both Heather Ryan and Ryan Willerton testified that the focus of the disciplinary complaint process is on the respondent's behavior, to the exclusion of consideration of the respondent's mental health as a cause or mitigating factor. Unless a formal report was received requesting an accommodation on the basis of disability, John's depression could not be and was not taken into account in the disciplinary process. Based on the Hearing Panel's interpretation of the University's definition of a witness "to the incident," Notre Dame rejected the input of John's mental health counselor as to his progress in therapy. This is so even though the therapist would have had contact with John before, during, and after a number of incidents on which discipline was based.

24

Fifth, the significant "data dump" of Jane's supplemental materials (up to several inches thick) the week of the Administrative Hearing could be found to have contributed to a capricious process. John had two-and-a-half days to review the materials, and could only do so in the OCS office, without making copies. Such a process is not designed to facilitate a fair hearing for which John is fully prepared to respond against Jane's allegations and evidence. Similarly, the process can be criticized for its limitations on the examination of witnesses. That all questions must be proposed in writing and are asked of witnesses only at the discretion of the Hearing Panel does not permit a robust inquiry in support of a party's position. The stilted method does not allow for immediate follow-up questions based on a witness's answers, and stifles John's presentation of his defense to the allegations.

Sixth, at the Administrative Hearing, the accused student is essentially on his own. The actual presentation of the student's side of the case is left to the student himself, but with severe limitations. As noted, while he is permitted to have a lawyer or advisor present, those folks can't really do anything. They can't talk with the accused; they can't ask questions; they can't even pass notes to the accused. They are only permitted to consult with the students during breaks, given at the Hearing Panel's discretion. If, for example, a witness says something very inculpatory about the accused, and there is no break, the student can't talk with his advisor or lawyer about what he should ask the witness. And by the time the accused finally has a chance to talk with his advisor on a break, the witness could be long gone. When asked at the

25

preliminary injunction hearing why an attorney is not allowed to participate in the hearing especially given what is at stake—potential dismissal from school and the forfeiture of large sums of tuition money—Mr. Willerton, the Director of the Office of Community Standards and a member of the Hearing Panel, told me it's because he views this as an "educational" process for the student, not a punitive one. This testimony is not credible. Being thrown out of school, not being permitted to graduate and forfeiting a semester's worth of tuition is "punishment" in any reasonable sense of that term.

Seventh, many of these same concerns about the fairness of the disciplinary process were raised by John in his very substantive request to appeal the decision by "case review." These include the unfairness of consideration only of Jane's cherry-picked text messages (and Jane's efforts to avoid production of the entire text history) and the Hearing Panel's refusal of evidence pertinent to Jane's credibility and state of mind (whether she in fact felt threatened by John). The conclusory and dismissive denial by the Conduct Case Review Board may contribute to an ultimate finding that Notre Dame's process was arbitrary or capricious especially since it refused to take into consideration Jane's statement on video that her true motive in her charges against John was to "fuck up his reputation" so as to ensure that he will "never be able to have a social life."

Eighth, the Red Book sets out a goal of concluding each disciplinary complaint within 60 days from initial report to decision. [Def. Exh. 107 at 23.] Jane's formal

26

complaint initiating the investigation and hearing process occurred on November 29. The Hearing Panel's decision dated March 20 was issued 111 days later, roughly six weeks before final exam week was set to begin. This delay, and the timing of such a drastic disciplinary action, might factor into a determination that the process was conducted in an arbitrary and capricious manner. In contrast, the proceedings on John's complaints against Jane evidently remain pending and it appears that they won't have an impact on Jane's degree or graduation. If all the related matters had been combined for consideration, John would have had the benefit of his allegations reflecting on Jane's credibility being considered at the same time as her allegations against him, and (if conducted on the timetable of the remaining proceedings) the combined proceedings would not have potentially impacted his graduation either.

Of course, all conclusions about the merits are conjectural at this point, and do not predict ultimate victory for John Doe. But it has been shown by the evidence and argument submitted that a jury could conclude that the disciplinary process was conducted in an arbitrary and capricious manner, and that Notre Dame breached its promise to provide John with a prompt, fair and impartial investigation and resolution of Jane's complaint. Because I find that John demonstrates some likelihood of success on the merits of his breach of contract claim, I do not proceed to consideration of the merits of his Title IX claim.

27

### Irreparable Harm and the Adequacy of Legal Remedies

Preliminary injunctive relief requires a demonstration that John will suffer (and that the injunction sought will address) irreparable harm that will occur in the period before the case is decided on the merits. *Jones*, 842 F.3d at 1058. John argues that his "dismissal . . . from the University only weeks before his graduation, and after he has invested tens of thousands of dollars in his education, constitutes irreparable harm." [DE 9 at 25.] He further contends that "[i]f the University maintains the sanction of immediate dismissal, John will have an incomplete for all of his courses this semester and will be forced to repeat his entire final semester when he re-applies next spring, assuming he is even accepted...Without [the preliminary injunction], even if John were to ultimately prevail in this lawsuit and have the finding of responsibility reversed, he would still need to repeat his final semester." [DE 37 at 2.]

> Other courts have found similar circumstances to constitute irreparable harm:
>
> While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career....Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.

*Doe v. Middlebury College*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D.Vt. Sept. 16, 2015). Similarly, a preliminary injunction was granted against DePauw University after a judge was persuaded that the plaintiff would suffer irreparable harm if "not permitted to complete this upcoming semester" because the gap created in his record

28

would make it "inevitable that he would be asked to explain [the] situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw." *King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D.Ind. Aug. 22, 2014). *See also Ritter v. Oklahoma*, No. Civ.-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 at *8 (W.D.Okla. May 6, 2016) (plaintiff seeking a TRO demonstrated that the "loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages").

*Middlebury* and *DePauw* both present circumstances in which the student-plaintiff obtained an injunction in time to permit him to return to his university in the fall and complete the entire school year, and so to avoid entirely a gap in his education during the pendency of the litigation. An injunction requiring a university to allow a student to return for an entire school year strikes me as a much greater burden to the university than what is being requested here — the taking of two final examinations.

What's more, because of the timing of the University's discipline here, avoiding a gap in John's educational career is even more difficult. The pendency of the litigation inevitably creates a gap in John's education, as he was dismissed from the University just short of completing the semester and without an undergraduate degree. As noted, John has indicated, without contradiction by the University, that only two remaining courses (which were interrupted by his dismissal) are necessary for his degree requirements. [DE 9 at 5.] Even if John prevails in this case and the disciplinary

29

dismissal is set aside by the final relief awarded, in order to earn his degree John would still be required to interrupt his career, return to South Bend and retake the two courses necessary for his degree. This would extend the unavoidable gap in John's academic career represented by the pendency of this lawsuit.

I am persuaded that this gap constitutes irreparable harm to John's reputation and resumé for purposes of career prospects and possible further academic advancement. The questions the gap raises, and the explanation it requires, are potentially damaging to John in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in John's favor. To repeat, the preliminary relief John seeks is very narrow — an injunction that he be allowed to take two exams — and is appropriate to minimize the consequences of the irreparable harm attributable to the pendency of the lawsuit, if John meets the other requirements for preliminary injunctive relief.

John also represents that being unable to take the two exams "will have an immediate impact on his post-graduation employment" and that he will "risk losing a lucrative employment position set to begin in June 2017." [DE 9 at 5, 6.] John has told me, without contradiction from Notre Dame, that he will be able to start his job in June if he completes his course work even if his degree is not conferred. The financial component of this harm, while significant, is not irreparable or incapable of being addressed by money damages. But what is irreparable is the fact that if an injunction is not issued, no matter what he chooses to do after leaving South Bend, he will need to

30

interrupt it to return to Notre Dame next spring for four months to repeat the workload that he has already nearly completed this year. He will be putting his life on hold and will have a lot of explaining to do to future employers and potential graduate schools.

## Balance of the Harms

Although the injunction sought here is a mandatory or affirmative injunction, it is not the case that "the hardships of the contemplated injunction would fall disproportionately on" Notre Dame. *Kartman*, 634 F.3d at 892. To administer two exams to John Doe is a modest requirement, it presents no logistical burden to Notre Dame and is virtually costless to the institution. And because the balance of the disciplinary sanction will remain in place—his dismissal from the campus, the non-conferral of his degree this Spring, and his exclusion from graduation with his class—it is hyperbole to suggest, as the University does, that the proposed injunction would leave the disciplinary sanction "*without meaningful consequence.*" [DE 36 at 2 (emphasis in original).] That strikes me as an absurd overstatement since John will still not have his degree.

The remaining components of the University's discipline are far from toothless. Notre Dame's interest in the conclusiveness of its disciplinary process is not undermined in advance of a final decision in this litigation, even if Notre Dame wins and the discipline is upheld. For the same reason—this is limited relief from the overall sanction—I don't believe that the University suffers particularly significant harm in terms of a chilling effect on potential future complainants.

31

On the other hand, if John prevails and the discipline is reversed, to deny the limited relief he seeks now would impose a significant extension of the hardship he suffers by a wrongful dismissal interrupting his senior year at the 11th hour. In the absence of the injunction, John's ultimate success in the litigation would still require him to re-take two courses in order to obtain his degree, imposing a further gap in his record that would (as previously discussed) subject him to reputational and career hardships. In sum, the balance of harms weighs heavily in John's favor. *See Ritter*, 2016 U.S. Dist. LEXIS 60193 at *8 (the grading of a test and master's thesis, while not small tasks are "inconsiderable in comparison to the threatened injury to plaintiff if he was wrongly expelled").

The public interest does not weigh against the relief John seeks. The public has an interest in fundamentally fair and sound educational discipline that is not imposed arbitrarily or capriciously. The minimal step taken in the proposed injunction to prevent the exacerbation of harm to John during his litigation challenging that fairness, while leaving in place significant ramifications of the discipline already imposed, is not contrary to the public interest. The public also has an interest in the safety of students on university campuses. There is no suggestion (nor could there be) that the limited relief of permitting John to take two exams, which can at the University's option be administered off-campus, endangers Jane or any other Notre Dame student.

32

## Conclusion

I am persuaded to grant the limited preliminary injunctive relief sought by John Doe. The injunction is supported by John's showing of at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm. The balance of the harms and the inadequacy of legal relief weigh in favor of the issuance of the injunction, and the public interest is not averse. The University will be ordered to permit John to sit for the two final examinations, which may be administered off-campus at the University's option, at a time and place mutually and reasonably agreed upon by the parties. The exams are to be graded, so that the ability for the course's professor to grade them along with the rest of John's class will not be lost. Otherwise, all terms and ramifications of the disciplinary decision remain in place, including John's exclusion from campus and the withholding of his degree. The University has not requested that any security be posted in the event the injunction is granted, and has not identified any costs to be incurred if Notre Dame is wrongly enjoined. I find that no bond is necessary under Rule 65(c).

**ACCORDINGLY:**

Plaintiff John Doe's Corrected Motion for a Temporary Restraining Order and Preliminary Injunction [DE 8] is GRANTED.

Defendant University of Notre Dame and its officers, agents, servants, employees, and attorneys are hereby RESTRAINED AND ENJOINED as follows:

33

Defendant shall permit John to take his final examinations, which may be administered off-campus at the University's option. The parties are to confer in good faith to reasonably agree upon a time and place for the exams to be administered. The exams are to be graded, and John's final grades computed. The University's disciplinary decision may remain in place in all other respects. Therefore, John's degree can be withheld, he must continue to stay off of Notre Dame's campus and he is banned from participating in commencement.

Defendant is ORDERED to preserve and retain all documents and electronically stored information potentially relevant to the claims in the Verified Complaint, including the audio recording of the Administrative Hearing.

The Court FINDS that no compensable harm will result to Defendant as a result of this Order, and, therefore, the Court declines to assess any surety bond.

This Order is effective immediately.

SO ORDERED.

ENTERED: May 8, 2017

/s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**

34