The auto repair shop was worth $50,000 in 2008 and is worth $100,000 at separation, reflecting a $50,000 increase in value. Two apportionment methods apply: Pereira and Van Camp. Pereira is used when the increase is primarily attributable to the owner-spouse's labor, while Van Camp applies when the increase is primarily due to the inherent nature or capital of the business.

Here, the facts indicate that the shop flourished because of Walter's expertise and personal management. This suggests that community labor was the primary cause of the appreciation, making Pereira the appropriate method. Under Pereira, the court allocates a reasonable rate of return on the original separate property investment to Walter's separate estate, with the remaining appreciation characterized as community property.

Although the facts do not provide sufficient numerical detail to calculate a precise reasonable rate of return, the analysis requires that Walter receive the original $50,000 value plus a reasonable return as his separate property. The remaining portion of the $50,000 appreciation is community property, to be divided equally between Harriet and Walter. Thus, Harriet is entitled to one-half of the community share of the appreciation, while Walter retains his separate property interest plus his one-half share of the community portion.

Conclusion

Goldenacre is Harriet's separate property by inheritance, subject to a $25,000 community reimbursement claim for improvements made with community funds, resulting in $12,500 payable to each spouse. The savings account is community property because it consists entirely of Walter's earnings during marriage, entitling each spouse to one-half. The auto repair shop is Walter's separate property by inheritance, but its appreciation during marriage must be apportioned, with the community entitled to a share of the increased value attributable to Walter's marital labor.

Module 4 Module 10 and Module 11 Essay Quiz Assignment Instructions

This Essay Quiz includes a hypothetical. You will write an essay answer, and then after you submit your completed Essay Quiz, you will receive a model answer.

USDC IN/ND case 4:26-cv-00028-PPS-AZ   document 31-2   filed 05/20/26   page 3 of 109

**PURDUE**
GLOBAL

PG Provost <provost@purdueglobal.edu>

## Provost Level Appeal Response: Nicole Lawtone-Bowles (2nd breach)
1 message

**PG Provost** <provost@purdueglobal.edu>                                    Wed, Mar 4, 2026 at 5:32 PM
To: nicolelawtone@aol.com, Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>
Cc: Brian Victor <Brian.Victor@purdueglobal.edu>, Shaun Jamison <SJamison@purdueglobal.edu>
Bcc: CLS AssociateDean <pglawassociatedean@purdueglobal.edu>

Dear Nicole Lawtone-Bowles,

I appreciate your patience during this review period.

Our Provost, Carolyn Nordstrom, has conducted a thorough review of your appeal; please find attached a letter with the decision. Please be advised that this is the final stage in the review process.

Thank you.

**JoAnna Navarro**
Pronouns: she, her, hers
On behalf of the Office of the Provost

www.PurdueGlobal.edu

**PURDUE**
GLOBAL

The information contained in this e-mail and any attachments is confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by e-mail and delete the original message.

📄 **Provost Appeal Response_Nicole Lawtone-Bowles_03.04.26.docx**
33K

Lawtone-Bowles 120



**PURDUE GLOBAL**

PG Provost <provost@purdueglobal.edu>

## Academic Dishonesty Appeal Outcome - 2nd breach
1 message

**PG Provost** <provost@purdueglobal.edu>                                        Mon, Mar 2, 2026 at 3:47 PM
To: nicolelawtone@aol.com, Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>
Cc: Brian Victor <Brian.Victor@purdueglobal.edu>, Shaun Jamison <SJamison@purdueglobal.edu>

Dear Nicole Lawtone-Bowles,

Thank you for your patience while waiting for the outcome of your CL760-01: Community Property Academic Dishonesty Appeal and the investigation of your claim of discrimination based on race and disability.

Re the investigation into the claims of discrimination: the summary document is attached.

Re the charge of academic misconduct: Supporting documentation from you, the instructor, and the Law School were reviewed by the Academic Appeals Committee as part of the February 23rd, 2026 hearing process to determine if there was evidence of academic dishonesty.

The Committee found:

- After reviewing the student's submissions, one can observe the high quality of the work provided in the assignments in question, together with the short time periods in which the work was completed, both in terms of the writing time online while the timed assignments were accessed by the student and in terms of the number of days in which the student completed the content and assignments for the course.
- The quality of work and depth of knowledge reflected in the submitted assignments were not evident in the student's response to the instructor when questioned.
- The Module essays and quizzes were completed in a timeframe substantially shorter than would reasonably be expected for a student to read, analyze, and respond. Additionally, all course requirements were completed in a timeframe significantly shorter than the typical progression for similarly situated students.
- While speed alone is not dispositive, the student's submissions exhibit polished syntax and error-free grammar which, when viewed collectively and in conjunction with the compressed completion times, raise concerns regarding independent authorship. In addition, during the hearing, the student was unable to complete comparable multiple-choice and short-answer questions at a similar pace. This observation of a disconnect between the student's submitted work and in-person performance suggests that the assignments are not the student's own work.
- Moreover, the course syllabus requires that students retain Word documents of their submissions. The student was unable to produce draft materials when requested and indicated she was unaware of the requirement. The absence of retained drafts limits the ability to verify the independent development of the submitted work and is appropriate to consider.
- In the materials provided by the student, there was her own article, "When Accommodation Becomes Suspicion," explaining her situation. Of the five sources cited/referenced, two were fabricated sources (Harbour and Onwuachi-Willig).
- After reviewing all submitted materials and following a hearing where the student was provided an opportunity to present information, the preponderance of evidence supports the conclusion that the student engaged in conduct inconsistent with the University's academic integrity policy.

The Committee, therefore, determined that this is a violation of the Student Code of Conduct. As a result, the failure of the CL760-01: Community Property class will stand; you will be administratively withdrawn from the course, and the 2nd Academic Dishonesty charge will remain documented in the University's database.

If you disagree with the Academic Appeals Committee's decision, you may send a rebuttal to the Office of the Provost within 10 days of receiving the Committee's decision. The Office of the Provost will review the Committee's appeal decision process, the information submitted, and any new material presented to make a final

Lawtone-Bowles 121

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 31-2    filed 05/20/26    page 5 of 109

ruling.

If you have any questions, you may email provost@purdueglobal.edu.

Thank you.

**JoAnna Navarro**
Pronouns: she, her, hers
On behalf of the Office of the Provost

www.PurdueGlobal.edu

**PURDUE GLOBAL**

---

**2 attachments**

**Lawtone-Bowles Discrimination Investigation Summary - 02.2026.docx**
32K

**Lawtone-Bowles, Nicole.zip**
2633K

Lawtone-Bowles 122



March 4th, 2026

Dear Nicole Lawtone-Bowles,

I received your appeal of the decision by the Academic Appeals Committee about a grade received in CL760-01: Community Property.

In my review of your appeal, I examined the assignment requirements, syllabus, and all other associated documents, as well as any additional materials submitted to the Appeals Committee.

After careful consideration of all the information provided, I am upholding the decision to deny your appeal. While I understand this was not the outcome you sought, I found no compelling evidence to contradict the Appeals Committee.

Sincerely,

**Carolyn Nordstrom, Ph.D.**
Pronouns: she, her, hers
Provost

Lawtone-Bowles 123

USDC IN/ND case 4:26-cv-00028-PPS-AZ   document 31-2   filed 05/20/26   page 7 of 109

salesforce

- Close Window
- Print This Page
- Expand All | Collapse All

## Case: C-6523986

### Case Summary

| | | | |
|---|---|---|---|
| Case Record Type | Academic Engagement | Product Family of Case | |
| Case Type | Student Concern | Case Number | C-6523986 [View Hierarchy] |
| Case SubType | Plagiarism Charges | Case Owner | JoAnna Navarro |
| Formal Approval Process? | No | Status | Closed |
| Prefix for Course | | Campus | 848 Purdue Global Law School |
| Term | | Campus From Campus Lookup | 848 Purdue Global Law School |

### Case Information

Estimated Credits Remaining

### Case Account Information

| | | | |
|---|---|---|---|
| Account Name | Nicole Lawtone-Bowles | Opportunity | |
| Academic Engagement | | Contact Name | Nicole Lawtone-Bowles |
| Desired Program | Juris Doctor (Full Time) | CVUE Student Number | 40055989 |
| Desired Program of Interest | | Instructor Name | |
| Emphasis Area | | Course Code | |

### Description

| | |
|---|---|
| Subject | Academic Dishonesty - 3rd Breach: Nicole Lawtone-Bowles |
| Description | Nicole Lawtone-Bowles<br>Term: 2601L<br>Class: CL850-01: Education Law<br>Assignment: Modules 1 and 8<br>Instructor Name: Sarah Diab<br><br>Reason:<br>*******From the Professor, Sarah Diab |

https://srmkaplanedu.my.salesforce.com/500WR00001G2OxfYAF/p

Lawtone-Bowles 124

The student submitted all assignments for the course within 2 weeks, between January 7 and January 22. The assigned textbook is over 900 pages, assigned in full. The only explanation for her ability to submit all assignments within days of one another is use of Ai, which is indicated by Turnitin.

The student first refused to meet, claiming to be too busy, then scheduled a meeting; upon an emergency on my end, I requested to reschedule our meeting for the following day or any other upcoming day. The student refused to reschedule and displayed intense hostility. Since her offensive remarks and display of aggression, I have seized all communication with the student and decided to report her. I have attached both email threads below. No other student that I have met with or whose appointment was rescheduled reacted in the same hostile manner.

****From the Chair and Associate Dean of Academic Affairs, Shaun Jamison

Dear Nicole Lawtone Bowles,

I have carefully reviewed this matter. Much of the concerns were addressed in more detail in the inquiry letter so I won't be repeating everything in detail here. I will be referring this matter to the Provost's office as an academic integrity violation.

It is important to clarify a few foundational matters:
• The appropriateness of speech to text technology for the assessments in this course is uncontested by the academic department.
• The use of spell check and ordinary grammar checkers (i.e. fixing your tense) on open book assessments are not a violation whether they use AI or not.
• The fact that a speech to text software uses AI to train itself to your voice, accent, or manner of speaking is not a violation.
• Using AI to generate expression such as sentences, paragraphs, etc. or substantially rewrite sentences, paragraphs, etc. would be a violation in this course.
• We are not relying on AI detection in determining whether to move forward with this violation.
• It's undisputed that you were given an opportunity to speak to your professor. The first you refused. The second, you agreed, but unfortunately the professor had a conflict. The third time, you refused.

Having reviewed your submitted materials, I found the properties of the documents the most helpful. You felt they were objective and dispositive. I find, particularly looking at Module One and Eight, concerning.

Module 8 assessment shows it was created over a period of 5 minutes for 6 pages and over a 1000 words. Module 1 (which you sent the properties for) was 29 pages long, with 6140 words, and produced over 194 minutes or approximately 3.25 hours. This means that you produced 8.92 pages of law school writing and analysis per hour including editing for Module 1 and about one page per minute for Module 8.

So while the properties seem to support that you put forth some effort to edit the material, the speed and quality of the documents produced in the amount of time is not believable without the aid of unpermitted resources such as generative artificial intelligence. Add to that the context of what you agree is full-time employment (plus other obligations) and the ordinary need for sleep and other tasks, the other 15 credits you were taking, it is not believable. I am also concerned that your correspondence, at times, belays that the quality of your analysis and knowledge of subjects you took at the school are not complete.

You ask us to believe you, and yet what we see demonstrated is not honesty. You stated on your attestation for the full-time program that you were only working 20 or fewer hours per week, but, in fact, you are working full-time and possibly more than that. You submitted the Module 1 assignment for review and feedback, knowing that was not allowed. You did not admit this was the reason for the very high Turnitin report until I prompted you. You filled out the end of module acknowledgements that you had completed the work and hours when you clearly had not (because the seminars had not happened yet, for one).

I know this is not the result you were hoping for. I will communicate my investigation to the Provost's office. As you know, they will reach out and you will have the opportunity to appeal. Note that if you intend to appeal, additional evidence or arguments must be submitted through that process as I have completed my investigation.

Here is a link to our student assistance service: https://campus.purdueglobal.edu/page/student-assistance-program. Their phone number is 855-384-1800.

Lawtone-Bowles 125

**Close Case Reason**    Completed

**Case Closure Comments**    Dear Nicole Lawtone-Bowles,

This letter confirms your third Academic Dishonesty breach of the Student Code of Conduct. The following information summarizes your breaches:

First Breach
Term: 2505L
Class: CL685-01: Criminal Procedure
Assignment: Modules 6 and 10 Essay
Instructor Name: Victoria Vidt

Second Breach
Term: 2601L
Class: CL760-01: Community Property
Assignment: Modules 4, 10, and 11 Essay Quiz & Module 11 Discussion
Instructor Name: Brian Victor

Third Breach
Term: 2601L
Class: CL850-01: Education Law
Assignment: Modules 1 and 8
Instructor Name: Sarah Diab

All reports of academic dishonesty are recorded in Purdue Global's database and remain there permanently. All breaches you accumulate while completing a program will be carried over to any subsequent program at Purdue Global.

If you disagree with these findings and wish to appeal this breach, you must complete the following steps:
If you have not done so already, discuss the breach with your instructor, providing a thorough explanation and evidence of why you believe the suspicion of academic dishonesty to be inaccurate.
If the dispute is still unresolved and you wish to pursue an appeal of the report of academic dishonesty, you must submit an Academic Appeal Form to the Office of the Provost. The appeal form can be found on your student portal under quicklinks or by following this link.
The appeal form should include an explanation and evidence to support your position.
Please note all appeals must take place in writing within 10 days of receiving this letter. Submissions made more than 10 days after notification of the breach will not be accepted.

The Code of Student Conduct Policy is accessible via the Purdue University Global catalog.

Regards,

Office of the Provost

Cc:

Carolyn Nordstrom, Provost, Purdue Global
Martin Pritikin, Purdue Global Law School
Shaun Jamison, Chair and Associate Dean of Academic Affairs, Purdue Global Law School
Sarah Diab, Instructor, Purdue Global Law School

**Action Taken**

**Case Evaluation Result**

Lawtone-Bowles 126

### International Background Check

| | | | |
|---|---|---|---|
| Programs | | BG Cost | |
| Permanent State and Country | New York<br>United States of America | BG Code | |
| BG Notes | | | |

### System Information

| | | | |
|---|---|---|---|
| Created By | JoAnna Navarro, 3/10/2026 4:12 PM | Last Modified By | JoAnna Navarro, 3/10/2026 4:26 PM |
| Portal Submitted By | | Date/Time Opened | 3/10/2026 4:12 PM |
| Parent Case | | ODI Link | |
| Parent Case Date Opened | | | |

### Contact Information

### Open Case and Task

# # OF OPEN CASES:  3
# # OF OPEN TASKS:  0

### Account Information

| | | | |
|---|---|---|---|
| Account Name | Nicole Lawtone-Bowles | Account Record Type | Student Enrollment |
| Chosen First Name | Nicole | Account Owner | Integration API Pre-Enrollment |
| Student Status | Dismissal | Industry Owner | |
| Admissions Advisor | Integration API Pre-Enrollment | Lead Classification | PGLS |
| Admissions Advisor ID | 505141 | Previous Lead Classification | null (Integration API Pre-Enrollment on 3/4/2024 1:30:12 AM EST) |
| ActiveOpportunitySyStaffID | 505141 | Source Description | |
| Latest Opportunity Owner | Integration API Pre-Enrollment | Shared Service | |
| Latest Opportunity Creation Date | 4/9/2026 11:29 AM | Fraud | |
| Ledger Balance | USD 0.00 | EWC | Yes |

Lawtone-Bowles 127

| | | | | |
|---|---|---|---|---|
| Scholarship | | Education Advising Team | |
| Dean Enrollment Approval Required | ✓ | FERPA | |
| DEAR Approval Case Required | ✓ | Directory Information Withheld | |
| Academic Violation | ✓ | Do Not Call | |
| AV Approval Case Required | ✓ | Do Not Email | No |
| SAP Appeal Required | FA Warning | GDPR | No |
| Lead Type | Adult | Region | |
| Partner Current Term Eligibility | | Has RN Nursing License | |
| Partner Next Term Eligibility | | HS Articulation | |
| Partner Code | | Success Coach Student Engagement | |
| Transfer Credit Evaluation | | Success Coach Last Interaction | |
| Active Scheduled Appointment | | | |

## Student Profile

| | | | |
|---|---|---|---|
| | | Campus | 848 Purdue Global Law School |
| CVue Student Number | 40055989 | syStudentID | 42122638 |
| Middle Name | | PG Law ID | |
| Block Student | | Maiden Name | |
| COVID-19 Impacted | | Education Mapping | |

## Contact Information

| | | | |
|---|---|---|---|
| Best Method to Contact | | Best Time to Contact | Morning; Afternoon; Evening |
| Primary Phone | (347) 538-5386 | Contact Frequency | |
| Is Primary Mobile? | | Primary Phone DNC | |
| Secondary Phone | (347) 538-5386 | Primary Phone Call Through Date | |
| Is Secondary Mobile? | | Secondary Phone DNC | |
| Tertiary Phone | 3475385386 | Secondary Phone Call Through Date | |

Lawtone-Bowles 128

| | |
|---|---|
| Is Tertiary Mobile? | |
| Primary Email | nicolelawtone@aol.com |

| | |
|---|---|
| Tertiary Phone DNC | |
| Tertiary Phone Call Through Date | |
| Student/Alternate Email | nicolelawtonebow@student.purdueglobal.edu |
| Secondary Email | nicolelawtone@aol.com |
| Time Zone | (GMT-05:00) Eastern Standard Time (America/Panama) |

## Permanent Address

| | |
|---|---|
| Permanent Street Address | 56 Center Street |
| Permanent City | Highland Falls |
| Permanent Zip Code / Postal Code | 10928 |

| | |
|---|---|
| Permanent State/Province/Region | New York |
| Permanent Country | United States of America |

## Shipping Address

| | |
|---|---|
| Shipping Street Address 1 | 56 Center Street |
| Shipping City | Highland Falls |
| Shipping Zip Code / Postal Code | 10928 |

| | |
|---|---|
| Shipping Street Address 2 | |
| Shipping State/Province/Region | New York |
| Shipping Country | United States of America |

## Billing Address

| | |
|---|---|
| Billing Street Address 1 | |
| Billing City | |
| Billing Zip Code / Postal Code | |

| | |
|---|---|
| Billing Street Address 2 | |
| Billing State/Province/Region | |
| Billing Country | |

## Personal Information

| | |
|---|---|
| Birthdate | 12/4/1971 |
| Gender | Female |
| Marital Status | Single |
| Is Hispanic/Latino? | Yes |
| Ethnic Background | American Indian or Alaska Native; Asian; Black or African American; White |

| | |
|---|---|
| Citizenship Status | U.S. Citizen |
| Country of Citizenship | |
| PG Campus Username | NicoleLawtoneBow |
| Last 4 digits on SSN | 1555 |
| Disability | ✓ |

## Military Information

| | | | |
|---|---|---|---|
| Current Military Status | Military Dependent | Military Hybrid | |
| Secondary Military Status | | Military Outreach Program | |
| Military Spouse Type | | Military Occupation Specialty: Primary | |
| Military Branch | Marines | Military Occupation Specialty: Secondary | |
| Military Rank | | Agency Sponsor | ELS USFG PGLS 10% |
| Date of Separation | | | |

## Military Scholarship Information

| | | | |
|---|---|---|---|
| Military Scholarship | | Effective Date | |
| Approval Status | | End Date | |
| | | Military Scholarship Discussion | |

## Shared Profile

| | | | |
|---|---|---|---|
| Key Motivation | Graduate w a Doctorate degree - Career advancement | Past/Current Education | Bachelors degree completed - Was doing a legal masters degree at liberty university - did not complete Masters degree |
| Current Employer | The City of New York & United States Military Academy | Education Goals | Graduate w a EJD degree |
| Approved for SBS Enrollment | | School Needs | SAS |
| Time Management Analysis | Made all appointments and deadlines / kept promises | Potential Transfer Credits | ✓ |
| Computer Access | Online classes in the past | Prior Schools | Liberty University,Liberty University |
| Tech Comfort | Completely comfortable | Additional Information | NA |
| Support System | NA | SIF Notes | |
| VA Employer | NA | Passed Online Course? | |
| Upcoming Life Event? | | Passed Two Courses? | |
| Life Event Specifics | | C or Better? | |
| | | Work Experience in Field? | |
| | | Referral Program | |

## Educational Benefits GOK

Lawtone-Bowles 130

Case: C-6523986 ~ Salesforce - Unlimited Edition

| | |
|---|---|
| Employee Name | Relationship |
| Employee Email | Immediate Relationship |
| Employee ID | Extended Relationship |
| Employee Division | GOK IRC Code |
| Employee Campus | |
| Manager Name | |
| Manager Email | |

**Alliance**

*Content cannot be displayed: You do not have sufficient privileges to access the page: /apex/AllianceAccount*

Lawtone-Bowles 131

## PGLS Information

Allowed Overrides

Utilized Overrides

Moodle Total Attempts    2

## PG Information

PG Business Development
Manager

PG Local Marketing

PG Work From Home

## Excel Track Student Information

Have you worked 3+ yrs in
field of study

College Courses Passed with
C or better?

Why is Excel Track a Good
Fit?

How many hrs/week for
school work?

ExcelTrack SIF

ExcelTrack Candidate

## System Information

| | | | |
|---|---|---|---|
| Created By | Integration API CVue, 3/4/2021 10:18 AM | Last Modified By | Chris Liang, 4/13/2026 9:16 AM |
| No of Open Opportunity | 1 | mkLeadImportID | 62075092 |
| # of ORS Opportunities | 0 | Lead Date | 3/4/2021 |
| # of Reengage Opportunity | 0 | Re-SIF | |
| Total # of Opportunities | 8 | Last SIF Submission | 3/4/2024 1:30 AM |
| HelloSign Blocked | | Is Student Self-Enrollment | ✓ |
| HelloSign Date Unblock | | Parent/Guardian Last Name | |
| Release Date | | User Last ADM Contact Attempt | |
| Parent/Guardian Email | | User Last Date of Contact from ADM | |
| Parent/Guardian First Name | | PDL | |
| Last ADM Contact Attempt | | PDL Referee | |
| Last Date of Contact from ADM | | Segmentation Code | 11 |
| | | Source Application | VA |

Lawtone-Bowles 132

USDC IN/ND case 4:26-cv-00028-PPS-AZ   document 31-2   filed 05/20/26   page 16 of 109

Case: C-6523986 ~ Salesforce - Unlimited Edition

Transfer StudentID

Transfer From Org

## Documents

Load Student Documents

**Student 's Documents**

**Default**   All

**Academic File Status:**

## Case History
**3/10/2026 4:26 PM**

User  **JoAnna Navarro**

Action  Changed **Case Closure Comments.** Changed **Close Case Reason to Completed.** Changed **Status** from New to **Closed.** Closed.

**3/10/2026 4:26 PM**

User  **JoAnna Navarro**

Action  Changed **Case Owner** from Office of the Provost to **JoAnna Navarro.**

**3/10/2026 4:12 PM**

User  **JoAnna Navarro**

Action  Changed **Owner (Assignment)** from JoAnna Navarro to **Office of the Provost.** Created.

## Attachments

| Mail - Your EL Assignments (Nicole Lawtone-Bowles).pdf | | Mail - CL850 Education Law_ Missing Grades.pdf |
|---|---|---|
| Size | **139KB** | Size **124KB** |
| Ownership | **JoAnna Navarro** | Ownership **JoAnna Navarro** |
| View | **View file** | View **View file** |
| Last Modified | **3/10/2026 4:19 PM** | Last Modified **3/10/2026 4:18 PM** |

**SGJ #6 NLB Document Properties.docx**   **SGJ #5 CL850 Academic Integrity Inquiry.pdf**

https://srmkaplanedu.my.salesforce.com/500WR00001G2OxfYAF/p

10/11

Lawtone-Bowles 133

| | |
|---|---|
| Size | **330KB** |
| Ownership | **JoAnna Navarro** |
| View | **View file** |
| Last Modified | **3/10/2026 4:17 PM** |

| | |
|---|---|
| Size | **104KB** |
| Ownership | **JoAnna Navarro** |
| View | **View file** |
| Last Modified | **3/10/2026 4:17 PM** |

### SGJ #3 NLB Notice of Report CL850.docx

| | |
|---|---|
| Size | **9KB** |
| Ownership | **JoAnna Navarro** |
| View | **View file** |
| Last Modified | **3/10/2026 4:15 PM** |

### SGJ #2 NLB Linkedin.docx

| | |
|---|---|
| Size | **298KB** |
| Ownership | **JoAnna Navarro** |
| View | **View file** |
| Last Modified | **3/10/2026 4:15 PM** |

### SGJ #1 NLB Correspondence post CL850 Inquiry Letter.docx

| | |
|---|---|
| Size | **4.14MB** |
| Ownership | **JoAnna Navarro** |
| View | **View file** |
| Last Modified | **3/10/2026 4:15 PM** |

Copyright © 2000-2026 salesforce.com, inc. All rights reserved.

https://srmkaplanedu.my.salesforce.com/500WR00001G2OxfYAF/p

Lawtone-Bowles 134

## Subject: CL850 Education Law: Missing Grades

? **Nicole Lawtone-Bowles** <nicolelawtonebow@student.purdueglobal.edu>          Wed, Feb 11, 11:50 AM (8 days ago)
to Sarah Diab

Good morning, Professor,

I wanted to let you know that I have not received any grades from you so far. Could you please confirm if there's an issue with the system or if the grades just haven't been posted yet?

Thank you,

Nicole Lawtone-Bowles
Certified Law Student
The State Bar of California's Practical Training of Law Students Program
Adrains Place Inc 501(c)(3)
Phi Alpha Delta
Bar Exam Essay Rules
Free Themis Outlines from LexisNexis
TestMax BarMax Bar Prep
National Conference of Bar Examiners
Studicata

Lawtone-Bowles 135

USDC IN/ND case 4:26-cv-00028-PPS-AZ    document 31-2    filed 05/20/26    page 19 of 109


**PURDUE**
GLOBAL

PG Provost <provost@purdueglobal.edu>

---

## Fwd: Your EL Assignments (Nicole Lawtone-Bowles)
1 message

**Sarah Diab** <sarah.diab@purdueglobal.edu>                                    Thu, Feb 19, 2026 at 10:30 AM
To: PG Provost <provost@purdueglobal.edu>

FYI.

Best,

**Sarah Diab**
**Adjunct Professor**
2029 Century Park East, Suite 400
Los Angeles, CA 90067

**E:** sarah.diab@purdueglobal.edu
www.PurdueGlobalLawSchool.edu



Logo from the Princeton Review. ©2025 TPR Education.
All rights reserved. Used under license.

---------- Forwarded message ----------
From: **Nicole Lawtone-Bowles** <nicolelawtonebow@student.purdueglobal.edu>
Date: Sat, Feb 14, 2026 at 8:15 AM
Subject: Re: Your EL Assignments (Nicole Lawtone-Bowles)
To: Sarah Diab <sarah.diab@purdueglobal.edu>


Professor, you are an inconvenience to my schedule. I cleared my schedule today to deal with you after learning from my classmates that you are playing AI police. Let me be clear that I am preparing my complaint to Purdue Global Law School. If you intend to claim that my Dragon speech-to-text usage, which is approved by

Lawtone-Bowles 136

SAS for me, is proof that I am using ChatGPT, that allegation is unfounded. AI detectors are biased against disabled, English-as-a-second-language, and minority students, which has been proven by Professor Ryan Baker in his published research.

If we cannot meet today, then we will not meet at all. Labeling my work as inappropriate AI use is a violation of disability laws. If you plan to file complaints, I am prepared to respond accordingly. I am also very disappointed that Scott Johnson is not teaching this class because he wrote the book and I have had him as a professor several times. I enrolled in this course expecting that he would be teaching.

You are a disservice to this class, and I am not happy. If I were not graduating in seven months, I would request a refund and withdraw from the course. This situation is unnecessary and raises serious civil rights concerns. As an attorney, you should know better.


Nicole Lawtone-Bowles
Certified Law Student
The State Bar of California's Practical Training of Law Students Program
Purdue Global Law School (formerly Concord Law School)
Juris Doctor August 25, 2026
Pronouns: She/Her
Adrains Place Inc
Nicole Lawtone-Bowles SSRN
Nicole Lawtone-Bowles LinkedIn
"Master your mind because a thought can ruin your whole day."


On Sat, Feb 14, 2026 at 07:55 Sarah Diab <sarah.diab@purdueglobal.edu> wrote:


Good Morning, Nicole,

I need to move today's meeting. Does tomorrow at the same time work for you?

If not, let me know when else works for you tomorrow or any other day this week.

Best,
SD


# Your EL Assignments (Nicole Lawtone-Bowles)

Saturday Feb 14, 2026 · 10am – 10:30am (Eastern Time - New York)


**Booked by**
Nicole Lawtone-Bowles
nicolelawtonebow@student.purdueglobal.edu

Lawtone-Bowles 137

NLB Correspondence post CL850 Inquiry Letter

**Shaun Jamison**
<sjamison@purdueglob
al.edu>

Wed, Mar 4,
11:19 AM (2 days
ago)

to Nicole,

me

Dear Nicole,

I am writing on behalf of Professor Sarah Diab, who is your professor for CL850. As you know, the professor has reached out to all CL850 students to discuss the authorship of their work.

On February 11, 2026, the professor let you know she would like to discuss your assignments. On that same day, you responded that you have no time to meet because you are "homeless, fighting a foreclosure and bankruptcy matter, and [you had] just started a new position as Interim Deputy Commissioner for the New York City Department of Homeless Services." You then scheduled Sunday, February 14, 2026 at 10 AM ET on your professor's calendar to meet. At 7:55 AM ET on Sunday, February 14, 2026, the professor informed you that she had a sudden conflict and asked to reschedule the following day or "any other day [that] week." At 8:15 AM ET on February 14, 2026, you refused to reschedule and made the following remarks and threats verbatim:

1. Professor, you are an inconvenience to my schedule.
2. I cleared my schedule today to deal with you after learning from my classmates that you are playing AI police.
3. Let me be clear that I am preparing my complaint to Purdue Global Law School.
4. If you intend to claim that my Dragon speech-to-text usage, which is approved by SAS for me, is proof that I am using ChatGPT, that allegation is unfounded.
5. AI detectors are biased against disabled, English-as-a-second-language, and minority students, which has been proven by Professor Ryan Baker in his published research.
6. If we cannot meet today, then we will not meet at all.
7. Labeling my work as inappropriate AI use is a violation of disability laws.
8. If you plan to file complaints, I am prepared to respond accordingly.

Lawtone-Bowles 138

9. I am also very disappointed that Scott Johnson is not teaching this class because he wrote the book and I have had him as a professor several times. I enrolled in this course expecting that he would be teaching.
10. You are a disservice to this class, and I am not happy.
11. If I were not graduating in seven months, I would request a refund and withdraw from the course.
12. This situation is unnecessary and raises serious civil rights concerns. As an attorney, you should know better.

Because the professor was the subject of disrespectful remarks, accusations, and threats on your part, I am reaching out to you in order to complete the investigation. You may reply directly to me; do not contact the professor about this matter further.

The professor is concerned about whether you are the author of the work you submitted in the course. Because this matter has come to my desk, I am providing additional context. The investigation is for the following reasons:

- You completed the work in the course at an extraordinary pace. CL850 is a four-credit law school course, which is designed to involve 180 total hours of study (45 hours per credit). You completed CL850 by January 22, 2026, about 16 calendar days into the term. According to the schedule you provided to your advisor, you were also working full-time during this timeframe.
- However, you were not solely working on CL850 and full-time employment during this period. You also completed 15 other law school credits, for a total of 19 credits. The typical course load per term is 7-9 credits for part-time students and 10-12 credits for full-time students (who are required to affirm that they do not have more than 20 hours per week on average of outside work or dependent care commitments).
- Based on our expected time frame of 45 hours of total study per credit, your coursework would have taken approximately 855 hours (45 x 19), or nearly 36 straight twenty-four-hour days, without sleeping, eating, or working. Obviously, this is not physically possible.
- In addition, your courses require that you acknowledge that you have completed the work and the estimated hours in each module.
- Even if you worked extraordinarily quickly and completed all of your work in half the time it is expected to take (and notwithstanding your hours acknowledgments within your courses), it would still have required nearly 18 straight twenty-four-hour days, without sleeping, eating, or working—which is, again, physically impossible.
- Further, based on the totality of the circumstances, where you initially refused to meet with your professor to discuss your assignments and then refused to reschedule, this indicia remains uncontested.
- However, Module One's assignment is an exception in that it is 98% copied from another student paper. The Turnitin report is attached. Your Module 1 submission is 31 pages, submitted on the first official day of the semester, January 7, 2026, at 12:01 ET, prior to the first Seminar scheduled on January 8, 2026.
- To clarify, the subject of this inquiry is:

- o   Module One - 98% copied from another student paper.
- o   Module Three - AI usage
- o   Module Five - AI usage
- o   Module Eight - AI usage
- o   Module Thirteen - AI usage

Your PG Supplemental Student Manual (which is automatically posted in all PGLS courses), Version 1.2, Effective January 2025 outlines Generative Artificial Intelligence policy beginning on Page 10 of that manual. The pertinent policy states the following:

"AI tools may not be used with open-book assessments unless explicitly allowed through an announcement by the faculty member teaching or course or through the course materials or as outlined below:

1. AI-enabled assistance similar to Grammarly for spelling and grammar may be used unless disallowed by the faculty or course materials.

2. If used consistently with assignment instructions, AI-assisted research tools are allowed for open-book assignments

3. AI may be used to help organize your writing. For more information on using AI tools, please see Student Resources. AI tools may be used to assist you with studying. Some examples of the use of AI in studying include assisting with outlining, creating practice quizzes, and generating emails to communicate with faculty, staff, and other students. You can even use AI to role-play negotiations.

Using AI tools beyond the permissions granted in a course constitutes a violation of the Student Code of Conduct."

This policy restricts AI use to research and studying, and instances where explicitly allowed through an announcement by the faculty member teaching or course or through the course materials; your use appears to exceed research and studying, and none of the other permitted instances are applicable to the class in question where no such announcement has been made in the course and no course materials have prescribed permitted use of AI. Further, when consulted, Professor Scott Johnson had expressly confirmed that the course is of an open-book nature that demands conventional research methods that do not involve AI use. No express allowance was made anywhere in the course for AI usage.

You took and passed the PGLS Academic Integrity Course prior to this term which explained that AI use on graded assessments was not permitted without explicit permission. Likewise, the course, along with the Student Code of Conduct and Academic Integrity Course do not permit submitting someone else's work as your own.

Additionally, the amount of time set for completion of each of these modules and respective assignments and when they were completed is as follows:

- Module 1:
  - Total time for module: 14.8;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 7, 2026 12:01 AM
- Module 3:
  - Total time for module: 16.1;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 12, 2026 3:35 PM
- Module 5:
  - Total time for module: 13;
  - Total time for assignment: 4 hours.
  - Submission stamp: January 12, 2026 9:40 PM
- Module 8:
  - Total time for module: 17.3;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 13, 2026 1:19 PM
- Module 13:
  - Total time for module: 13.6;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 14, 2026 3:28 AM
- Module 15:
  - Total time for module: 12.5;
  - Total time for assignment: 10 hours.
  - Submission stamp: January 22, 2026 6:34 AM

The speed with which you've completed your assignments, within 2 weeks, does not match the requisite time assigned for each of these modules and respective assignments, especially when taking your schedule and personal challenges into consideration.

On February 25, 2026, you emailed the professor a "request for clarification and accommodation compliance," while continuing to threaten your professor with a civil rights complaint. Your email contained the following statements verbatim:

- I received your email to the class regarding AI after you canceled my appointment one hour before we were scheduled to meet on Valentine's Day, after I had cleared my schedule.
- I completed my work early because I have surgery coming up and needed to plan accordingly. I understand that all of my instructors received notice of my approved accommodations before the semester began.
- The failure to accommodate my approved use of assistive technology, including speech-to-text, raises concerns under applicable disability laws.

- In addition, your lack of response to my questions since the beginning of the class has raised serious concerns and contributed to my decision to file a civil rights complaint.
- My work should be evaluated based on the substance and quality of the information provided, not solely on the results of an AI-detection tool such as GPTZero, to which I have a subscription.
- Research by scholars, including Professor Ryan Baker and researchers affiliated with institutions such as Harvard and Yale, has raised concerns about the reliability and potential bias of AI-detection systems. These studies indicate that such tools can produce false positives and may disproportionately impact certain writing styles or users of assistive technology. For these reasons, reliance on AI-detection software without substantive academic review raises fairness and accuracy concerns. Law students' work should be graded on its academic merit based on the rubric, not on an automated suspicion score.
- AI-detection tools like GPTZero are probabilistic systems, not forensic instruments. Independent research has shown that these tools can produce false positives, meaning they sometimes label human-written work as AI-generated. Scholars in educational data science, including Professor Ryan Baker, have cautioned that detection systems are not reliably accurate across different writing styles and linguistic patterns. Research discussions from institutions such as Harvard and Yale have also emphasized the risk of bias and over-reliance on automated academic integrity tools without human review. The concern becomes more serious when assistive technology is involved.
- Speech-to-text software can produce syntactic patterns that differ from conventional typing, which may inadvertently trigger AI-detection flags. I have observed this issue in my own research because I use speech-to-text applications and devices. If a disability accommodation changes the mechanics of writing, an algorithm trained on typical keyboard-generated prose may misclassify that output. This creates a potential disparate impact issue if disabled students are disproportionately flagged. For that reason, best practice in academic integrity review requires substantive faculty evaluation rather than sole reliance on detection software.

In your February 25, 2026 email, you raised several concerns regarding (1) disability accommodations, including speech-to-text software; (2) the reliability and potential bias of AI-detection tools; and (3) the propriety of relying on such tools in evaluating student work.

To clarify the basis of this investigation, kindly note the following:

1. The issue under review is not your use of approved assistive technology; PG fully honors approved accommodations, including speech-to-text software, and nothing in this investigation concerns or restricts your lawful use of such tools. As mentioned above, where the policy expressly permits certain limited uses of AI-enabled tools, such as grammar assistance and research and study support, such use must be consistent with course instructions. There is no prohibition on approved disability accommodations, and that is not at issue here.

2. While you assert that AI-detection systems are probabilistic and may produce false positives, no academic integrity determination is made solely on the basis of an automated detection score. AI-detection software is used as one screening mechanism among others to help professors with their identification of work that may warrant further review. It is not treated as a forensic instrument or as dispositive proof of misconduct. Rather, it functions as an integrity-support tool that prompts substantive faculty evaluation, similar to plagiarism detection software, and is more probative of plagiarism in conjunction with other proof such as the speed of submission in your case, which is disproportionate to the time allocated for completion of the assigned coursework.

3. Regardless of ongoing scholarly debate about detection accuracy, the controlling standard in this matter is PG's Supplemental Student Manual, cited above, which limits AI use to specific contexts: primarily research, studying, or where explicitly authorized by the instructor in open-book assignments, which is not the case here. Use of AI beyond these permissions constitutes a violation of the Student Code of Conduct, and where Professor Scott Johnson has not prescribed for use of AI in his designed course assignments, the likelihood of violation in the case of your submissions is high; no announcement, course material, or instruction authorizes generative AI use for drafting or composing the module assessments in this course, signaling the need for conventional research and original written analysis. Even if AI-detection tools are imperfect, that does not authorize the use of generative AI beyond what the policy or course permits, which is "none" in this course.

The central question in this investigation is therefore not whether detection software is flawless; rather, it is whether your submissions of all assignments within two weeks complied with the AI policy and the assignment instructions. Excessive or unauthorized generative AI use cannot be justified by general concerns about detection methodology. The relevant inquiry is whether the work submitted reflects your own analysis consistent with the permitted scope of AI use under institutional policy.

Lastly, academic integrity protections exist to ensure fairness across the student body. If some students rely on generative AI beyond authorized limits, while others comply with restrictions, the grading process becomes inequitable. PG's policy restrictions and the tools used to enforce them are intended to maintain consistent standards, protect the value of student work and the integrity of your degree, and ensure that all students are evaluated under the same rules.

Given the above, I request the following:

As to assignments from Modules 3, 5, 8, and 13:

- A statement about whether you have used AI in the creation of graded assessments in CL850.
- If you have used AI, explain how you have used it for each graded assignment.

- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.

As to the assignment from Module 1:

- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.
- An explanation for the 98% match with another student's paper

I request that you provide the following to me by 11:59 p.m. ET on Mar 6, 2026 at sjamison@purdueglobal.edu. Pending an outcome, the assessments will not be graded and thus remain zeros, though the zeros are placeholders only until the matter is resolved. If you do not respond, we will proceed with the allegations above. If you do respond, we will review and consider your response. Thank you for your attention to this matter. --
**Shaun G. Jamison**


## e: CL850 Academic Integrity Inquiry 1st Reply Via Video

---

**Nicole Lawtone-Bowles**
<nicolelawtonebow@student.purdueglobal.edu>

Wed, Mar 4, 2026 at 4:19 PM

To: Shaun Jamison <sjamison@purdueglobal.edu>



Lawtone-Bowles 145

Dear Nicole,

I am writing on behalf of Professor Sarah Diab, who is your professor for CL850. As you know, the professor has reached out to all CL850 students to discuss the authorship of their work. Yes, I heard from other classmates who reached out to me, but she failed to tell you that I had already sent several emails to her that went unanswered because I was asking a question about the Module 15 Assignment. See I started doing work during preview week which started on Janurary 2, 2026 because I had seven courses before you hit me with another academic violation for using SAS approved Assitive Technology. See I am a 54 year old Black Woman who is a Disabled Student with OCD, PTSD, Cervical and Lumbar Spine Trauma and Bilateral Knee Replacements.I have an IEP, and I am in Access VR, which is a New York State Rehabilitation program for disabled people to help fund my education and find jobs for disabled people like myself. I have reached out to you several times because you accused me of academic misconduct twice without ever speaking to me or having met me. This process of taking what an instructor says vs a disabled student is very discouraging to disabled students who need to study law to help get their rights. With that said, I use assistive technology because I can't type like a normal person. The only AI I use is Grammarly or Spell Check, because when you speak into your computer, words get distorted, as I will show you in the video. That is why I go to school online and not in person. Your decision has caused me to feel IIED because you and your faculty have accused me of cheating. I have an associate's in arts where I study English Literature and Philosophy. So no I dont need AI to

Lawtone-Bowles 146

write for me. I use Dragon Anywhere, which is on my phone or dictation software that is embedded into programs to type my work, which makes everything look like AI. Unfortunately, you, as an expert, should know that.

On February 11, 2026, the professor let you know she would like to discuss your assignments. On that same day, you responded that you have no time to meet because you are "homeless, fighting a foreclosure and bankruptcy matter, and [you had] just started a new position as Clerical Associate IV/ Administrative Assistant Deputy Commissioner for the New York City Department of Homeless Services."

You then scheduled Sunday, February 14, 2026 at 10 AM ET on your professor's calendar to meet. At 7:55 AM ET on Sunday, February 14, 2026, the professor informed you that she had a sudden conflict and asked to reschedule the following day or "any other day [that] week." At 8:15 AM ET on

February 14, 2026, you refused to reschedule and made the following remarks and threats verbatim:



Lawtone-Bowles 148



Lawtone-Bowles 149

1. Professor, you are an inconvenience to my schedule. Yes because I work at the U.S Miltary Academy on Saturday so I lost money and time. I work six days a week. 0900 to 1700 Monday to Friday and 1400 to 2230 on Saturday

2. I cleared my schedule today to deal with you after learning from my classmates that you are playing AI police. Yes that is exactly what it feels like because AI is in everything now you can't get away from it. I have tried.

3. Let me be clear that I am preparing my complaint to Purdue Global Law School. Yes I did file a complaint

4. If you intend to claim that my Dragon speech-to-text usage, which is approved by SAS for me, is proof that I am using ChatGPT, that allegation is unfounded. Yes I do use Dragon and my computer is Apple As of early 2026, Apple has integrated OpenAI's ChatGPT into iOS, iPadOS, and macOS via Apple Intelligence. Users can leverage ChatGPT for writing, image generation, and, as of iOS 26, on-screen analysis, with options to connect existing accounts. However, for core Siri upgrades, Apple has increasingly shifted toward partnering with Google and Anthropic.

5. AI detectors are biased against disabled, English-as-a-second-language, and minority students, which has been proven by Professor Ryan Baker in his published research. Yes see attached https://www.youtube.com/watch?v=3ZzmjgsDM2A

6. If we cannot meet today, then we will not meet at all. Yes I did say that I lost money because I took the day off. I never speak to anyone while I am at work or driving home because it always ends up with Academic Misconduct by you. So I make sure I am home and comfortable before meeting with any professor.

7. Labeling my work as inappropriate AI use is a violation of disability laws. Yes it is see attached link https://www.ed.gov/media/document/avoiding-discriminatory-use-of-artificial-intelligence-112274.pdf

8. If you plan to file complaints, I am prepared to respond accordingly. Yes I am because I have a disability and use assistive technology and have

Lawtone-Bowles 150

accommodations for that see attached

1. I am also very disappointed that Scott Johnson is not teaching this class because he wrote the book and I have had him as a professor several times. I enrolled in this course expecting that he would be teaching. Yes I am very disappointed Professor Johnson book is amazing and I want to pick his brain about the book. So yes.

2. You are a disservice to this class, and I am not happy. Professor Diab caused an Amy Veteran to quit the course because she activated his PTSD she's also aggravated my PTSD that's not good School supposed to be fun.

3. If I were not graduating in seven months, I would request a refund and withdraw from the course. That's true. I have five months left to graduate. I am trying my best,

but academic misconduct for having a disability and for using assistive technology is ridiculous.

4. This situation is unnecessary and raises serious civil rights concerns. As an attorney, you should know better. Yes you should know better my lawyer Arthur Schwartz just won a case for failure to accomindate people with disabilities in court see attached https://nypost.com/2025/10/27/us-news/national-grid-must-pay-2-workers-a-total-of-3-1m-for-denying-them-remote-work-after-pandemic/

Because the professor was the subject of disrespectful remarks, accusations, and threats on your part, I am reaching out to you in order to complete the investigation. You may reply directly to me; do not contact the professor about this matter further. Freedom of speech is a fundamental human right protecting the ability to express opinions without government censorship or retaliation. In the U.S., the First Amendment safeguards this right, covering spoken, written, and symbolic speech. This is my career, my life and my family life you people are playing with and you expect me after I have $200,000.00 in student loans to take this abuse from you. You can't be serious I am angry because this is emotional distress. I am set to graduate on August 25, 2026 I am busting my ass despite my disablity to complete my law degree. You Victoria Vidt, Brian A Victor, and Sarah Diab is standing in my way to change my life and my family life. You know why I am in law school one because my 8 year old grandson has never been held by my son his father who is sittting in a California Prison for a crime he did not commit. I am in school to save my family not to be harrassed for assitive technology. When I graduate I have five months to prepare for the Connecticut State Bar Feburary 2027 and six months to prepare for the Californina Bar July 2027 you are standing in my way to save my son and my home.

The professor is concerned about whether you are the author of the work you submitted in the course. Because this matter has come to my desk, I am providing additional context. The investigation is for the following reasons: I am having surgery on March 6, 2026, and I

Lawtone-Bowles 152

will be down for a while. I started doing work on preview day, January 2, 2026. If you look at Brightspace, I am always in the system. I don't sleep Monday to Friday. I get up at 0200 to leave my home at 0300 to find parking at 33 Beaver Street. I spend most of my time on the road listening to audiobooks and BarMax. I get to my job and sleep in the car until 0800. I get to work an hour before I have to punch in to do my homework, and I work on it during my lunch hour and when my boss is not in the building. The UBE gives you six essays, and you have 30 minutes to do each. I put a timer on and do my essays with 30 minutes. I review work every day; that is why I am prepared at all the seminars I can attend. For you to do what you did to me has caused me emotional distress. I am very sick, trying to work and trying to finish law school so I can complete my Juris Doctor degree this year because I am deteriorating. I walk with a walker, and my caregiver has to bathe me and dress me. My car is equipped for my handicap so I can still drive myself. The harm you have inflicted on me because of my assistive technology is ridiculous. School is supposed to be fun.

- You completed the work in the course at an extraordinary pace. CL850 is a four-credit law school course, which is designed to involve 180 total hours of study (45 hours per credit). You completed CL850 by January 22, 2026, about 16 calendar days into the term. According to the schedule you provided to your advisor, you were also working full-time during this timeframe. Response to the question regarding the pace at which I completed CL850:
  I began working on my coursework during preview week on January 2, 2026, because I knew I was scheduled to have surgery on March 6, 2026 and would be down for a period of time. Because of that, I planned my schedule so that I could complete as much coursework as possible before my surgery. If you review Brightspace, you will see that I am frequently logged into the system because I spend a significant amount of time studying and reviewing course materials. I go to sleep once I get home at 2000 and in bed by 2100 Monday through Friday because I use that time to work, commute, and study. I wake up at 0200 and leave my home at 0300 to find parking at 33 Beaver Street before work.
- However, you were not solely working on CL850 and full-time employment during this period. You also completed 15 other law school credits, for a total of 19 credits. The typical course load per term is 7-9 credits for part-time students and 10-12 credits for full-time students (who are required to affirm that they do not have more than 20 hours per week on average of outside work or dependent care commitments). Response to the question regarding how I managed coursework while working

Lawtone-Bowles 153

full-time:During my commute and while on the road, I listen to audiobooks and BarMax so that I can continue studying. When I arrive at my job, I sleep in my car until 0800. I also arrive at work an hour before I have to punch in so that I can work on my homework. I continue working on my coursework during my lunch hour and whenever my boss is not in the building. I use every available moment during the day to review and complete assignments.

- Based on our expected time frame of 45 hours of total study per credit, your coursework would have taken approximately 855 hours (45 x 19), or nearly 36 straight twenty-four-hour days, without sleeping, eating, or working. Obviously, this is not physically possible. Response to the question regarding the speed at which I completed written assignments: The UBE requires examinees to complete six essays with approximately 30 minutes allowed for each essay. Because of that format, I train myself by setting a timer and writing essays within 30 minutes. I review work every day, which is why I am prepared at the seminars I attend. Practicing timed essays and reviewing materials daily allows me to complete assignments efficiently. I also began completing coursework early because I knew my upcoming surgery would limit my ability to work later in the semester.

- In addition, your courses require that you acknowledge that you have completed the work and the estimated hours in each module. Which I do because I review course work all the time. While studying for the MPRE this month.

- Even if you worked extraordinarily quickly and completed all of your work in half the time it is expected to take (and notwithstanding your hours acknowledgments within your courses), it would still have required nearly 18 straight twenty-four-hour days, without sleeping, eating, or working—which is, again, physically impossible. For you your not me stop comparing me to your data.

- Further, based on the totality of the circumstances, where you initially refused to meet with your professor to discuss your assignments and then refused to reschedule, this indicia remains uncontested. Yes, because I work six days a week, sometimes, not all the time. I cleared my schedule for the meeting, and according to her Google calendar, she has nothing available. I have been home for two weeks preparing for my surgery with doctor visits and preparation, and her calendar is full.

- However, Module One's assignment is an exception in that it is 98% copied from another student paper. Your a liar. I will never copy anybody work you need to turn on the TurnItIn in the course so I can see it. I don't trust your report I need to see it for myself. So TurnItOn for the entire course Sarah Diab has it off. The Turnitin report is attached. Your Module 1 submission is 31 pages, submitted on the first official day of the semester, January 7, 2026, at 12:01 ET, prior to the first Seminar scheduled on January 8,

Lawtone-Bowles 154

2026. I started working on that assignement January 2, 2026 and uploaded on January 7, 2026. I can read very well you can't not teach me what I can read in the course and watching videos on my own time.

- To clarify, the subject of this inquiry is:
    - Module One - 98% copied from another student paper. I can't see the TurnItIn because it's not turned on please turn it on in the course.

    - Module Three - AI usage I can't see the TurnItIn because it's not turned on please turn it on in the course.

 

 

- Module Five - AI usage 10%

 

- Module Eight - AI usage I can't see the TurnItIn because it's not turned on please turn it on in the course.

Lawtone-Bowles 156

o   Module Thirteen - AI usage 30%

Your PG Supplemental Student Manual (which is automatically posted in all PGLS courses), Version 1.2, Effective January 2025 outlines Generative Artificial Intelligence policy beginning on Page 10 of that manual. The pertinent policy states the following: Yes which I have nothing says anything about speed or working at your own pace

"AI tools may not be used with open-book assessments unless explicitly allowed through an announcement by the faculty member teaching or course or through the course materials or as outlined below: I use Assitive Technology due to my disability

1. AI-enabled assistance similar to Grammarly for spelling and grammar may be used unless disallowed by the faculty or course materials. I use Assitive Technology due to my disability

2. If used consistently with assignment instructions, AI-assisted research tools are allowed for open-book assignments I use Assitive Technology due to my disability

3. AI may be used to help organize your writing. For more information on using AI tools, please see Student Resources. AI tools may be used to assist you with studying. Some examples of the use of AI in studying include assisting with outlining, creating practice quizzes, and generating emails to communicate with faculty, staff, and other students. You can even use AI to role-play negotiations. I use Assitive Technology due to my disability

Using AI tools beyond the permissions granted in a course constitutes a violation of the Student Code of Conduct." I have permission from SAS because of my disabilty I use Assitive Technology due to my disability

This policy restricts AI use to research and studying, and instances where explicitly allowed through an announcement by the faculty member teaching or course or through the course materials; your use appears to exceed research and studying, and none of the other permitted instances are applicable to the class in question where no such announcement has been made in the course and no course materials have prescribed permitted use of AI. Further, when consulted, Professor Scott Johnson had expressly confirmed that the course is of an open-book nature that demands conventional research methods that do not involve AI use. No express allowance was made anywhere in the course for AI usage. Not for Assitive Technology due to my disability

You took and passed the PGLS Academic Integrity Course prior to this term which explained that AI use on graded assessments was not permitted without explicit permission. Likewise, the course, along with the Student Code of Conduct and Academic Integrity Course do not

permit submitting someone else's work as your own. I use Assitive Technology due to my disability

Additionally, the amount of time set for completion of each of these modules and respective assignments and when they were completed is as follows:

- Module 1: I use Assitive Technology due to my disability
  - Total time for module: 14.8;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 7, 2026 12:01 AM
- Module 3: I use Assitive Technology due to my disability
  - Total time for module: 16.1;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 12, 2026 3:35 PM
- Module 5: I use Assitive Technology due to my disability
  - Total time for module: 13;
  - Total time for assignment: 4 hours.
  - Submission stamp: January 12, 2026 9:40 PM
- Module 8: I use Assitive Technology due to my disability
  - Total time for module: 17.3;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 13, 2026 1:19 PM
- Module 13: I use Assitive Technology due to my disability
  - Total time for module: 13.6;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 14, 2026 3:28 AM
- Module 15: I use Assitive Technology due to my disability
  - Total time for module: 12.5;
  - Total time for assignment: 10 hours.
  - Submission stamp: January 22, 2026 6:34 AM

The speed with which you've completed your assignments, within 2 weeks, does not match the requisite time assigned for each of these modules and respective assignments, especially when taking your schedule and personal challenges into consideration. I use Assitive Technology due to my disability

On February 25, 2026, you emailed the professor a "request for clarification and accommodation compliance," while continuing to threaten your professor with a civil rights complaint. Your email contained the following statements verbatim: I use Assitive Technology due to my disability

- I received your email to the class regarding AI after you canceled my appointment one hour before we were scheduled to meet on Valentine's Day, after I had cleared my schedule. Yes I did I did not go to work at the Miltary Base

- I completed my work early because I have surgery coming up and needed to plan accordingly. I understand that all of my instructors received notice of my approved accommodations before the semester began. Yes
- The failure to accommodate my approved use of assistive technology, including speech-to-text, raises concerns under applicable disability laws. Yes
- In addition, your lack of response to my questions since the beginning of the class has raised serious concerns and contributed to my decision to file a civil rights complaint. Yes
- My work should be evaluated based on the substance and quality of the information provided, not solely on the results of an AI-detection tool such as GPTZero, to which I have a subscription. Yes
- Research by scholars, including Professor Ryan Baker and researchers affiliated with institutions such as Harvard and Yale, has raised concerns about the reliability and potential bias of AI-detection systems. These studies indicate that such tools can produce false positives and may disproportionately impact certain writing styles or users of assistive technology. For these reasons, reliance on AI-detection software without substantive academic review raises fairness and accuracy concerns. Law students' work should be graded on its academic merit based on the rubric, not on an automated suspicion score. Yes
- AI-detection tools like GPTZero are probabilistic systems, not forensic instruments. Independent research has shown that these tools can produce false positives, meaning they sometimes label human-written work as AI-generated. Scholars in educational data science, including Professor Ryan Baker, have cautioned that detection systems are not reliably accurate across different writing styles and linguistic patterns. Research discussions from institutions such as Harvard and Yale have also emphasized the risk of bias and over-reliance on automated academic integrity tools without human review. The concern becomes more serious when assistive technology is involved. Yes
- Speech-to-text software can produce syntactic patterns that differ from conventional typing, which may inadvertently trigger AI-detection flags. I have observed this issue in my own research because I use speech-to-text applications and devices. If a disability accommodation changes the mechanics of writing, an algorithm trained on typical keyboard-generated prose may misclassify that output. This creates a potential disparate impact issue if disabled students are disproportionately flagged. For that reason, best practice in academic integrity review requires substantive faculty evaluation rather than sole reliance on detection software. Yes

In your February 25, 2026 email, you raised several concerns regarding (1) disability accommodations, including speech-to-text software; (2) the reliability and potential bias of AI-detection tools; and (3) the propriety of relying on such tools in evaluating student work.

To clarify the basis of this investigation, kindly note the following:

1. The issue under review is not your use of approved assistive technology; PG fully honors approved accommodations, including speech-to-text software, and nothing in this investigation concerns or restricts your lawful use of such tools. As mentioned above, where the policy expressly permits certain limited uses of AI-enabled tools, such as grammar assistance and research and study support, such use must be consistent with course instructions. There is no prohibition on approved disability accommodations, and that is not at issue here.  I use Assitive Technology due to my disability

2. While you assert that AI-detection systems are probabilistic and may produce false positives, no academic integrity determination is made solely on the basis of an automated detection score. AI-detection software is used as one screening mechanism among others to help professors with their identification of work that may warrant further review. It is not treated as a forensic instrument or as dispositive proof of misconduct. Rather, it functions as an integrity-support tool that prompts substantive faculty evaluation, similar to plagiarism detection software, and is more probative of plagiarism in conjunction with other proof such as the speed of submission in your case, which is disproportionate to the time allocated for completion of the assigned coursework.  I use Assitive Technology due to my disability

3. Regardless of ongoing scholarly debate about detection accuracy, the controlling standard in this matter is PG's Supplemental Student Manual, cited above, which limits AI use to specific contexts: primarily research, studying, or where explicitly authorized by the instructor in open-book assignments, which is not the case here. Use of AI beyond these permissions constitutes a violation of the Student Code of Conduct, and where Professor Scott Johnson has not prescribed for use of AI in his designed course assignments, the likelihood of violation in the case of your submissions is high; no announcement, course material, or instruction authorizes generative AI use for drafting or composing the module assessments in this course, signaling the need for conventional research and original written analysis. Even if AI-detection tools are imperfect, that does not authorize the use of generative AI beyond what the policy or course permits, which is "none" in this course.  I use Assitive Technology due to my disability

The central question in this investigation is therefore not whether detection software is flawless; rather, it is whether your submissions of all assignments within two weeks complied with the AI policy and the assignment instructions. Excessive or unauthorized generative AI use cannot be justified by general concerns about detection methodology. The relevant inquiry is whether the work submitted reflects your own analysis consistent with the permitted scope of AI use under institutional policy.  I use Assitive Technology due to my disability

Lastly, academic integrity protections exist to ensure fairness across the student body. If some students rely on generative AI beyond authorized limits, while others comply with

restrictions, the grading process becomes inequitable. PG's policy restrictions and the tools used to enforce them are intended to maintain consistent standards, protect the value of student work and the integrity of your degree, and ensure that all students are evaluated under the same rules.  I use Assitive Technology due to my disability

Given the above, I request the following:  I use Assitive Technology due to my disability

As to assignments from Modules 3, 5, 8, and 13: I use Assitive Technology due to my disability

- A statement about whether you have used AI in the creation of graded assessments in CL850.
- If you have used AI, explain how you have used it for each graded assignment.
- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.

As to the assignment from Module 1: I use Assitive Technology due to my disability

- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.
- An explanation for the 98% match with another student's paper Turn on the TurnItIn Feature in the course now

I request that you provide the following to me by 11:59 p.m. ET on Mar 6, 2026 at sjamison@purdueglobal.edu. Pending an outcome, the assessments will not be graded and thus remain zeros, though the zeros are placeholders only until the matter is resolved. If you do not respond, we will proceed with the allegations above. If you do respond, we will review and consider your response. Thank you for your attention to this matter.  I use Assitive Technology due to my disability

9:14 AM (5 hours ago)

**Nicole Lawtone-Bowles**

to me

Dear Dean Jamison,

I wanted to add that I am attaching documentation from my employer confirming that AI tools are not permitted on my work computer systems at The City of New York. I use assistive technology—specifically text-to-speech and speech-to-text—to complete my work. This is the same assistive technology I use when completing my coursework, both at home and at work.

Sincerely,

Nicole Lawtone-Bowles

**HI** **HRS Information**    ・・・

To: HRA Distribution List;  OCSE List DL  + 2

Fri 2/27/2026 06:40    View more

## **Generative AI Tool Prohibition**

Effective immediately, all DSS-HRA-DHS employees are strictly prohibited from entering or uploading any agency-related data, confidential information, internal documents, or personally identifiable information/private health information (PII/PHI) into any public or unapproved Generative AI tool (e.g., ChatGPT, public Copilot, or similar services).

Access to these tools will be blocked on official agency devices, and any of the above uses of AI tools for any business reason on any personal device is also prohibited.

The Agency is currently evaluating a potential exception policy that would permit limited access to Generative AI tools under defined conditions. Further details regarding the eligibility criteria, controls, and implementation procedures will be communicated once the process is finalized.

↩ ⌄    Reply

🔒 outlook.office.com    ↻

Lawtone-Bowles 164



|  | 11:09 AM |
|  | (3 hours |
| **Nicole Lawtone-Bowles** | ago) |

to me

Dear Dean Jamison,

Please see the attached screenshot from the Student Accessibility Services (SAS) office confirming that my accommodations have been approved, as they have been in the past. Despite these approved accommodations being on file, I have not been properly accommodated, and I was reported for academic misconduct while using accommodations that were already documented and authorized. Please review the attached documentation.

 **Student Accessibility Services** 11:45

to me, nicolelawtone ⌄

Hi, Nicole,

This information has been saved to your SAS student file.

Regarding a request for reasonable accommodations, you are currently approved and receiving accommodations through SAS.

Thank you,

**Toni Pesce, MBA**
**Manager, Student Accessibility Services (SAS)**
T: 317-208-1686
F: 866-422-4773
E: sas@purdueglobal.edu
www.PurdueGlobal.edu

The information contained in this e-mail and any attachments is confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by e-mail and delete the original message.

**Shaun Jamison**

5:14 P
M (0
minute
s ago)

to Nicole

Nicole, thank you for your response. I see at the bottom that you said something about a more detailed response. Are you planning to send more information supporting that you are the author of these assignments or is this your entire submission?

My working theory after more investigation on Module One is that you may have uploaded the assignment to Turnitin on January 4th and then uploaded it to Brightspace on January 7th. Is that correct? That would explain the 98% overlap. If so, simply share something demonstrating that you uploaded it and we can set aside the issue of you using another student's work. We would still need anything to show that you are the author of Module One, the same as the other identified assignments.

Professor Diab does not turn off or on Turnitin. This is controlled by another department. I know it's on because I sent you the report. I'm not sure what calling me a liar accomplishes. Attached to your email are screenshots from Brightspace showing Turnitin results which contradicts your statement that Turnitin is not on.

Again, please let me know if you are planning on submitting anything else.

Mar 4, 2026,
6:04 PM (2
days ago)

**Nicole Lawtone-Bowles**

to me

On Wed, Mar 4, 2026 at 6:15 PM Shaun Jamison <sjamison@purdueglobal.edu> wrote:

Lawtone-Bowles 167

Nicole, thank you for your response. I see at the bottom that you said something about a more detailed response. Are you planning to send more information supporting that you are the author of these assignments or is this your entire submission? I sent you a video of how I use my assistive technology; I need to know if you can view it. I am having surgery on March 6, 2026, and I am scheduled to take the MPRE on March 24, 2026, if my doctor allows it after the surgery.

My working theory after more investigation on Module One is that you may have uploaded the assignment to Turnitin on January 4th and then uploaded it to Brightspace on January 7th. Is that correct? That is correct. I uploaded the assignment to PG411 to check the Turnitin results, but they sent it back because they said they could not review ungraded assignments. So, I dropped PG411 and purchased GPTZero. I used it so much that they made me an Ambassador. That would explain the 98% overlap. If so, simply share something demonstrating that you uploaded it and we can set aside the issue of you using another student's work. We would still need anything to show that you are the author of Module One, the same as the other identified assignments. I would have to re-register for PG411 to give you that, so you would have to wait for it to appear in my portal.

Professor Diab does not turn off or on Turnitin. This is controlled by another department. I know it's on because I sent you the report. I'm not sure what calling me a liar accomplishes. You have cited me twice without speaking to me and without acknowledging that I have a disability. Your decisions have ruined my life. This is the third academic misconduct against me since I have been here, which would end my pursuit of my Juris Doctor degree. You are white and I am Black, and history has shown both of us who has the power. You have caused me so much distress. I have five months to change my entire life, and your plan is to take that from me. I am pissed and annoyed because I work hard. For two semesters I have taken seven classes. You go by credits; I go by days. Law school has saved my life. My children had me on suicide watch when I became disabled. I could not ride a motorcycle, I could not drive a truck anymore,

Lawtone-Bowles 168

and I lost my pilot license because of my medical cannabis use to monitor my OCD and PTSD. You have triggered everything that I had under control because of going to law school. My oldest son is in prison for a crime he did not commit. See Dean Pritikin—he knows my story and why I am here. You don't. You go by algorithms or race and label me a cheater. It is insulting. I am 54 years old and I am not anyone's child. I have my doctors fighting for me because they have seen everything I have been through. I want to be a lawyer to help people like me. You know my life is in your hands. You know that one more infraction and I am out. So how do you expect me to feel? You are not Black, so you would never understand the weight that is on my shoulders and how white people have the power to crush you in their hands. I am angry at you because I am working hard to succeed. I tutor other students who reach out to me. You cited me twice with academic misconduct, and the appeal process was useless. The law has gatekeepers that look like you to keep people like me out. History tells us that.

Attached to your email are screenshots from Brightspace showing Turnitin results which contradicts your statement that Turnitin is not on. Now, who is calling whom a liar? Turnitin is not turned on for all assignments. See the attached screenshots—one with color and one without.

13A TurnItIn is on

1A is TurnItIn is off

Lawtone-Bowles 170

Again, please let me know if you are planning on submitting anything else. I have another doctor's appointment tomorrow. He is writing a letter to the school about my assistive technology use; that is what I am waiting for, along with registering for PG411.

...

[Message clipped]  <u>View entire message</u>



**Nicole Lawtone-Bowles**

Mar 4, 2026, 8:08 PM (2 days ago)

to me

*Dean Jamison,*

*Please find the Turnitin report from PG411 attached for your review.*

*When TurnItIn is on it looks like this.*



On Wed, Mar 4, 2026 at 6:15 PM Shaun Jamison <sjamison@purdueglobal.edu> wrote:

Lawtone-Bowles 172

...

[Message clipped]  <u>View entire message</u>

**4 Attachments** · Scanned by Gmail

Mar 4, 2026,
8:22 PM (2
days ago)

**Shaun Jamison
<sjamison@purdueglob
al.edu>**

to Nicole

Nicole, the video would not play. It said it was too small to play and to download it. I did so and it still didn't work.

Maybe if you load it onto your student Google Drive and share it?

I saw your turnitin report. Please consider the matter closed as to the Turnitin similarity report for ordinary plagiarism on Module One.

If you think the doctor's note is pertinent, of course you should submit. As I hope I clarified in my letter, neither the faculty member nor I are challenging your right to use speech to text with spelling and ordinary grammar checking for open book assignments. As you know, some "grammar" software goes beyond just fixing grammar errors and suggests or rewrites entire sentences and that would be a violation of the policy to use those larger suggestions. I hope that clarifies things.

Lawtone-Bowles 173

Mar 4, 2026,
9:04 PM (2
days ago)

**Nicole Lawtone-Bowles**

to me

On Wed, Mar 4, 2026 at 9:22 PM Shaun Jamison <sjamison@purdueglobal.edu> wrote:

Nicole, the video would not play. It said it was too small to play and to download it. I did so and it still didn't work.

Maybe if you load it onto your student Google Drive and share it? I have an iPhone, so Android and iPhone videos do not always work with each other. I will need to speak with my caregiver to determine how I can make the video playable outside of the iPhone.

I saw your turnitin report. Please consider the matter closed as to the Turnitin similarity report for ordinary plagiarism on Module One. Thank you. However, because I use assistive technology, my AI score is always high, which is why I use GPTZero. Please watch the Ryan Baker video and read the articles.

If you think the doctor's note is pertinent, of course you should submit. As I hope I clarified in my letter, neither the faculty member nor I are challenging your right to use speech to text with spelling and ordinary grammar checking for open book assignments. As you know, some "grammar" software goes beyond just fixing grammar errors and suggests or rewrites entire sentences and that would be a violation of the policy to use those larger suggestions. I hope that clarifies things. I have provided all of my medical documentation and am currently waiting for one additional doctor's note. I have documented disabilities, including OCD and PTSD, along with a physical disability. Because of these conditions, I rely on assistive technology in order to function academically and professionally. I do not need to cheat, and I would not do so. I work extremely hard to

Lawtone-Bowles 174

complete my coursework honestly. The video I referenced shows how I use assistive technology, including listening to my textbooks and using my computer in a way that accommodates my disabilities. I will determine how to provide the video so that it can be reviewed, because I am tired of being accused of academic misconduct simply for using assistive technology. This technology is not optional for me. It is something I must use in order to read, write, and complete my work. I use the same technology at my job every day so that I can perform my professional duties. This situation is deeply disheartening. I already have two academic misconduct findings on my record, and one more could cost me the opportunity to complete my Juris Doctor degree on August 25, 2026. This is not a trivial matter. The appeal process feels ineffective because it appears to favor the instructor rather than the student. This is my life and my financial investment. It is not fair for my future to be jeopardized in this way. It is already difficult navigating higher education while living with disabilities and facing the additional challenges that I mentioned and that come with being a Black woman. My education represents my opportunity to help others. I would be the first person in my family to earn a law degree. I am asking that this opportunity not be taken away from me. I may not survive if that happens.

Mar 5, 2026,
7:04 AM (1 day
ago)

**Shaun Jamison**
<sjamison@purdueglob
al.edu>

Lawtone-Bowles 175

to Nicole

I think that uploading the video to your PG Google Drive and sharing it should work. Otherwise, you could convert it to MP4 which would play on anything.

I recommend using the drive because then you don't have to worry about the video getting screened out for being too large of a file or perceived as a security risk.

Here's information on uploading:

https://support.google.com/drive/answer/2423694?hl=en&co=GENIE.Platform%3DiOS&oco=1

You would need to share the file so that myself and the committee would be able to view it.

I know this process is stressful. We have a student assistance program: https://campus.purdueglobal.edu/page/student-assistance-program. The phone # is 855-384-1800.

**Nicole Lawtone-Bowles**

Mar 5, 2026, 7:14 AM (1 day ago)

to me

Dean Jamison,

This correspondence is to formally place you on notice regarding matters that are currently the subject of complaints I have filed with the U.S. Department of Education. Any action taken to expel me from the program, or to treat this matter as a third alleged breach resulting in disciplinary removal, will be considered retaliatory if the academic misconduct findings are not removed and if I am prevented from graduating on August 25, 2026. You are already aware

Lawtone-Bowles 176

that I have filed formal complaints concerning failure to accommodate my disability and related institutional conduct. Because those complaints are pending, any additional adverse academic action taken against me may reasonably be interpreted as retaliation.

As I have consistently stated in each appeal and complaint submitted, I have not engaged in academic misconduct. I complete my coursework using assistive technology required because of my documented disability, including speech-to-text software that allows me to dictate written responses rather than type them manually. My use of this technology has been consistent throughout my academic history and is necessary for me to participate in my coursework on equal terms with other students. The speed with which I am able to respond to emails or complete written assignments is the direct result of dictation technology, not the use of prohibited tools or academic dishonesty.

The presence of artificial intelligence technologies in modern digital systems should not be used as a basis to infer misconduct. Artificial intelligence has been embedded in computer systems, communication platforms, and software infrastructure for decades, including the systems used by educational institutions themselves. The mere existence of AI-related detection tools does not establish that a student has cheated, particularly where the student relies on disability-related assistive technologies. My academic background in English literature and philosophy reflects my ability to write independently, and I have no need to engage in academic dishonesty to complete my work.

Penalizing or disciplining me because I rely on assistive technology required by my disability would raise serious concerns under the Americans with Disabilities Act and related disability-access laws. I did not choose to have a disability, and the accommodations that enable me to complete my coursework are necessary for equal access to education. The use of speech-to-text software to dictate my written work is a standard assistive practice for individuals with disabilities that affect typing or written input. Treating that accommodation as evidence of misconduct would undermine the very purpose of disability accommodation laws.

Once my updated medical documentation is finalized, I will submit the complete record of supporting materials. That submission will conclude my documentation on this matter. This letter is not intended as a threat but as formal notice that I will continue to pursue all appropriate administrative and legal remedies if I am prevented from graduating as

Lawtone-Bowles 177

scheduled. My intention is to resolve this matter through the proper channels and ensure that my rights under disability law are respected.

Sincerely,

Nicole Lawtone-Bowles

See attached Reason: "Subject: Formal ADA and Section 504 Civil Rights Grievance Appeal

First Breach

Term: 2505L

Class: CL685-01 Criminal Procedure

Assignment: Modules 6 and 10 Essay

Instructor: Victoria Vidt

Second Breach

Term: 2601L

Class: CL760-01 Community Property

Assignment: Modules 4, 10, and 11 Essay Quiz and Module 11 Discussion

Instructor: Brian Victor

**Nicole Lawtone-Bowles**

Mar 5, 2026, 4:13 PM (22 hours ago)

to me

Notice and Supporting Documentation of Disability and Accommodations

Dean Jamison,

Here are the letters from my doctors' offices to Purdue University and my employer, the City of New York Department of Homeless Services, as proof of my disability and the requested accommodations I requested from Purdue Global Law School (formerly Concord Law School), which you, Victoria Vidt, Brian Victor, and Sarah Diab have all violated by failing to accommodate my use of assistive technology, which always gets flagged by AI detectors as AI because of the unnatural typing caused by the fact that I speak into my computer.

OCR Permission to Give My Name to Purdue and Proof of Disability Failure To Accommodate For Assis...

Also, I have been called not credible, and it has been stated that no one believes that I have mastered law. I suggest you Google my entire full name and see how many cases I have done pro se; some I win and some I lose, but I have been pro se since 2011 according to court records.

Lawtone-Bowles 179

My paralegal instructor, who taught me everything I know, works here as an instructor. You may speak with her; her name is Angela Dixon, JD, Adjunct Professor of Law. I met her in March of 2019 when I started the law study program in New York with Glenn Kimelman, Senior Partner at Kimelman Law PLLC.

As previously stated, I have several complaints filed with the U.S. Department of Education, Office for Civil Rights, for failure to accommodate me for my disability so I can complete my degree. Your decisions have caused me mental and financial harm.

Therefore, I am asking you to withdraw the academic misconduct findings so I can complete the remaining five months required for my Juris Doctor degree so I can change my life and my family's life.

I will attempt to upload the video, but I may have to place it on YouTube because the school email will not accept it from my iPhone. I am also scheduled to have surgery tomorrow and do not know how long I will be unavailable.

Accordingly, I ask you to spare my mental health and withdraw all academic misconduct allegations against me because I have supplied you with metadata and all assignments that I submitted in Education Law.

As for threats, you can clearly see that I did not make threats. I told you and Sarah Diab what I was going to do, and now you have the complaints, and so does Purdue.

I will state again that I do not need AI to write for me. I cannot help that AI is embedded in assistive technology.

Sincerely,
Nicole Lawtone-Bowles

...



**Nicole Lawtone-Bowles**

2:49 AM (12 hours ago)

to me

Dear Dean Jamison,

I am writing regarding the F grade issued in Course CL760-01: Community Property by Professor Brian A. Victor and the subsequent decision by the Provost to uphold that grade. As you know, I have filed a civil rights complaint with the United States Department of Justice regarding the handling of my coursework and disability accommodations. I am providing this notice so that the institution is aware that the matter is now under federal review.

I believe the actions taken against me in CL760 were discriminatory and based on assumptions rather than evidence. My coursework was completed using approved disability accommodations, including Dragon speech-to-text assistive technology authorized through

Student Accessibility Services. Instead of evaluating my work on its academic merit, the professor relied on assumptions about how quickly a student could complete assignments and concluded that the pace of my work must indicate misconduct.

As you are aware, Purdue Global Law School receives federal funding and is therefore subject to the requirements of the Rehabilitation Act and other federal disability protections. The decision to assign an F and impose academic penalties based on assumptions about my productivity, rather than on proof of misconduct, raises serious concerns regarding compliance with those laws.

For the record, I completed all of the coursework in the class. The autograded assignments reflect that my work was submitted and evaluated through the course system. My written assignments should be reviewed and graded based on their substance and academic merit rather than on speculation about how quickly I was able to complete them.

During my conversation with Professor Victor, he stated that he had "never met anybody like you before." That conversation was recorded. The recording reflects the statements made during that discussion and will be preserved as part of the documentation related to this matter.

At this stage, I am requesting a straightforward remedy. I ask that my access to the course be restored and that my written work be evaluated fairly and graded based on the rubric and academic content rather than on assumptions about the method or pace of my work. I am seeking the opportunity to have my work assessed on its merits so that my academic record accurately reflects the work I completed.

A copy of the complaint filed with the Department of Justice is attached for your reference.

Sincerely,

Nicole Lawtone-Bowles



6:09 AM (8 hours ago)

**Nicole Lawtone-Bowles**

to me

Dear Dean Jamison,

I am providing the attached video and supporting documentation to clarify the method by which I complete my coursework. As previously explained, I utilize Dragon speech-to-text software as an approved disability accommodation through Student Accessibility Services. Because my written work is dictated through assistive technology rather than typed conventionally, AI-detection tools frequently flag the text as "unnatural" or atypical typing patterns. These results are a known limitation of automated AI-detection systems and do not constitute evidence of academic misconduct.

Characterizing the use of approved assistive technology as academic misconduct raises serious legal concerns under federal disability law. Purdue Global Law School receives federal funding and is therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination against qualified individuals with disabilities in programs receiving federal financial assistance. In addition, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and its implementing regulations require institutions to provide reasonable accommodations and ensure that individuals with disabilities are not excluded from participation in or denied the benefits of educational programs because of their disabilities.

The U.S. Department of Education has also issued guidance recognizing that assistive technologies, including speech-to-text software, are legitimate accessibility

Lawtone-Bowles 183

tools and must be treated as reasonable accommodations when properly authorized through an institution's disability services office. Mischaracterizing the use of approved assistive technology as academic misconduct or artificial intelligence misuse effectively penalizes a student for exercising legally protected disability accommodations.

For these reasons, labeling my work as academic misconduct based solely on AI-detection results or assumptions regarding the pace or structure of my writing violates both institutional policy and federal disability protections. My coursework should be evaluated on its academic merits in accordance with the course rubric and with full recognition of my approved accommodations.

Accordingly, I request that my submissions be reviewed without reliance on automated AI-detection tools and that my work be evaluated through substantive academic review consistent with disability accommodation requirements and applicable federal law.

Please see the attached video and supporting documentation demonstrating how my speech-to-text assistive technology functions during the preparation of my written work.

Sincerely,
Nicole Lawtone-Bowles

https://docs.google.com/document/d/1CjEic7dYi8JrF7DaCb2rwZnC2cIC041PwIK_PQDZqzo/edit?usp=sharing

https://app.gptzero.me/writing-reports/shared/69aac223d61d34170d5b90bc



9:14 AM (5 hours ago)

**Nicole Lawtone-Bowles**

to me

Dear Dean Jamison,

I wanted to add that I am attaching documentation from my employer confirming that AI tools are not permitted on my work computer systems at The City of New York. I use assistive technology—specifically text-to-speech and speech-to-text—to complete my work. This is the same assistive technology I use when completing my coursework, both at home and at work.

Sincerely,

Nicole Lawtone-Bowles

Lawtone-Bowles 185

 **HRS Information** ...

To: HRA Distribution List;  OCSE List DL  + 2

Fri 2/27/2026 06:40    View more

### Generative AI Tool Prohibition

Effective immediately, all DSS-HRA-DHS employees are strictly prohibited from entering or uploading any agency-related data, confidential information, internal documents, or personally identifiable information/private health information (PII/PHI) into any public or unapproved Generative AI tool (e.g., ChatGPT, public Copilot, or similar services).

Access to these tools will be blocked on official agency devices, and any of the above uses of AI tools for any business reason on any personal device is also prohibited.

The Agency is currently evaluating a potential exception policy that would permit limited access to Generative AI tools under defined conditions. Further details regarding the eligibility criteria, controls, and implementation procedures will be communicated once the process is finalized.

↩ ⌄    Reply

 outlook.office.com    ↻

< > + 2 ☰

Lawtone-Bowles 186

11:09 AM
(3 hours
ago)

**Nicole Lawtone-Bowles**

to me

Dear Dean Jamison,

Please see the attached screenshot from the Student Accessibility Services (SAS) office confirming that my accommodations have been approved, as they have been in the past. Despite these approved accommodations being on file, I have not been properly accommodated, and I was reported for academic misconduct while using accommodations that were already documented and authorized. Please review the attached documentation.

**Student Accessibility Services** 11:45     ...

to me, nicolelawtone ⌄

Hi, Nicole,

This information has been saved to your SAS student file.

Regarding a request for reasonable accommodations, you are currently approved and receiving accommodations through SAS.

Thank you,

**Toni Pesce, MBA**
**Manager, Student Accessibility Services (SAS)**
T: 317-208-1686
F: 866-422-4773
E: sas@purdueglobal.edu
www.PurdueGlobal.edu

The information contained in this e-mail and any attachments is confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by e-mail and delete the original message.

Dear Dean Jamison,

Attached is a screenshot illustrating how metadata appears in a Microsoft Word document. As the screenshot shows, the document was originally created on January 2 at 10:56 p.m. and last modified on Tuesday, the 13th at 10:48 p.m. The metadata also reflects a total editing time of approximately 198 minutes and indicates that the

Lawtone-Bowles 188

document underwent six revisions. These embedded details are automatically generated by Microsoft Word and appear consistently across all of my Word documents.

This metadata clearly shows the time spent drafting and revising the document. It reflects a normal writing and editing process conducted directly in Word. For that reason, the metadata indicates that the document was produced through standard drafting and revision rather than through external automated tools.

I am requesting that this information be reviewed carefully before any conclusions are drawn about how my work is produced. The metadata provides an objective record of when the document was created, how long it was worked on, and the number of revisions made during the drafting process.



**Nicole Lawtone-Bowles**

1:50 AM (6 hours ago)

to me

Dean Jamison,

please add the following documents to the evidentiary record.

https://www.linkedin.com/in/nicolelawtone-bowles?utm_source=share_via&utm_content=profile&utm_medium=member_ios

Nicole Lawtone-Bowles

Certified Law Student

The State Bar of California's Practical Training of Law Students Program

Purdue Global Law School (formerly Concord Law School)

Juris Doctor August 25, 2026

Pronouns: She/Her

Adrains Place Inc

Nicole Lawtone-Bowles SSRN

Nicole Lawtone-Bowles LinkedIn

"Master your mind because a thought can ruin your whole day."

**Nicole Lawtone-Bowles**

2:15 AM
(6 hours
ago)

to me

Dear Dean Jamison,

I am writing to formally request the names of all individuals who served on or participated in the committee or decision-making body that reviewed and voted on the academic determinations

Lawtone-Bowles 190

made in my case. This request applies to both academic integrity matters that resulted in adverse academic decisions concerning my coursework.

I am requesting this information as part of my effort to fully understand the basis for the decisions made and to ensure that I have a complete record of the individuals involved in the review process. I am currently compiling documentation related to these matters, including materials relevant to disability accommodations and academic integrity proceedings.

This request is also necessary as I prepare materials for submission to federal authorities regarding a potential failure to accommodate and related concerns. In particular, I am assembling documentation that may be provided to the United States Department of Justice and other appropriate agencies.

Under the Family Educational Rights and Privacy Act (FERPA), students have the legal right to inspect and review their education records maintained by an educational institution. FERPA requires that institutions provide access to such records within forty-five (45) days of receiving a written request.

Accordingly, I respectfully request access to any education records identifying the individuals who participated in the review, deliberation, or voting related to the academic integrity findings or academic sanctions issued in my case. This includes the names and titles of committee members, administrators, or faculty involved in those determinations, as well as any records reflecting the review process.

Please treat this correspondence as my formal FERPA request for inspection and review of the relevant education records. I would appreciate confirmation that my request has been received and information regarding when the requested records will be made available.

Thank you for your attention to this matter.

Sincerely,

Nicole Lawtone-Bowles

**Shaun Jamison**

8:52 AM (0 minutes ago)

to Janet,

Nicole

Nicole, I am still investigating and thus wouldn't know the answer, for example, if I determined a violation, who would be on the panel should you choose to appeal. I am forwarding your request to student relations as they would likely be better equipped to determine how to handle such a request. My role here (CL850) is to complete the investigation and determine if a violation should be reported.

**Nicole Lawtone-Bowles**

9:01 AM (47 minutes ago)

to me

Dear Dean Jamison,

I am writing regarding the academic integrity findings that have been issued against me in connection with my use of assistive technology. I have now received two academic misconduct findings, and I have been informed that a third allegation could result in my dismissal from the program, despite the fact that I have approximately five months remaining before my expected graduation date of August 25, 2026.

The conduct that has been treated as misconduct is directly related to my approved disability accommodations, including the use of speech-to-text assistive technology. I use this technology because my disability significantly limits my ability to type, and the accommodation was

Lawtone-Bowles 192

approved through the university's Student Accessibility Services. Treating the use of approved assistive technology as evidence of misconduct effectively nullifies the accommodation and places me at risk of expulsion for conduct that is consistent with my documented disability needs.

I believe this situation reflects a failure to properly implement my approved accommodations and raises serious concerns regarding compliance with federal disability discrimination laws. The Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq., requires places of public accommodation, including private educational institutions, to provide reasonable accommodations to qualified individuals with disabilities. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, similarly prohibits discrimination against individuals with disabilities by institutions that receive federal financial assistance and requires that qualified students with disabilities be provided equal access to educational programs and activities.

Regulations enforced by the U.S. Department of Education's Office for Civil Rights, including those found at 34 C.F.R. Part 104, require institutions to provide appropriate academic adjustments and auxiliary aids when necessary to ensure that students with disabilities are not excluded from participation in or denied the benefits of educational programs. Assistive technology such as speech-to-text software is widely recognized as an auxiliary aid when approved through a university's disability services process.

The actions taken against me also raise concerns regarding compliance with applicable state civil rights protections governing disability discrimination in educational institutions operating in California. These include the California Civil Rights Act, California Civil Code § 51, and the California Disabled Persons Act, California Civil Code §§ 54 and 54.1, which guarantee individuals with disabilities full and equal access to places of public accommodation.

Because the academic integrity findings appear to be based on conduct that is consistent with my approved accommodations, I am requesting access to all records and materials related to these determinations. This includes documentation regarding the allegations, the review process, the individuals involved in the decision-making process, and any evidence relied upon in reaching these conclusions. This request is being made so that I may complete my documentation and finalize my complaint submissions to the United States Department of Justice and the U.S. Department of Education's Office for Civil Rights.

Lawtone-Bowles 193

This matter is extremely serious. I have worked toward this degree with the expectation that my documented disabilities would be accommodated in accordance with federal law and university policy. I am requesting that the university review this matter carefully and ensure that my approved accommodations are fully recognized and implemented.

Sincerely,

Nicole Lawtone-Bowles

9:46 AM (6 minutes ago)

**Shaun Jamison**

to Janet,

Nicole

Again, I refer you to student relations who might be better able to determine how to address your request.

As I noted, the process for CL850 is not yet even past the investigation stage.

9:33 AM (17

**Nicole Lawtone-Bowles**

Lawtone-Bowles 194

minutes

ago)


to me


Dear Dean Jamison,

I want to be quite frank with you. I am spending the weekend speaking with my attorneys about bringing a lawsuit against you and Purdue Global Law School (formerly Concord Law School) because the decisions made against me have caused me severe emotional distress, including intentional infliction of emotional distress (IIED).

I paid for the Community Property course, completed all of the work, and was removed from the class because you failed to accommodate my disability and my use of assistive technology. The reality with schools is that they rarely go against faculty members, which is why I am holding you personally responsible for the decisions that have been made in this matter.


I have read the transcripts and communications where your name appears regarding my situation, including the direction given about how questions should be asked and how the issue should be handled. From my perspective, the underlying issue is that my use of assistive technology has been treated by you as suspicious or improper rather than as the disability accommodation that it is. That is a violation of my civil rights because you have failed to accommodate my use of assistive technology.

You can see how quickly I respond to emails. That is because I speak into my phone and then copy the text into email. This is the method I use throughout my daily life because I can no longer type effectively. I speak into my phone or into my computer using a headset and speech-to-text software in order to produce written work. I do this all day because this is my life now. I

Lawtone-Bowles 195

speak into my computer to produce written materials for my employers, and I conduct legal research for my law office study attorneys in both New York and California.

I also want you to understand the personal toll this situation has taken. I had surgery yesterday and I am currently waiting for medical results to determine whether I have cancer. I should be resting and focusing on my health. Instead, I am forced to deal with the stress created by these decisions and the continuing threat to my education. The level of stress this situation has caused is significant, and I am placing you on notice regarding the impact these actions are having on me.

I have jobs waiting for me in law offices when I graduate and pass the bar. Plus my goal is to get my oldest son out of prison was serving time for a crime he did not commit. Your actions are jeopardizing my ability to complete my legal education and move forward with my career and to help my family and people like me.  Because of that, I am holding you personally responsible for all the consequences of these decisions.

I expect to be reinstated in the Community Property course by Monday so that my work can be evaluated based on its honest merits. If that does not happen, I will continue moving forward with legal action against Purdue Global Law School (formerly Concord Law School). I will retain counsel and pursue this matter formally.

Dean Jamison you have failed to accommodate my use of assistive technology, which is a reasonable accommodation connected to my documented disability. If I am not reinstated in the Community Property course and allowed to complete my work, I will move forward with legal action against Purdue Global Law School (formerly Concord Law School) and against you personally for the decisions that have been made in all matters against me. This is not a threat. This is a promise because I am attached to a union. My attorneys are most likely going to be free because they have a point to prove, as the union and the City of New York and Department of Defense are paying for this education under the Public Service Loan Forgiveness Program.

https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service

Nicole Lawtone-Bowles

10:07 AM
(7 minutes
ago)

**Nicole Lawtone-Bowles**

to me,

Janet

Dean Jamison,

This entire investigation is a real-life situation in education law. This is one of the reasons I chose to take Education Law. I love the textbook, and Scott Johnson is an amazing legal writer. I am his biggest fan. He is also an amazing instructor. I am very disappointed that he did not teach his course because I wanted to pick his brain so badly. I admire him very much.

I do not deserve this with five months left to go before graduation. However, this situation has become a real lesson in education law for me, because I am now learning the steps involved in bringing an action.

Nicole Lawtone-Bowles

Dean Jamison,

Please see the attached escalated tech support request to turn on TurnItIn for the course CL850.

Also, I can no longer see my work in Community Property. I think you really need to rescind your academic misconduct against me, given that you failed to accommodate me for my assistive technology that has already been approved by SAS so I could finish my class, take my exam, and be graded properly, and not be forced to retake it in the summer.

You have obviously misjudged me. You failed to accommodate me, and this is all done because of your actions. See attached proof.



Lawtone-Bowles 198



---------- Forwarded message ---------
From: **Tech Support** <techsupport@support.purdueglobal.edu>
Date: Sun, Mar 8, 2026 at 7:57 PM
Subject: CSR0643359 - opened on your behalf
To: <NicoleLawtoneBow@student.purdueglobal.edu>, <nicolelawtone@aol.com>

Lawtone-Bowles 199



Lawtone-Bowles 200

## CSR0643359 - Brightspace Support Escalation
Details:

Contact: Nicole Lawtone-Bowles

Opened: 03/08/26 07:37:39 PM

State: New

Short description:
Brightspace Support Escalation

Description:
Details:
Turn-in Functionality Issue -
- The Client reported that the turn-in feature in the education law module (CL850) is not working.
- The Client can see the submission module but cannot view the report or see the percentage and colors.
- The Advisor confirmed this is a system issue and will escalate it to the back office.
- The Advisor will create a ticket for the Client to forward to their instructor.
- The Advisor mentioned that if the turn-in feature doesn't reset itself at midnight, they will investigate it in the morning.

Purdue University Global, Inc., is an Indiana nonprofit, public benefit corporation controlled by The Trustees of Purdue University.
For comprehensive consumer information, visit Info.PurdueGlobal.edu.
To contact Purdue University Global, call 866-522-7747.
Privacy Policy
Veterans Affairs Inquiries: Purdue University Global | 9000 Keystone Crossing, Suite 800 | Indianapolis, IN 46240
University Academic Offices: Purdue University Global | 2550 Northwestern Ave., Ste. 1100 | West Lafayette, IN 47906

Lawtone-Bowles 201

Ref:MSG17828723

8:04 AM
(3 hours
ago)

**Nicole Lawtone-Bowles**

to me

Shaun Jamison, JD, PhD, Associate Dean of Academics, you Professor Brian A. Victor, who teaches Community Property, Professor Sarah Diab, who teaches Education Law, and Professor Victoria Vidt, who teaches Criminal Procedure at Purdue Global Law School, formerly Concord Law School, are connected to an experience that raised serious concerns about how disabled students who rely on assistive technology are treated in legal education. Students who use speech-to-text software, dictation tools, and other accessibility technologies should be supported under disability accommodation policies, not penalized for using the tools that allow them to participate in the classroom. Assistive technology such as speech-to-text and text-to-speech software is widely recognized as a reasonable accommodation for individuals with disabilities. When a university's Student Accessibility Services office approves these tools, the purpose is to ensure that disabled students can complete assignments, participate in coursework, and take exams on equal footing with other students. When those accommodations are ignored, restricted, or misinterpreted as academic misconduct, it creates barriers that prevent disabled students from receiving equal access to education.

Voice-to-text technology produces writing differently from traditional typing. Dictation software generates text continuously and quickly, and it often produces grammatically clean sentences because the words are converted directly from speech. Because of this, automated AI-detection systems can sometimes misinterpret dictation output as artificial intelligence-generated writing. When institutions rely on automated detection tools without understanding assistive technology, disabled students can be wrongly accused of misconduct. Failure to accommodate disabled students is not just an academic issue; it is a civil rights issue. Federal laws such as the Americans with Disabilities Act and Section 504 of the Rehabilitation Act require educational

Lawtone-Bowles 202

institutions to provide reasonable accommodations and ensure that students with disabilities have equal access to educational programs.

When accommodations are not implemented properly, disabled students can face academic penalties, delays in graduation, and damage to their academic records. Disabled students should not have to fight simply to use the tools that allow them to learn. Law schools train future lawyers, and those institutions have a responsibility to ensure that their policies respect accessibility, civil rights, and equal opportunity. When accessibility barriers appear in legal education, students must speak up so that institutions recognize the importance of accommodating assistive technology and protecting the rights of disabled students.

Nicole Lawtone-Bowles



**Nicole Lawtone-Bowles**

8:09 AM
(3 hours
ago)

to me

You don't understand OCD. There are seven days in a week, and I had seven classes, one for each day, to work on, along with my time and everything else. For you to say that you don't believe me is your problem. You have been inflicting emotional stress on me since Victoria course. I will take this to the next level, which means I will sue you and Purdue Global.

Nicole Lawtone-Bowles

Lawtone-Bowles 203

11:21 AM
(33 minutes
ago)

**Nicole Lawtone-Bowles**

to me

Dear Dean Jamison,

I disagree with the conclusion that my work could not have been completed without the use of unpermitted resources. I want to explain how I manage my time and workload.

I have seven classes. A week has seven days, and a day has twenty-four hours. I can work for seven hours and study for seven hours. Seven plus seven equals fourteen hours, and twenty-four minus fourteen equals ten hours remaining. That still leaves me ten hours in a day for sleep and other personal responsibilities.

I work extremely hard and dedicate a significant amount of time to my studies. My ability to complete work efficiently is not the result of artificial intelligence but rather the result of careful time management and the use of speech-to-text assistive technology, which allows me to dictate my work instead of typing due to my disability.

As I have explained previously, I use speech-to-text software because I cannot type for long periods. Dictation software produces text quickly because the words are spoken and converted directly into written form. This can make the writing process appear faster than traditional typing, but it does not mean that artificial intelligence is generating the content.

You state that you do not find me credible. I must address that directly. I am a 54-year-old Black disabled woman who has worked extremely hard to reach this point in my legal education. Being repeatedly described as "not credible" despite my work, my academic record, and the accommodations documented for my disability is deeply troubling discriminatory and racist especially coming for someone that looks like you.

Respectfully,

Lawtone-Bowles 204

Nicole Lawtone Bowles


- Forwarded message ----------
From: **Martin Pritikin** <martin.pritikin@purdueglobal.edu>
Date: Mon, Mar 9, 2026 at 9:04 AM
Subject: Re: NLB Notice of Report CL850
To: Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>


Did you mean to send this to me or to Dean Jamison?

I must say, accusing Dean Jamison of discriminating against you purely on the basis of his skin color appears itself to be an example of racist thinking. I have worked with Dean Jamison for a decade. I have always found him to be ethical, diligent, cautious in his judgments and, to the extent it is even relevant, quite progressive in his attitudes. Nor have I found any indication that anyone involved with the Academic Appeals Committee or the appeals process to be prejudiced in any way. Decisions are made based on the evidence, and I am aware that some students have in fact successfully appealed charges against them. I would think that your time and energies will be better spent compiling credible objective evidence (e.g., drafts of your work in Microsoft Word or Google docs) that you generated your own work without the assistance of unauthorized AI technologies than accusing the Associate Dean of racism.

All the best,
Dean Pritikin

On Mon, Mar 9, 2026 at 8:50 AM Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu> wrote:

Dear Dean Jamison,

I disagree with the conclusion that my work could not have been completed without the use of unpermitted resources. I want to explain how I manage my time and workload.

I have seven classes. A week has seven days, and a day has twenty-four hours. I can work for seven hours and study for seven hours. Seven plus seven equals fourteen hours, and twenty-four minus fourteen equals ten hours remaining. That still leaves me ten hours in a day for sleep and other personal responsibilities.

Lawtone-Bowles 205

I work extremely hard and dedicate a significant amount of time to my studies. My ability to complete work efficiently is not the result of artificial intelligence but rather the result of careful time management and the use of speech-to-text assistive technology, which allows me to dictate my work instead of typing due to my disability.

As I have explained previously, I use speech-to-text software because I cannot type for long periods. Dictation software produces text quickly because the words are spoken and converted directly into written form. This can make the writing process appear faster than traditional typing, but it does not mean that artificial intelligence is generating the content.

You state that you do not find me credible. I must address that directly. I am a 54-year-old Black disabled woman who has worked extremely hard to reach this point in my legal education. Being repeatedly described as "not credible" despite my work, my academic record, and the accommodations documented for my disability is deeply troubling discriminatory and racist especially coming for someone that looks like you.

Respectfully,

Nicole Lawtone Bowles


Nicole Lawtone-Bowles
Certified Law Student
The State Bar of California's Practical Training of Law Students Program
Purdue Global Law School (formerly Concord Law School)
Juris Doctor August 25, 2026
Pronouns: She/Her
Adrains Place Inc
Nicole Lawtone-Bowles SSRN
Nicole Lawtone-Bowles LinkedIn
"Master your mind because a thought can ruin your whole day."


On Mon, Mar 9, 2026 at 10:45 Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu> wrote:

Dear Dean Pritikin,

Please help me. I forwarded you the email I received from him this morning. I cannot take this anymore. I am so upset. I work very, very hard, and I only have 169 days left before graduation.

Lawtone-Bowles 206

Please do not kick me out. Please, I am begging you.



The link was submitted to <u>Shaun Jamison</u> by NLB and he created the screenshots of current employment on Mar 9, 2026.

https://www.linkedin.com/in/nicolelawtone-bowles/

  Q I'm looking for…

 Home    My Network    Jobs    Messaging

 **Nicole Lawtone-Bowles**
Empowering Futures

## Experience

 **Clerical Associate IV / Administrative Assistant to Interim Deputy Commissioner**
City of New York, Department of Homeless Services · Full-time
Aug 2013 - Present · 12 yrs 8 mos
New York City Metropolitan Area · On-site

From August 18, 2013, through November 10, 2025, I served concurrently as a Motor Vehicle Operator and an active representative of DC 37 Local 983. In addition to safely and efficiently transporting clients,... more

**New York City Department of Homeless Services (DHS)**
Together with our not-for-profit partners, our mission is to prevent homelessness when possible, address street homelessness, provide safe temporary shelter, and connect New ...

🜂 NYS Notary Public, Government and +2 skills

 **Civilian Employee/Contractor**
United States Military Academy at West Point · Part-time
May 2006 - Present · 19 yrs 11 mos
West Point, New York, United States · On-site

Contributed to the academic and operational missions of USMA through administrative, educational, and logistical roles. Supported cadet development with high levels of professionalism, confidentiality, and... more

**Civilians | United States Military Academy West Point**
Our civilian faculty members are valued members of the team. They exemplify dedicated civilian service to the Nation and the exceptionally high professional and personal standar...

🜂 Government

Lawtone-Bowles 208

 **Nicole Lawtone-Bowles**
Empowering Futures

 Adrains Place Inc · Full-time
Jan 2022 - Present · 4 yrs 3 mos
Highland Falls, New York, United States · Hybrid

As the Volunteer CEO of Adrains Place Inc., I provide strategic leadership, operational oversight, and vision to advance our mission of supporting single parents and families in need. This role is a commitment to... more

 **Adrains Place Inc.**
Adrain's Place Inc. is a 501(c)(3) nonprofit organization in Highland Falls, NY, dedicated to providing financial education and support to individuals and families in need. The ...

♡ Nonprofit Organizations

 **Volunteer Chief Executive Officer**
ULTRESS · Full-time
Mar 2001 - Present · 25 yrs 1 mo
West Point, New York, United States · Hybrid

Ultress Inc. began as a professional executive transportation and protection company, serving high-profile clients in the government, corporate, and entertainment sectors. Over time, it evolved into a... more

 **Ultress Inc**
Empowering Futures, One Student at a Time

♡ Executive Protection, Event Planning and +5 skills

Lawtone-Bowles 209

NLB Notice of Report CL850

Dear Nicole Lawtone Bowles,

I have carefully reviewed this matter. Much of the concerns were addressed in more detail in the inquiry letter so I won't be repeating everything in detail here. I will be referring this matter to the Provost's office as an academic integrity violation.

It is important to clarify a few foundational matters:
- The appropriateness of speech to text technology for the assessments in this course is uncontested by the academic department.
- The use of spell check and ordinary grammar checkers (i.e. fixing your tense) on open book assessments are not a violation whether they use AI or not.
- The fact that a speech to text software uses AI to train itself to your voice, accent, or manner of speaking is not a violation.
- Using AI to generate expression such as sentences, paragraphs, etc, or substantially rewrite sentences, paragraphs, etc. would be a violation in this course.
- We are not relying on AI detection in determining whether to move forward with this violation.
- It's undisputed that you were given an opportunity to speak to your professor. The first you refused. The second, you agreed, but unfortunately the professor had a conflict. The third time, you refused.

Having reviewed your submitted materials, I found the properties of the documents the most helpful. You felt they were objective and dispositive. I find, particularly looking at Module One and Eight, concerning.

Module 8 assessment shows it was created over a period of 5 minutes for 6 pages and over a 1000 words. Module 1 (which you sent the properties for) was 29 pages long, with 6140 words, and produced over 194 minutes or approximately 3.25 hours. This means that you produced 8.92 pages of law school writing and analysis per hour including editing for Module 1 and about one page per minute for Module 8.

So while the properties seem to support that you put forth some effort to edit the material, the speed and quality of the documents produced in the amount of time is not believable without the aid of unpermitted resources such as generative artificial intelligence. Add to that the context of what you agree is full-time employment (plus other obligations) and the ordinary need for sleep and other tasks, the other 15 credits you were taking, it is not believable. I am also concerned that your correspondence, at times, belays that the quality of your analysis and knowledge of subjects you took at the school are not complete.

You ask us to believe you, and yet what we see demonstrated is not honesty. You stated on your attestation for the full-time program that you were only working 20 or fewer hours per week, but, in fact, you are working full-time and possibly more than that. You submitted the Module 1

Lawtone-Bowles 210

assignment for review and feedback, knowing that was not allowed. You did not admit this was the reason for the very high Turnitin report until I prompted you. You filled out the end of module acknowledgements that you had completed the work and hours when you clearly had not (because the seminars had not happened yet, for one).

I know this is not the result you were hoping for. I will communicate my investigation to the Provost's office. As you know, they will reach out and you will have the opportunity to appeal. Note that if you intend to appeal, additional evidence or arguments must be submitted through that process as I have completed my investigation.

Here is a link to our student assistance service: https://campus.purdueglobal.edu/page/student-assistance-program. Their phone number is 855-384-1800.

SGJ #5 NLB Document Properties
Document Created by <u>Shaun Jamison</u>. NLB requested I look at the properties. The first screen shot was supplied by NLB, the others I took from NLB's other submissions.

Lawtone-BowlesCL850M1A (2) Properties          ?          ✕

General   Summary   Statistics   Contents   Custom

Created:      Friday, January 2, 2026 9:56:00 PM
Modified:    Friday, March 6, 2026 8:25:23 PM
Accessed:   Friday, March 6, 2026 8:25:27 PM
Printed:

Last saved by:        Nicole Lawtone-Bowles
Revision number:    4
Total editing time:   194 Minutes

Statistics:

| Statistic name | Value |
| --- | --- |
| Pages: | 29 |
| Paragraphs: | 83 |
| Lines: | 568 |
| Words: | 6140 |
| Characters: | 36078 |
| Characters (with space... | 42144 |

OK          Cancel

Lawtone-Bowles 212





Lawtone-BowlesCL850M5A

Downloads

Upload | Share | Copy path | Copy local path | Open file location

**Protect Document**
Control what types of changes people can make to this document.

Protect Document ˅

**Inspect Document**
Before publishing this file, be aware that it contains:
* Document properties and author's name

Check for Issues ˅

**Version History**
View and restore previous versions.

Version History

**Manage Document**
There are no unsaved changes.

Manage Document ˅

**Slow and Disabled COM Add-ins**
Manage COM add-ins that are affecting your Word experience.

Manage COM Add-ins

Properties ˅
| Size | 17.5KB |
|---|---|
| Pages | 7 |
| Words | 1190 |
| Total Editing Time | 197 Minutes |
| Title | Add a title |
| Tags | Add a tag |
| Comments | Add comments... |
| Template | Normal |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Adrains Place Inc. |

Related Dates
| Last Modified | 1/12/2026 8:38 PM |
|---|---|
| Created | 1/2/2026 9:56 PM |
| Last Printed | |

Related People
| Manager | Specify the manager |
|---|---|
| Author | NL Nicole Lawtone-Bowles |
| | Add an author |
| Last Modified By | NL Nicole Lawtone-Bowles |

Lawtone-Bowles 214





## Lawtone-BowlesCL850M13A
Downloads

**Upload** | **Share** | **Copy path** | **Copy local path** | **Open file location**

**Protect Document**
Control what types of changes people can make to this document.

Protect Document ⌄

**Inspect Document**
Before publishing this file, be aware that it contains:
- Document properties and author's name

Check for Issues ⌄

**Version History**
View and restore previous versions.

Version History

**Manage Document**
There are no unsaved changes.

Manage Document ⌄

**Slow and Disabled COM Add-ins**
Manage COM add-ins that are affecting your Word experience.

Manage COM Add-ins

**Properties** ⌄

| | |
|---|---|
| Size | 168KB |
| Pages | 6 |
| Words | 1023 |
| Total Editing Time | 198 Minutes |
| Title | Add a title |
| Tags | Add a tag |
| Comments | Add comments |
| Template | Normal |
| Status | Add text |
| Categories | Add a category |
| Subject | Specify the subject |
| Hyperlink Base | Add text |
| Company | Adrains Place Inc. |

**Related Dates**

| | |
|---|---|
| Last Modified | 1/13/2026 9:48 PM |
| Created | 1/2/2026 9:56 PM |
| Last Printed | |

**Related People**

| | |
|---|---|
| Manager | Specify the manager |
| Author | NL  Nicole Lawtone-Bowles |
| | Add an author |
| Last Modified By | NL  Nicole Lawtone-Bowles |

Lawtone-Bowles 216

 Gmail

Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>

## CL850 Academic Integrity Inquiry

Shaun Jamison <sjamison@purdueglobal.edu>                                    Wed, Mar 4 at 12:19
To: Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>, Shaun Jamison <SJamison@purdueglobal.edu>

Dear Nicole,

I am writing on behalf of Professor Sarah Diab, who is your professor for CL850. As you know, the professor has reached out to all CL850 students to discuss the authorship of their work.

On February 11, 2026, the professor let you know she would like to discuss your assignments. On that same day, you responded that you have no time to meet because you are "homeless, fighting a foreclosure and bankruptcy matter, and [you had] just started a new position as Interim Deputy Commissioner for the New York City Department of Homeless Services." You then scheduled Sunday, February 14, 2026 at 10 AM ET on your professor's calendar to meet. At 7:55 AM ET on Sunday, February 14, 2026, the professor informed you that she had a sudden conflict and asked to reschedule the following day or "any other day [that] week." At 8:15 AM ET on February 14, 2026, you refused to reschedule and made the following remarks and threats verbatim:

1. Professor, you are an inconvenience to my schedule.
2. I cleared my schedule today to deal with you after learning from my classmates that you are playing AI police.
3. Let me be clear that I am preparing my complaint to Purdue Global Law School.
4. If you intend to claim that my Dragon speech-to-text usage, which is approved by SAS for me, is proof that I am using ChatGPT, that allegation is unfounded.
5. AI detectors are biased against disabled, English-as-a-second-language, and minority students, which has been proven by Professor Ryan Baker in his published research.
6. If we cannot meet today, then we will not meet at all.
7. Labeling my work as inappropriate AI use is a violation of disability laws.
8. If you plan to file complaints, I am prepared to respond accordingly.
9. I am also very disappointed that Scott Johnson is not teaching this class because he wrote the book and I have had him as a professor several times. I enrolled in this course expecting that he would be teaching.
10. You are a disservice to this class, and I am not happy.
11. If I were not graduating in seven months, I would request a refund and withdraw from the course.
12. This situation is unnecessary and raises serious civil rights concerns. As an attorney, you should know better.

Because the professor was the subject of disrespectful remarks, accusations, and threats on your part, I am reaching out to you in order to complete the investigation. You may reply directly to me; do not contact the professor about this matter further.

The professor is concerned about whether you are the author of the work you submitted in the course. Because this matter has come to my desk, I am providing additional context. The investigation is for the following reasons:

Lawtone-Bowles 217

- You completed the work in the course at an extraordinary pace. CL850 is a four-credit law school course, which is designed to involve 180 total hours of study (45 hours per credit). You completed CL850 by January 22, 2026, about 16 calendar days into the term. According to the schedule you provided to your advisor, you were also working full-time during this timeframe.
- However, you were not solely working on CL850 and full-time employment during this period. You also completed 15 other law school credits, for a total of 19 credits. The typical course load per term is 7-9 credits for part-time students and 10-12 credits for full-time students (who are required to affirm that they do not have more than 20 hours per week on average of outside work or dependent care commitments).
- Based on our expected time frame of 45 hours of total study per credit, your coursework would have taken approximately 855 hours (45 x 19), or nearly 36 straight twenty-four-hour days, without sleeping, eating, or working. Obviously, this is not physically possible.
- In addition, your courses require that you acknowledge that you have completed the work and the estimated hours in each module.
- Even if you worked extraordinarily quickly and completed all of your work in half the time it is expected to take (and notwithstanding your hours acknowledgments within your courses), it would still have required nearly 18 straight twenty-four-hour days, without sleeping, eating, or working—which is, again, physically impossible.
- Further, based on the totality of the circumstances, where you initially refused to meet with your professor to discuss your assignments and then refused to reschedule, this indicia remains uncontested.
- However, Module One's assignment is an exception in that it is 98% copied from another student paper. The Turnitin report is attached. Your Module 1 submission is 31 pages, submitted on the first official day of the semester, January 7, 2026, at 12:01 ET, prior to the first Seminar scheduled on January 8, 2026.
- To clarify, the subject of this inquiry is:
  - Module One - 98% copied from another student paper.
  - Module Three - AI usage
  - Module Five - AI usage
  - Module Eight - AI usage
  - Module Thirteen - AI usage

Your PG Supplemental Student Manual (which is automatically posted in all PGLS courses), Version 1.2, Effective January 2025 outlines Generative Artificial Intelligence policy beginning on Page 10 of that manual. The pertinent policy states the following:

"AI tools may not be used with open-book assessments unless explicitly allowed through an announcement by the faculty member teaching or course or through the course materials or as outlined below:
  1. AI-enabled assistance similar to Grammarly for spelling and grammar may be used unless disallowed by the faculty or course materials.
  2. If used consistently with assignment instructions, AI-assisted research tools are allowed for open-book assignments
  3. AI may be used to help organize your writing. For more information on using AI tools, please see Student Resources. AI tools may be used to assist you with studying. Some examples of the use of AI in studying include assisting with outlining, creating practice quizzes, and generating emails to communicate with faculty, staff, and other students. You can even use AI to role-play negotiations.
Using AI tools beyond the permissions granted in a course constitutes a violation of the Student Code of Conduct."

Lawtone-Bowles 218

This policy restricts AI use to research and studying, and instances where explicitly allowed through an announcement by the faculty member teaching or course or through the course materials; your use appears to exceed research and studying, and none of the other permitted instances are applicable to the class in question where no such announcement has been made in the course and no course materials have prescribed permitted use of AI. Further, when consulted, Professor Scott Johnson had expressly confirmed that the course is of an open-book nature that demands conventional research methods that do not involve AI use. No express allowance was made anywhere in the course for AI usage.

You took and passed the PGLS Academic Integrity Course prior to this term which explained that AI use on graded assessments was not permitted without explicit permission. Likewise, the course, along with the Student Code of Conduct and Academic Integrity Course do not permit submitting someone else's work as your own.

Additionally, the amount of time set for completion of each of these modules and respective assignments and when they were completed is as follows:

- Module 1:
  - Total time for module: 14.8;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 7, 2026 12:01 AM
- Module 3:
  - Total time for module: 16.1;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 12, 2026 3:35 PM
- Module 5:
  - Total time for module: 13;
  - Total time for assignment: 4 hours.
  - Submission stamp: January 12, 2026 9:40 PM
- Module 8:
  - Total time for module: 17.3;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 13, 2026 1:19 PM
- Module 13:
  - Total time for module: 13.6;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 14, 2026 3:28 AM
- Module 15:
  - Total time for module: 12.5;
  - Total time for assignment: 10 hours.
  - Submission stamp: January 22, 2026 6:34 AM

The speed with which you've completed your assignments, within 2 weeks, does not match the requisite time assigned for each of these modules and respective assignments, especially when taking your schedule and personal challenges into consideration.

On February 25, 2026, you emailed the professor a "request for clarification and accommodation compliance," while continuing to threaten your professor with a civil rights complaint. Your email contained the following statements verbatim:

Lawtone-Bowles 219

- I received your email to the class regarding AI after you canceled my appointment one hour before we were scheduled to meet on Valentine's Day, after I had cleared my schedule.
- I completed my work early because I have surgery coming up and needed to plan accordingly. I understand that all of my instructors received notice of my approved accommodations before the semester began.
- The failure to accommodate my approved use of assistive technology, including speech-to-text, raises concerns under applicable disability laws.
- In addition, your lack of response to my questions since the beginning of the class has raised serious concerns and contributed to my decision to file a civil rights complaint.
- My work should be evaluated based on the substance and quality of the information provided, not solely on the results of an AI-detection tool such as GPTZero, to which I have a subscription.
- Research by scholars, including Professor Ryan Baker and researchers affiliated with institutions such as Harvard and Yale, has raised concerns about the reliability and potential bias of AI-detection systems. These studies indicate that such tools can produce false positives and may disproportionately impact certain writing styles or users of assistive technology. For these reasons, reliance on AI-detection software without substantive academic review raises fairness and accuracy concerns. Law students' work should be graded on its academic merit based on the rubric, not on an automated suspicion score.
- AI-detection tools like GPTZero are probabilistic systems, not forensic instruments. Independent research has shown that these tools can produce false positives, meaning they sometimes label human-written work as AI-generated. Scholars in educational data science, including Professor Ryan Baker, have cautioned that detection systems are not reliably accurate across different writing styles and linguistic patterns. Research discussions from institutions such as Harvard and Yale have also emphasized the risk of bias and over-reliance on automated academic integrity tools without human review. The concern becomes more serious when assistive technology is involved.
- Speech-to-text software can produce syntactic patterns that differ from conventional typing, which may inadvertently trigger AI-detection flags. I have observed this issue in my own research because I use speech-to-text applications and devices. If a disability accommodation changes the mechanics of writing, an algorithm trained on typical keyboard-generated prose may misclassify that output. This creates a potential disparate impact issue if disabled students are disproportionately flagged. For that reason, best practice in academic integrity review requires substantive faculty evaluation rather than sole reliance on detection software.

In your February 25, 2026 email, you raised several concerns regarding (1) disability accommodations, including speech-to-text software; (2) the reliability and potential bias of AI-detection tools; and (3) the propriety of relying on such tools in evaluating student work.

To clarify the basis of this investigation, kindly note the following:

1. The issue under review is not your use of approved assistive technology; PG fully honors approved accommodations, including speech-to-text software, and nothing in this investigation concerns or restricts your lawful use of such tools. As mentioned above, where the policy expressly permits certain limited uses of AI-enabled tools, such as grammar assistance and research and study support, such use must be consistent with course instructions. There is no prohibition on approved disability accommodations, and that is not at issue here.
2. While you assert that AI-detection systems are probabilistic and may produce false positives, no academic integrity determination is made solely on the basis of an automated detection score. AI-detection software is used as one screening mechanism among others to help professors with their

Lawtone-Bowles 220

identification of work that may warrant further review. It is not treated as a forensic instrument or as dispositive proof of misconduct. Rather, it functions as an integrity-support tool that prompts substantive faculty evaluation, similar to plagiarism detection software, and is more probative of plagiarism in conjunction with other proof such as the speed of submission in your case, which is disproportionate to the time allocated for completion of the assigned coursework.

3. Regardless of ongoing scholarly debate about detection accuracy, the controlling standard in this matter is PG's Supplemental Student Manual, cited above, which limits AI use to specific contexts: primarily research, studying, or where explicitly authorized by the instructor in open-book assignments, which is not the case here. Use of AI beyond these permissions constitutes a violation of the Student Code of Conduct, and where Professor Scott Johnson has not prescribed for use of AI in his designed course assignments, the likelihood of violation in the case of your submissions is high; no announcement, course material, or instruction authorizes generative AI use for drafting or composing the module assessments in this course, signaling the need for conventional research and original written analysis. Even if AI-detection tools are imperfect, that does not authorize the use of generative AI beyond what the policy or course permits, which is "none" in this course.

The central question in this investigation is therefore not whether detection software is flawless; rather, it is whether your submissions of all assignments within two weeks complied with the AI policy and the assignment instructions. Excessive or unauthorized generative AI use cannot be justified by general concerns about detection methodology. The relevant inquiry is whether the work submitted reflects your own analysis consistent with the permitted scope of AI use under institutional policy.

Lastly, academic integrity protections exist to ensure fairness across the student body. If some students rely on generative AI beyond authorized limits, while others comply with restrictions, the grading process becomes inequitable. PG's policy restrictions and the tools used to enforce them are intended to maintain consistent standards, protect the value of student work and the integrity of your degree, and ensure that all students are evaluated under the same rules.

Given the above, I request the following:
As to assignments from Modules 3, 5, 8, and 13:
- A statement about whether you have used AI in the creation of graded assessments in CL850.
- If you have used AI, explain how you have used it for each graded assignment.
- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.

As to the assignment from Module 1:
- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.
- An explanation for the 98% match with another student's paper

I request that you provide the following to me by 11:59 p.m. ET on Mar 6, 2026 at sjamison@purdueglobal.edu. Pending an outcome, the assessments will not be graded and thus remain zeros, though the zeros are placeholders only until the matter is resolved. If you do not respond, we will proceed with the allegations above. If you do respond, we will review and consider your response. Thank you for your attention to this matter.

Lawtone-Bowles 221

--
**Shaun G. Jamison**
Pronouns: he, him, his
Associate Dean of Academic Affairs

Purdue Global Law School
2029 Century Park East, Suite 400
Los Angeles, CA 90067
**Email:** sjamison@purdueglobal.edu

image.png



Make a tax-deductible donation to Purdue Global Law School

Lawtone-BowlesCL850M1A.pdf

Lawtone-Bowles 222

**PURDUE GLOBAL.**

PG Provost <provost@purdueglobal.edu>

## Academic Dishonesty Appeal Outcome - 3rd Breach
1 message

**PG Provost** <provost@purdueglobal.edu>       Wed, Apr 1, 2026 at 4:47 PM
To: nicolelawtone@aol.com, Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>
Cc: Sarah.Diab@purdueglobal.edu, Shaun Jamison <SJamison@purdueglobal.edu>

Dear Ms. Lawtone-Bowles,

Thank you for your patience while waiting for the outcome of your CL850-01: Education Law Academic Dishonesty Appeal.

Re the academic dishonesty breach of the Student Code of Conduct:

Supporting documentation from you, the instructor, and the Law School were reviewed by the Academic Appeals Committee as part of the March 25th, 2026 hearing process to determine if there was evidence of academic dishonesty.

The Committee found:

Based on the written submissions and the oral arguments presented at the virtual hearing, the Dean's representative has established, by a preponderance of the evidence, that the student committed academic misconduct in connection with both the Module 1 and Module 8 assignments. That same evidence would, in the alternative, even satisfy a clear-and-convincing standard.

With respect to the Module 1 assignment:

- Both the length of the submission (31 pages) and the level of polished prose are difficult to reconcile with the student's claim that the work was completed during the term without AI assistance. Alternatively, if the assignment was started prior to the beginning of the term, this would also raise concerns of misconduct, as the student affirmed—via the end-of-module acknowledgment—that the work was completed during the assigned period.
- The citations in the Module 1 assignment reinforce the view that the student used generative AI. The student cited T.K. v. New York City Department of Education, 779 F.3d 144 (2d Cir. 2015), but no such case appears at that citation. That reporter citation instead corresponds to Newton v. City of New York, 779 F.3d 140 (2d Cir. 2015), an unrelated case. Likewise, although N.Y. Educ. Law § 3204(1) does exist as a statute, it does not concern, as the student asserted on page 9, "minimum instructional requirements." Rather, it addresses the place of instruction. These inaccuracies are notable in light of the student's stated advanced legal training (including a master's degree in law) and her representation during oral argument that she was trained to carefully proofread citations. Under such circumstances, these errors are less consistent with ordinary inadvertence and more consistent with citation fabrication or AI-generated hallucination, both of which undermine the credibility of the submission.

With respect to the Module 8 assignment:

- As the student conceded during oral argument, the years given for the case citations in her assignment were almost all incorrect, with Appeal of Aversa as the apparent exception.
- Second, with the same exception, the cited cases bore little or no relation to the propositions for which they were offered. For example, Appeal of R.D. concerned residency; Appeal of B.M. concerned grading; and Appeal of A.M. concerned a school district's failure to adopt a budget. The decision the student identified as Appeal of P.B. was, in fact, Appeal of S.U. In addition, one of the cited authorities, "Decision 17,297," actually stated that "hearsay alone may

Lawtone-Bowles 223

constitute competent and substantial evidence," which directly contradicts the proposition asserted on page 5 of the student's paper that hearsay "may not, standing alone, constitute substantial evidence."

- Third, the student's explanations for these discrepancies were inconsistent. When asked where she had obtained the cases, the student stated that she found them on the New York website for administrative decisions. At the same time, despite citing to that reporter, she appears not to have had access to the Education Department Reporter, a specialized reporter not available through the school's Westlaw subscription. When asked to explain the mismatch between the cited authorities and the legal propositions attributed to them, the student asserted that she believed the assignment required her to generate fictional cases. That explanation, however, is difficult to reconcile with her March 24, 2026, email to the Committee, in which she stated that she was providing PDFs of the cases so that the Committee could "cross-check" them against the propositions in her paper and verify that "the cases are real." Moreover, with respect to the citations to the Education Department Reporter, the student appeared to acknowledge at oral argument that she had fabricated those citations, which would explain why she could not provide the Committee with the corresponding decisions from that reporter rather than from the public website.

Taken together, these errors and shifting explanations led the Committee to conclude that the Module 8 assignment did not reflect genuine legal research and writing but was rather the product of AI hallucinations. If, however, the Committee was incorrect in that conclusion, and the student created all the work without using generative AI, the gross mismatch between the authorities cited and the propositions claimed would constitute academic misconduct.

The Committee, therefore, determined that this constitutes a violation of the Student Code of Conduct. This is your third Academic Dishonesty breach. It will be recorded in the Purdue Global database and remain permanently, per the catalog. This breach will result in dismissal from the university. Prior to any dismissal action, you have a final option to appeal within 10 days of receiving this notification. This appeal should present evidence that the just-completed hearing did not consider.

If dismissed, any future application to return to the university must be reviewed and approved by the Dean of the School, who has the final decision.

If you decide to appeal the outcome of the hearing, you may send the new evidence to the Office of the Provost within 10 days of receiving the Committee's decision. The Office of the Provost will review the Committee's appeal decision process, the information submitted as part of the hearing, and any new material presented to make a final ruling.

Please email provost@purdueglobal.edu with any questions.

**JoAnna Navarro**
Pronouns: she, her, hers
On behalf of the Office of the Provost

www.PurdueGlobal.edu



PURDUE
GLOBAL.

Lawtone-Bowles 224

## PURDUE GLOBAL

PG Provost <provost@purdueglobal.edu>

## Provost Level Appeal Response: Nicole Lawtone-Bowles (3rd Breach)

1 message

**PG Provost** <provost@purdueglobal.edu>                                                Tue, Apr 7, 2026 at 1:13 PM
To: nicolelawtone@aol.com, Nicole Lawtone-Bowles <nicolelawtonebow@student.purdueglobal.edu>
Cc: Sarah.Diab@purdueglobal.edu, Shaun Jamison <SJamison@purdueglobal.edu>
Bcc: bloom@purdue.edu

Dear Ms. Lawtone Bowles:

I appreciate your patience during this review period.

Our Provost, Carolyn Nordstrom, has completed a thorough review of your appeal. Attached is the decision letter.

Please be advised that this is the final stage in the review process.

Thank you.

**JoAnna Navarro**
Pronouns: she, her, hers
On behalf of the Office of the Provost

www.PurdueGlobal.edu



## PURDUE GLOBAL

The information contained in this e-mail and any attachments is confidential and intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by e-mail and delete the original message.

📎 **Provost Appeal Response_Nicole Lawtone-Bowles_04.07.26.docx**
    2513K

Lawtone-Bowles 225



April 7th, 2026

Dear Ms. Lawtone Bowles:

I have carefully reviewed your appeal communications, the written decision of the Academic Appeals Committee, and the written material presented to the Academic Appeals Committee by you and by Purdue Global Law School. Following this review, I have concluded that there is no basis to change the decision of the Academic Appeals Committee.

My review indicated that the Committee carefully considered the arguments you presented in your appeal, particularly that the speed with which you completed the assignments at issue was due to the use of assistive technology and non-generative Artificial Intelligence ("AI"). Your appeal continues, as before, to focus on the use of assistive technology and a claim that Purdue Global is not honoring your accommodations.

Purdue Global has never disputed your approved accommodations or your ability to use assistive technology. The violations of academic integrity you had the opportunity to defend resulted from allegations of the inappropriate use of generative AI to complete assignments and assessments. Your appeal did not provide evidence addressing the inappropriate use of generative AI, and you have not provided substantive information that would support a reversal of the Academic Appeals Committee's thoughtful and comprehensive review.

I agree with the Academic Appeals Committee's conclusion that your conduct constituted a breach of Purdue Global's academic integrity rules. Further, this is the third academic integrity violation for which you have been found responsible. Accordingly, I am upholding the April 1st, 2026 decision of the Academic Appeals Committee, and you are dismissed from the University, effective immediately. This decision is final.

Sincerely,

Carolyn Nordstrom, Ph.D
Provost