## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| Nicole Lawtone-Bowles<br>        Plaintiff,<br><br>v.<br><br>Purdue Global Law School,<br>Purdue University Global,<br>Sarah Diab, Shaun Jamison,<br>Brian Victor, & Victoria Vidt<br>        Defendants | Case No.: 4:26-cv-00028-PPS-AZ<br>Judge: Hon. Philip P. Simon<br>Magistrate Judge: Hon. Abizer Zanzi<br><br>CERTIFICATE OF SERVICE |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served on Defendants' counsel of record via CM/ECF on the date received by the court:

John R. Maley, Esq. (jmaley@btlaw.com)
Amanda Jane Gallagher, Esq. (amanda.gallagher@btlaw.com)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204

Respectfully submitted,
/s/ Nicole Lawtone-Bowles
Nicole Lawtone-Bowles, Pro Se Plaintiff
56 Center Street
Highland Falls, New York 10928
NicoleLawtone@aol.com
(347) 538-5386

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

NICOLE LAWTONE-BOWLES, )
)
Plaintiff, )
v. ) No. 4:26-cv-00028-PPS-AZ
)
PURDUE UNIVERSITY GLOBAL, et al, )
)
Defendants. )

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiff's opposition confirms the Complaint's central flaw: it treats two different issues as though they are one. They are not. Purdue approved Plaintiff's use of speech-to-text technology. It later concluded, after multiple reports, hearings, and levels of academic review, that Plaintiff violated the Law School's academic integrity standards. Those are separate decisions. The Complaint itself alleges that Purdue considered Plaintiff's explanation that Dragon software accounted for the issues identified in her work and rejected it. Plaintiff may disagree with that academic judgment, but the question is not whether Purdue reached the correct decision. It is whether Purdue honestly exercised its academic judgment. The Complaint pleads nothing suggesting that Purdue disciplined Plaintiff for using an approved assistive technology, failed to exercise professional judgment, or substantially departed from accepted academic norms. It instead alleges that Purdue accommodated Plaintiff, investigated repeated academic integrity concerns, and ultimately dismissed her only after concluding those concerns remained unresolved. That is precisely the type of academic decision to which courts owe substantial deference.

In short, the Complaint alleges an accommodated student who was later dismissed for academic misconduct—not a student dismissed because she requested or used an accommodation. That is simply not an ADA claim, and Plaintiff's Complaint should be dismissed in its entirety.

1

I.    **Plaintiff Has Not Plausibly Alleged That Purdue Dismissed Her Because of Her Disability or Accommodation.**

As an initial matter, Plaintiff's opposition never bridges the gap between an approved accommodation and an adverse action taken because of that accommodation. Instead, Plaintiff assumes that because she attributed the characteristics of her work to Dragon software, Purdue was required to accept that explanation. The law imposes no such requirement.

The Supreme Court has long recognized that courts owe substantial deference to academic judgments because they involve "an expert evaluation of cumulative information" and the exercise of professional judgment. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). Although the Seventh Circuit has explained that *Ewing*'s "substantial departure from accepted academic norms" standard arises in the substantive due process context, it has made equally clear that, in ADA cases, the relevant question remains whether the university honestly exercised its academic judgment—not whether the plaintiff believes the decision was mistaken or unfair. *Novak v. Bd. of Trs. of S. Illinois Univ.*, 777 F.3d 966, 976–77 (7th Cir. 2015); *Royan v. Chicago State Univ.*, 145 F.4th 681, 691–92 (7th Cir. 2025). A plaintiff must plead facts supporting a plausible inference that the university's stated academic reason was dishonest—a "phony reason" masking discrimination—not merely wrong. *Royan*, 145 F.4th at 691–92; *Novak*, 777 F.3d at 976–77.

That is not what Plaintiff alleges. The Complaint alleges that Purdue considered Plaintiff's explanation that Dragon software accounted for the perceived irregularities in her work and rejected it after multiple reports, disciplinary proceedings, and layers of academic review. Those allegations describe the exercise of academic judgment, not disability discrimination. Plaintiff may disagree with Purdue's conclusions, but disagreement does not plausibly suggest that Purdue acted dishonestly or abandoned its professional judgment. *See Novak*, 777 F.3d at 976–77 (alleged flaws in faculty methodology show, at most, possible error—not pretext); *Royan*, 145 F.4th at 692 (same).

2

Plaintiff's theory also misunderstands the scope of a reasonable accommodation. Purdue approved Plaintiff's use of speech-to-text technology. It did not waive the Law School's academic integrity standards or its requirement that students independently author their work. The Rehabilitation Act and ADA protect qualified students from discrimination; they do not exempt students from meeting legitimate academic standards or require universities to lower those standards as an accommodation. *Royan*, 145 F.4th at 684; *Khan v. Midwestern Univ.*, 879 F.3d 838, 844–45 (7th Cir. 2018), *as amended on denial of reh'g* (Feb. 26, 2018); *Klene v. Trs. of Indiana Univ.*, 413 F. App'x 919, 921 (7th Cir. 2011). Nor does the ADA allow a court to substitute its judgment for the faculty's on whether submitted work satisfied those standards. *Anderson v. Univ. of Wisconsin*, 841 F.2d 737, 741–42 (7th Cir. 1988).

The Complaint also undermines any inference of discriminatory motive. Plaintiff alleges that Purdue approved her use of speech-to-text technology, permitted her to use it throughout her enrollment, considered her explanation during the disciplinary process, and dismissed her only after repeated findings of academic misconduct. The Seventh Circuit has recognized that a university's repeated accommodation of a student's disability weighs strongly against an inference that a later academic dismissal was motivated by disability discrimination. *Royan*, 145 F.4th at 692. The Complaint therefore alleges exactly what those cases contemplate: a university that accommodated a student's disability while separately enforcing its academic standards. That is not disability discrimination.

## II.     Purdue's Decision-Making Process Was Not a Substantial Departure from Accepted Academic Norms.

Even under Plaintiff's articulation of the governing standard, the Complaint falls well short. Plaintiff identifies no facts suggesting that Purdue abandoned its academic policies, dispensed with professional judgment, or otherwise acted outside accepted academic norms. Instead, the Complaint alleges that Purdue followed its ordinary academic integrity process from beginning to end.

According to the Complaint, multiple faculty members independently raised academic integrity concerns. Purdue notified Plaintiff of those concerns, conducted disciplinary proceedings, permitted Plaintiff to explain that Dragon software accounted for the perceived irregularities, reviewed those explanations through multiple levels of academic review, and imposed progressively greater sanctions only after repeated findings of academic misconduct. Those allegations reflect an institution applying its academic standards—not departing from them.

As discussed above, a substantial departure from accepted academic norms is not established merely because a student disagrees with the faculty's conclusions or believes the faculty should have credited a different explanation. *See Ewing*, 474 U.S. at 225; *Novak*, 777 F.3d at 976–77. The Complaint alleges no facts suggesting Purdue ignored its own procedures, applied different standards to similarly situated students, or reached its decision for reasons unrelated to Plaintiff's academic work. At most, Plaintiff alleges that Purdue should have accepted her explanation for the characteristics of her submissions. That allegation challenges the correctness of Purdue's academic judgment, not whether Purdue exercised professional judgment at all.

Plaintiff's cited authorities do not compel a different result. The cases that Plaintiff relies on involve allegations that an institution disregarded its own procedures, failed to afford basic process, or otherwise acted arbitrarily. By contrast, the Complaint here alleges repeated notice, multiple opportunities to respond, committee review, and progressive discipline under Purdue's Academic Dishonesty Policy. Those allegations are fundamentally inconsistent with Plaintiff's assertion that Purdue substantially departed from accepted academic norms.

In the end, Plaintiff asks the Court to do what the Seventh Circuit has instructed courts not to do: second-guess the faculty's academic judgment because Plaintiff believes her explanation should have prevailed. The Complaint does not plausibly allege that Purdue abandoned accepted academic norms or failed to exercise professional judgment. It therefore does not state a claim.

4

### III.     Plaintiff's Unpleaded Claims Cannot Proceed

Plaintiff's final argument that Purdue failed to address purported Title VI and § 1981 claims is without merit because Plaintiff never pleaded those claims. Purdue reasonably construed the Complaint as asserting a single disability-discrimination claim under the ADA because that is the only claim the factual allegations fairly support. The Complaint does not identify Title VI, § 1981, or § 1983 as causes of action, nor does it allege facts sufficient to state any such claim. It alleges no intentional race discrimination, no similarly situated comparator outside Plaintiff's protected class who was treated more favorably, no exclusion from a federally funded program because of race, no deprivation of any constitutional right, no action taken under color of state law that violated such a right, and no other facts that would place Purdue on notice that Plaintiff intended to pursue those statutory theories. Notably, Plaintiff's response fares no better. Although it references Title VI and § 1981 in passing, it never articulates the legal basis for either claim or explains what constitutional right could support a § 1983 claim. Rule 12(b)(6) tests the sufficiency of the claims actually pleaded, not statutory references unsupported by factual allegations.

To the extent the Court construes the Complaint as asserting any disability-discrimination theory beyond the ADA, Purdue's substantive arguments apply equally. Each theory rests on the same factual allegations: Purdue approved Plaintiff's requested accommodation but later disciplined her based on independent academic integrity concerns. Those allegations do not plausibly state a claim for disability discrimination under any statutory label.

For each and all of the foregoing reasons, Purdue Global respectfully moves the Court to dismiss Plaintiff's Complaint under the Fed. R. Civ. P. 12(b)(6) and award Purdue Global all other just and proper relief.

Respectfully submitted,

/s/ John R. Maley
John R. Maley (#14300-89)
Amanda Jane Gallagher (#32662-79)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: 317-236-1313
Facsimile: 317-231-7433
jmaley@btlaw.com
amanda.gallagher@btlaw.com

*Attorneys for Defendants*

Re: CL850 Academic Integrity Inquiry 1st Reply Via Video

From:  Nicole Lawtone-Bowles (nicolelawtonebow@student.purdueglobal.edu)

To:    sjamison@purdueglobal.edu

Bcc:   nicolelawtone@aol.com

Date:  Wednesday, March 4, 2026 at 05:20 PM EST

---

Dear Associate Dean Jamison,

This message summarizes my responses to the questions raised in your email regarding authorship, AI usage, and the pace of my coursework in CL850.

First, I did not use generative AI to create my graded assessments in CL850. The only technology I use when completing written work is assistive technology due to my disability. I use Dragon Anywhere and speech-to-text dictation software to convert my spoken words into text because I cannot type normally. I also use Grammarly or spell check to correct distorted words that occur when speaking into a device. These tools are assistive technologies that I use because of my disability and are consistent with the type of spelling and grammar assistance described in the student manual.

Second, my coursework was completed early because I began working during preview week on January 2, 2026. I did this intentionally because I am scheduled to have surgery on March 6, 2026 and expected that my recovery would limit my ability to complete assignments later in the term. If you review Brightspace activity records, you will see that I am frequently logged into the system reviewing materials and completing work. I structure my schedule around studying whenever I have available time. I also use my commute time to listen to audiobooks and BarMax materials so that I can continue studying while traveling.

Third, although I work full time, I dedicate substantial portions of my day to studying and completing coursework. I wake up at approximately 0200 and leave my home around 0300 to find parking before work. When I arrive near my job, I sleep in my car until 0800 and then use the time before work to complete assignments. I also work on coursework during my lunch break and whenever I have available time during the workday. In addition, I review materials daily so that I remain prepared for seminars and assignments.

Fourth, I train myself to write efficiently by practicing timed essays similar to the format used on the Uniform Bar Examination. The UBE requires six essays to be completed in approximately thirty minutes each. I regularly practice writing essays within that time limit using a timer. Because of that practice, I am able to draft written responses efficiently. Beginning coursework during preview week and practicing timed writing allowed me to complete assignments quickly.

Fifth, regarding authorship of my assignments, the work submitted in OL830 reflects my own analysis and writing. My writing process involves dictating my thoughts through speech-to-text technology and then reviewing the text to correct distortions caused by voice recognition. This process can create writing patterns that differ from traditional keyboard typing. I am willing to provide drafts, document properties, notes, or any other available materials that demonstrate the development of my work if requested.

Finally, with respect to Module One, I began working on that assignment during preview week when I started reviewing course materials on January 2, 2026. I submitted the assignment on January 7, 2026 after completing my review of the materials. I did not intentionally copy another student's work. Because the Turnitin feature is not visible to me in the course, I request access to the report so that I can review the similarity results directly. Once I am able to see the report, I will provide any drafts or documentation that demonstrate the development of my work and clarify the circumstances surrounding that submission.

Thank you for reviewing my responses. I remain willing to cooperate fully and provide any additional information needed to resolve this matter.

Respectfully,
Nicole Lawtone-Bowles

Dear Associate Dean Jamison,

This is my first response my words are in blue I'm sending you this video so you can see how I work on stuff, and I'm going to respond to your email in detail, but I'm sending you this video right now because I use assistive technology and I want this video on record because I am speaking into my phone to answer your email. This is emotional distress on a person who's disabled, and I have reasonable accommodations through SAS for assistive technology, but I'm going to answer your email in detail. This is to let you know that I received your email, and I'm sending you this video because this is harassment, and I feel like you're targeting me.

 IMG_3485.mov

Respectfully,

Nicole Lawtone-Bowles

Nicole Lawtone-Bowles
Certified Law Student
The State Bar of California's Practical Training of Law Students Program
Purdue Global Law School (formerly Concord Law School)

Pronouns: She/Her
Adrains Place Inc
Nicole Lawtone-Bowles SSRN
Nicole Lawtone-Bowles LinkedIn
"Master your mind because a thought can ruin your whole day."

On Wed, Mar 4, 2026 at 12:19 Shaun Jamison <sjamison@purdueglobal.edu> wrote:

Dear Nicole,

I am writing on behalf of Professor Sarah Diab, who is your professor for CL850. As you know, the professor has reached out to all CL850 students to discuss the authorship of their work. Yes, I heard from other classmates who reached out to me, but she failed to tell you that I had already sent several emails to her that went unanswered because I was asking a question about the Module 15 Assignment. See I started doing work during preview week which started on Janurary 2, 2026 because I had seven courses before you hit me with another academic violation for using SAS approved Assitive Technology. See I am a 54 year old Black Woman who is a Disabled Student with OCD, PTSD, Cervical and Lumbar Spine Trauma and Bilateral Knee Replacements.I have an IEP, and I am in Access VR, which is a New York State Rehabilitation program for disabled people to help fund my education and find jobs for disabled people like myself. I have reached out to you several times because you accused me of academic misconduct twice without ever speaking to me or having met me. This process of taking what an instructor says vs a disabled student is very discouraging to disabled students who need to study law to help get their rights. With that said, I use assistive technology because I can't type like a normal person. The only AI I use is Grammarly or Spell Check, because when you speak into your computer, words get distorted, as I will show you in the video. That is why I go to school online and not in person. Your decision has caused me to feel IIED because you and your faculty have accused me of cheating. I have an associate's in arts where I study English Literature and Philosophy. So no I dont need AI to write for me. I use Dragon Anywhere, which is on my phone or dictation software that is embedded into programs to type my work, which makes everything look like AI. Unfortunately, you, as an expert, should know that.

On February 11, 2026, the professor let you know she would like to discuss your assignments. On that same day, you responded that you have no time to meet because you are "homeless, fighting a foreclosure and bankruptcy matter, and [you had] just started a new position as Clerical Associate IV/ Administrative Assistant Deputy Commissioner for the New York City Department of Homeless Services."



Nicole Lawtone-Bowles | *Clerical Associate IV / Administrative Assistant*
Pronouns: She/Her/Hers
To Sonya Y. Russell | *Interim Deputy Commissioner, Shelter Operations for Single Adults,*
*Adult Families and Special Populations*
Pronouns: She/Her/Hers
New York City Department of Homeless Services (DHS)
33 Beaver Street, 15th Floor
New York, NY 10004
(212) 361-7397
nlbowles@dhs.nyc.gov

Human Resources
Administration
Department of
Homeless Services

**Department of**
**Social Services**

*Together We Make a Difference for New Yorkers*
CONFIDENTIALITY NOTICE:

You then scheduled Sunday, February 14, 2026 at 10 AM ET on your professor's calendar to meet. At 7:55 AM ET on Sunday, February 14, 2026, the professor informed you that she had a sudden conflict and asked to reschedule the following day or "any other day [that] week." At 8:15 AM ET on February 14, 2026, you refused to reschedule and made the following remarks and threats verbatim:

1. Professor, you are an inconvenience to my schedule. Yes because I work at the U.S Miltary Academy on Saturday so I lost money and time. I work six days a week. 0900 to 1700 Monday to Friday and 1400 to 2230 on Saturday

2. I cleared my schedule today to deal with you after learning from my classmates that you are playing AI police. Yes that is exactly what it feels like because AI is in everything now you can't get away from it. I have tried.

3. Let me be clear that I am preparing my complaint to Purdue Global Law School. Yes I did file a complaint

4. If you intend to claim that my Dragon speech-to-text usage, which is approved by SAS for me, is proof that I am using ChatGPT, that allegation is unfounded. Yes I do use Dragon and my computer is Apple As of early 2026, Apple has integrated OpenAI's ChatGPT into iOS, iPadOS, and macOS via Apple Intelligence. Users can leverage ChatGPT for writing, image generation, and, as of iOS 26, on-screen analysis, with options to connect existing accounts. However, for core Siri upgrades, Apple has increasingly shifted toward partnering with Google and Anthropic.

5. AI detectors are biased against disabled, English-as-a-second-language, and minority students, which has been proven by Professor Ryan Baker in his published research. Yes see attached https://www.youtube.com/watch?v=3ZzmjgsDM2A

6. If we cannot meet today, then we will not meet at all. Yes I did say that I lost money because I took the day off. I never speak to anyone while I am at work or driving home because it always ends up with Academic Misconduct by you. So I make

sure I am home and comfortable before meeting with any professor.

7. Labeling my work as inappropriate AI use is a violation of disability laws. **Yes it is see attached link** https://www.ed.gov/media/document/avoiding-discriminatory-use-of-artificial-intelligence-112274.pdf

8. If you plan to file complaints, I am prepared to respond accordingly. **Yes I am because I have a disability and use assistive technology and have accommodations for that see attached**



Accommodation Request (External) Inbox x

Student Accessibility Services (sent by tpesce@purdueglobal.edu)      Mon, Mar 2, 12:12PM (1 day ago)
to nicolelawtone, me

Hi, Nicole,

The SAS office recently received your message submitted through the accommodation request self-referral in your student portal regarding your request to use your personal Dragon Legal dictation program in your classes.

| Subject | Request accommodations |
| Description | I am writing to formally request accommodation for the use of Nuance® Dragon® Legal as part of my approved assistive technology. D drafting. Because of my documented disability, speech-to-text software is necessary for me to effectively complete written assignments While I understand that the university may have general policies regarding third-party software, my approved accommodations include efficiently. Without it, my ability to complete assignments is substantially limited. Please confirm that I may use Nuance® Dragon® Legal for all written coursework consistent with my approved accommodations. If adi |
| Created By | Integration API User, 2/27/2026 2:57 PM |
| Portal Submitted By | Student [Nicole Lawtone-Bowles] |

Please note that SAS approval is not required for this request. All students are permitted to use a personal dictation program in their classes.

Thank you,

Toni Pesce, MBA
Manager, Student Accessibility Services (SAS)
T: 317-208-1686
F: 866-422-4773
E: sas@purdueglobal.edu

Assistive Technology: Read&Write Screen Reader (Purdue Global does not support third-party software, and therefore, it is the student's responsibility to seek technical assistance directly from the manufacturer if needed.) You will receive an email from SAS within 24 business hours. This email will contain a download link for the Read&Write. The Read&Write screenreader license is for one year beginning today (3/13/2024). Should you require an extension to your one-year license and are active in classes at PG, please contact SAS, and we will extend the license.

Turn off Respondus: Purdue Global Law School Dean's office will turn off Respondus.

A letter outlining your approved accommodations will be drafted and issued through e-mail to each of your instructor(s) upon approval (if the term is currently in session) within two business days, and during the first week of every new term. Please note that you will be included in your Letter of Accommodation should you desire a copy for your personal records.

Accommodations are not retroactive and will remain in effect until you are no longer an active student at Purdue Global Law School. Upon graduation, withdrawal, and/or dismissal from the University, the student must inform SAS of their re-enrollment if accommodation reinstatement is desired.

Should you have any questions regarding your approved accommodations, please contact SAS directly at sas@purdueglobal.edu.

1. I am also very disappointed that Scott Johnson is not teaching this class because he wrote the book and I have had him as a professor several times. I enrolled in this course expecting that he would be teaching. **Yes I am very disappointed Professor Johnson book is amazing and I want to pick his brain about the book. So yes.**

2. You are a disservice to this class, and I am not happy. **Professor Diab caused an Army Veteran to quit the course because she activated his PTSD she's also aggravated my PTSD that's not good School supposed to be fun.**

3. If I were not graduating in seven months, I would request a refund and withdraw from the course. That's true. I have five months left to graduate. I am trying my best, but academic misconduct for having a disability and for using assistive technology is ridiculous.

4. This situation is unnecessary and raises serious civil rights concerns. As an attorney, you should know better. Yes you should know better my lawyer Arthur Schwartz just won a case for failure to accomindate people with disabilities in court see attached https://nypost.com/2025/10/27/us-news/national-grid-must-pay-2-workers-a-total-of-3-1m-for-denying-them-remote-work-after-pandemic/

Because the professor was the subject of disrespectful remarks, accusations, and threats on your part, I am reaching out to you in order to complete the investigation. You may reply directly to me; do not contact the professor about this matter further. Freedom of speech is a fundamental human right protecting the ability to express opinions without government censorship or retaliation. In the U.S., the First Amendment safeguards this right, covering spoken, written, and symbolic speech. This is my career, my life and my family life you people are playing with and you expect me after I have $200,000.00 in student loans to take this abuse from you. You can't be serious I am angry because this is emotional distress. I am set to graduate on August 25, 2026 I am busting my ass despite my disablity to complete my law degree. You Victoria Vidt, Brian A Victor, and Sarah Diab is standing in my way to change my life and my family life. You know why I am in law school one because my 8 year old grandson has never been held by my son his father who is sittting in a California Prison for a crime he did not commit. I am in school to save my family not to be harrassed for assitive technology. When I graduate I have five months to prepare for the Connecticut State Bar Feburary 2027 and six months to prepare for the Californina Bar July 2027 you are standing in my way to save my son and my home.

The professor is concerned about whether you are the author of the work you submitted in the course. Because this matter has come to my desk, I am providing additional context. The investigation is for the following reasons: I am having surgery on March 6, 2026, and I will be down for a while. I started doing work on preview day, January 2, 2026. If you look at Brightspace, I am always in the system. I don't sleep Monday to Friday. I get up at 0200 to leave my home at 0300 to find parking at 33 Beaver Street. I spend most of my time on the road listening to audiobooks and BarMax. I get to my job and sleep in the car until 0800. I get to work an hour before I have to punch in to do my homework, and I work on it during my lunch hour and when my boss is not in the building. The UBE gives you six essays, and you have 30 minutes to do each. I put a timer on and do my essays with 30 minutes. I review work every day; that is why I am prepared at all the seminars I can attend. For you to do what you did to me has caused me emotional distress. I am very sick, trying to work and trying to finish law school so I can complete my Juris Doctor degree this year because I am deteriorating. I walk with a walker, and my caregiver has to bathe me and dress me. My car is equipped for my handicap so I can still drive myself. The harm you have inflicted on me because of my assistive technology is ridiculous. School is supposed to be fun.

- You completed the work in the course at an extraordinary pace. CL850 is a four-credit law school course, which is designed to involve 180 total hours of study (45 hours per credit). You completed CL850 by January 22, 2026, about 16 calendar days into the term. According to the schedule

you provided to your advisor, you were also working full-time during this timeframe. Response to the question regarding the pace at which I completed CL850:

I began working on my coursework during preview week on January 2, 2026, because I knew I was scheduled to have surgery on March 6, 2026 and would be down for a period of time. Because of that, I planned my schedule so that I could complete as much coursework as possible before my surgery. If you review Brightspace, you will see that I am frequently logged into the system because I spend a significant amount of time studying and reviewing course materials. I go to sleep once I get home at 2000 and in bed by 2100 Monday through Friday because I use that time to work, commute, and study. I wake up at 0200 and leave my home at 0300 to find parking at 33 Beaver Street before work.

- However, you were not solely working on CL850 and full-time employment during this period. You also completed 15 other law school credits, for a total of 19 credits. The typical course load per term is 7-9 credits for part-time students and 10-12 credits for full-time students (who are required to affirm that they do not have more than 20 hours per week on average of outside work or dependent care commitments). Response to the question regarding how I managed coursework while working full-time:During my commute and while on the road, I listen to audiobooks and BarMax so that I can continue studying. When I arrive at my job, I sleep in my car until 0800. I also arrive at work an hour before I have to punch in so that I can work on my homework. I continue working on my coursework during my lunch hour and whenever my boss is not in the building. I use every available moment during the day to review and complete assignments.

- Based on our expected time frame of 45 hours of total study per credit, your coursework would have taken approximately 855 hours (45 x 19), or nearly 36 straight twenty-four-hour days, without sleeping, eating, or working. Obviously, this is not physically possible. Response to the question regarding the speed at which I completed written assignments: The UBE requires examinees to complete six essays with approximately 30 minutes allowed for each essay. Because of that format, I train myself by setting a timer and writing essays within 30 minutes. I review work every day, which is why I am prepared at the seminars I attend. Practicing timed essays and reviewing materials daily allows me to complete assignments efficiently. I also began completing coursework early because I knew my upcoming surgery would limit my ability to work later in the semester.

- In addition, your courses require that you acknowledge that you have completed the work and the estimated hours in each module. Which I do because I review course work all the time. While studying for the MPRE this month.

- Even if you worked extraordinarily quickly and completed all of your work in half the time it is expected to take (and notwithstanding your hours acknowledgments within your courses), it would still have required nearly 18 straight twenty-four-hour days, without sleeping, eating, or working—which is, again, physically impossible. For you your not me stop comparing me to your data.

- Further, based on the totality of the circumstances, where you initially refused to meet with your professor to discuss your assignments and then refused to reschedule, this indicia remains uncontested. Yes, because I work six days a week, sometimes, not all the time. I cleared my schedule for the meeting, and according to her Google calendar, she has nothing available. I have been home for two weeks preparing for my surgery with doctor visits and preparation, and her calendar is full.

- However, Module One's assignment is an exception in that it is 98% copied from another student paper. Your a liar. I will never copy anybody work you need to turn on the TurnItIn in the course so I can see it. I don't trust your report I need to see it for

myself. So TurnItOn for the entire course Sarah Diab has it on.  The Turnitin report is attached. Your Module 1 submission is 31 pages, submitted on the first official day of the semester January 7, 2026, at 12:01 ET prior to the first Seminar scheduled on January 8, 2026. I started working on that assignement January 2, 2026 and uploaded on January 7, 2026. I can read very well you can't not teach me what I can read in the course and watching videos on my own time.

- To clarify, the subject of this inquiry is:
  - Module One - 98% copied from another student paper. I can't see the TurnItIn because it's not turned on please turn it on in the course.



**PURDUE GLOBAL** | CL850 Education Law   Nicole Lawtone-Bowles

Content  Discussions  Assignments  Quizzes  Grades  More Tools ∨  Help ∨

Assignments › View History

# Submission History

**Assignment**

[ Module 1 Assignment Dropbox  ∨ ]  Apply

**Assignment Type**

Individual assignment

| Submission ID | Submission(s) | Date Submitted ▾ |
|---|---|---|
| 19098202 | Lawtone-BowlesCL850M1A.docx (373.93 KB)Turnitin™ Submission ID 2853472142 | Jan 7, 2026 12:01 AM |

  - Module Three - AI usage I can't see the TurnItIn because it's not turned on please turn it on in the course.



Assignments › View History

# Submission History

**Assignment**

Module 3 Assignment Dropbox  ⌄    Apply

**Assignment Type**

Individual assignment

| Submission ID | Submission(s) | Date Submitted ⌄ |
|---|---|---|
| 19129429 | Lawtone-BowlesCL850M3A.docx (20.51 KB)Turnitin™ Submission ID 2855822409 | Jan 12, 2026 3:35 PM |

- Module Five - AI usage **10%**

Assignments › View History

# Submission History

**Assignment**

Module 5 Assignment Dropbox  ⌄    Apply

**Assignment Type**

Individual assignment

| Submission ID | Submission(s) | Turnitin Similarity Report | Date Submitted ⌄ |
|---|---|---|---|
| 19133662 | Lawtone-BowlesCL850M5A.docx (17.54 KB)Turnitin™ Submission ID 2855964551 | 10 % | Jan 12, 2026 9:40 PM |

- Module Eight - AI usage I can't see the TurnItIn because it's not turned on please turn it on in the course.



# Submission History

**Assignment**

| Module 8 Assignment Dropbox ⌄ |  Apply |

**Assignment Type**

Individual assignment

| Submission ID | Submission(s) | Date Submitted ▼ |
|---|---|---|
| 19139170 | Lawtone-BowlesCL850M8A.docx (17.04 KB)Turnitin™ Submission ID 2856288941 | Jan 13, 2026 1:19 PM |

○ Module Thirteen - AI usage **30%**

# Submission History

**Assignment**

| Module 13 Assignment Dropbox ⌄ |  Apply |

**Assignment Type**

Individual assignment

| Submission ID | Submission(s) | Turnitin Similarity Report | Date Submitted ▼ |
|---|---|---|---|
| 19157612 | Lawtone-BowlesCL850M13A.docx (16.89 KB)Turnitin™ Submission ID 2856628205 | 30 % | Jan 14, 2026 3:28 AM |

Your PG Supplemental Student Manual (which is automatically posted in all PGLS courses), Version 1.2, Effective January 2025 outlines Generative Artificial Intelligence policy beginning on Page 10 of that manual. The pertinent policy states the following: **Yes which I have nothing says**

AI tools may not be used with open-book assessments unless explicitly allowed through an announcement by the faculty member teaching of course or through the course materials or as outlined below: I use Assitive Technology due to my disability

1. AI-enabled assistance similar to Grammarly for spelling and grammar may be used unless disallowed by the faculty or course materials. I use Assitive Technology due to my disability

2. If used consistently with assignment instructions, AI-assisted research tools are allowed for open-book assignments I use Assitive Technology due to my disability

3. AI may be used to help organize your writing. For more information on using AI tools, please see Student Resources. AI tools may be used to assist you with studying. Some examples of the use of AI in studying include assisting with outlining, creating practice quizzes, and generating emails to communicate with faculty, staff, and other students. You can even use AI to role-play negotiations. I use Assitive Technology due to my disability

Using AI tools beyond the permissions granted in a course constitutes a violation of the Student Code of Conduct." I have permission from SAS because of my disabilty I use Assitive Technology due to my disability

This policy restricts AI use to research and studying, and instances where explicitly allowed through an announcement by the faculty member teaching or course or through the course materials; your use appears to exceed research and studying, and none of the other permitted instances are applicable to the class in question where no such announcement has been made in the course and no course materials have prescribed permitted use of AI. Further, when consulted, Professor Scott Johnson had expressly confirmed that the course is of an open-book nature that demands conventional research methods that do not involve AI use. No express allowance was made anywhere in the course for AI usage. Not for Assitive Technology due to my disability

You took and passed the PGLS Academic Integrity Course prior to this term which explained that AI use on graded assessments was not permitted without explicit permission. Likewise, the course, along with the Student Code of Conduct and Academic Integrity Course do not permit submitting someone else's work as your own. I use Assitive Technology due to my disability

Additionally, the amount of time set for completion of each of these modules and respective assignments and when they were completed is as follows:

- Module 1: I use Assitive Technology due to my disability
  - Total time for module: 14.8;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 7, 2026 12:01 AM
- Module 3: I use Assitive Technology due to my disability
  - Total time for module: 16.1;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 12, 2026 3:35 PM
- Module 5: I use Assitive Technology due to my disability
  - Total time for module: 13;
  - Total time for assignment: 4 hours.
  - Submission stamp: January 12, 2026 9:40 PM

- Module 8: I use Assitive Technology due to my disability
  - Total time for module: 17.3;
  - Total time for assignment: 8 hours.
  - Submission stamp: January 13, 2026 1:19 PM
- Module 13: I use Assitive Technology due to my disability
  - Total time for module: 13.6;
  - Total time for assignment: 5 hours.
  - Submission stamp: January 14, 2026 3:28 AM
- Module 15: I use Assitive Technology due to my disability
  - Total time for module: 12.5;
  - Total time for assignment: 10 hours.
  - Submission stamp: January 22, 2026 6:34 AM

The speed with which you've completed your assignments, within 2 weeks, does not match the requisite time assigned for each of these modules and respective assignments, especially when taking your schedule and personal challenges into consideration. I use Assitive Technology due to my disability

On February 25, 2026, you emailed the professor a "request for clarification and accommodation compliance," while continuing to threaten your professor with a civil rights complaint. Your email contained the following statements verbatim: I use Assitive Technology due to my disability

- I received your email to the class regarding AI after you canceled my appointment one hour before we were scheduled to meet on Valentine's Day, after I had cleared my schedule. Yes I did I did not go to work at the Miltary Base
- I completed my work early because I have surgery coming up and needed to plan accordingly. I understand that all of my instructors received notice of my approved accommodations before the semester began. Yes
- The failure to accommodate my approved use of assistive technology, including speech-to-text, raises concerns under applicable disability laws. Yes
- In addition, your lack of response to my questions since the beginning of the class has raised serious concerns and contributed to my decision to file a civil rights complaint. Yes
- My work should be evaluated based on the substance and quality of the information provided, not solely on the results of an AI-detection tool such as GPTZero, to which I have a subscription. Yes
- Research by scholars, including Professor Ryan Baker and researchers affiliated with institutions such as Harvard and Yale, has raised concerns about the reliability and potential bias of AI-detection systems. These studies indicate that such tools can produce false positives and may disproportionately impact certain writing styles or users of assistive technology. For these reasons, reliance on AI-detection software without substantive academic review raises fairness and accuracy concerns. Law students' work should be graded on its academic merit based on the rubric, not on an automated suspicion score. Yes
- AI-detection tools like GPTZero are probabilistic systems, not forensic instruments. Independent research has shown that these tools can produce false positives, meaning they sometimes label human-written work as AI-generated. Scholars in educational data science, including Professor Ryan Baker, have cautioned that detection systems are not reliably accurate across different writing styles and linguistic patterns. Research

discussions from institutions such as Harvard and Yale have also emphasized the risk of bias and over-reliance on automated academic integrity tools without human review. The concern becomes more serious when assistive technology is involved. **Yes**

- Speech-to-text software can produce syntactic patterns that differ from conventional typing, which may inadvertently trigger AI-detection flags. I have observed this issue in my own research because I use speech-to-text applications and devices. If a disability accommodation changes the mechanics of writing, an algorithm trained on typical keyboard-generated prose may misclassify that output. This creates a potential disparate impact issue if disabled students are disproportionately flagged. For that reason, best practice in academic integrity review requires substantive faculty evaluation rather than sole reliance on detection software. **Yes**

In your February 25, 2026 email, you raised several concerns regarding (1) disability accommodations, including speech-to-text software; (2) the reliability and potential bias of AI-detection tools; and (3) the propriety of relying on such tools in evaluating student work.

To clarify the basis of this investigation, kindly note the following:

1. The issue under review is not your use of approved assistive technology; PG fully honors approved accommodations, including speech-to-text software, and nothing in this investigation concerns or restricts your lawful use of such tools. As mentioned above, where the policy expressly permits certain limited uses of AI-enabled tools, such as grammar assistance and research and study support, such use must be consistent with course instructions. There is no prohibition on approved disability accommodations, and that is not at issue here. **I use Assitive Technology due to my disability**

2. While you assert that AI-detection systems are probabilistic and may produce false positives, no academic integrity determination is made solely on the basis of an automated detection score. AI-detection software is used as one screening mechanism among others to help professors with their identification of work that may warrant further review. It is not treated as a forensic instrument or as dispositive proof of misconduct. Rather, it functions as an integrity-support tool that prompts substantive faculty evaluation, similar to plagiarism detection software, and is more probative of plagiarism in conjunction with other proof such as the speed of submission in your case, which is disproportionate to the time allocated for completion of the assigned coursework. **I use Assitive Technology due to my disability**

3. Regardless of ongoing scholarly debate about detection accuracy, the controlling standard in this matter is PG's Supplemental Student Manual, cited above, which limits AI use to specific contexts: primarily research, studying, or where explicitly authorized by the instructor in open-book assignments, which is not the case here. Use of AI beyond these permissions constitutes a violation of the Student Code of Conduct, and where Professor Scott Johnson has not prescribed for use of AI in his designed course assignments, the likelihood of violation in the case of your submissions is high; no announcement, course material, or instruction authorizes generative AI use for drafting or composing the module assessments in this course, signaling the need for conventional research and original written analysis. Even if AI-detection tools are imperfect, that does not authorize the use of generative AI beyond what the policy or course permits, which is "none" in this course. **I use Assitive Technology due to my disability**

The central question in this investigation is therefore not whether detection software is flawless; rather, it is whether your submissions of all assignments within two weeks complied with the AI policy and the assignment instructions. Excessive or unauthorized generative AI use cannot be justified by general concerns about detection methodology. The relevant inquiry is whether the work submitted reflects your own analysis consistent with the permitted scope of AI use under institutional policy. **I use Assitive Technology due to my disability**

Lastly, academic integrity protections exist to ensure fairness across the student body. If some students rely on generative AI beyond authorized limits,

to maintain consistent standards, protect the value of student work and the integrity of your degree, and ensure that all students are evaluated under the same rules. I use Assitive Technology due to my disability

Given the above, I request the following: I use Assitive Technology due to my disability

As to assignments from Modules 3, 5, 8, and 13: I use Assitive Technology due to my disability

- A statement about whether you have used AI in the creation of graded assessments in CL850.
- If you have used AI, explain how you have used it for each graded assignment.
- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.

As to the assignment from Module 1: I use Assitive Technology due to my disability

- Any supporting evidence that you are the author of the graded assessments in CL850. For example, drafts, research notes, document properties, versioning history, or other proof that you created these documents yourself.
- An explanation for the 98% match with another student's paper Turn on the TurnItIn Feature in the course now

I request that you provide the following to me by 11:59 p.m. ET on Mar 6, 2026 at sjamison@purdueglobal.edu. Pending an outcome, the assessments will not be graded and thus remain zeros, though the zeros are placeholders only until the matter is resolved. If you do not respond, we will proceed with the allegations above. If you do respond, we will review and consider your response. Thank you for your attention to this matter. I use Assitive Technology due to my disability

**Shaun G. Jamison**
Pronouns: he, him, his
Associate Dean of Academic Affairs

Purdue Global Law School
2029 Century Park East, Suite 400
Los Angeles, CA 90067
**Email:** sjamison@purdueglobal.edu



Logo from the Princeton Review. ©2025 TPR Education. All rights reserved. Used under license.

Make a tax-deductible donation to Purdue
Global Law School

 Updated_ 4_2_2024_ Purdue Global Law School Accommodation Approval.pdf
128.3 kB



Disability Letter.pdf
1.7 MB

DrHinke to Purdue SAS.pdf
2.7 MB

#1 APPROVAL_ Includes ClaroRead_ Concord Law at Purdue University Global Accommodation Approval.pdf
114.4 kB

Associate Dean of Academics Ed.Gov OCR .pdf
233.4 kB

Appeal - Nicole Lawtone.pdf
88.5 kB

portal.nybarexam.org_NYLEC.pdf
88.4 kB

avoiding-discriminatory-use-of-artificial-intelligence-112274.pdf
1.1 MB

ed.govPGLS2.pdf
1.7 MB

ed.govPGLS1.pdf
233.4 kB

Lawtone-BowlesCL850M13A.docx
16.9 kB

Lawtone-BowlesCL850M8A.docx
17 kB

Lawtone-BowlesCL850M3A.docx
20.5 kB

Lawtone-BowlesCL850M1A.docx
373.9 kB

Lawtone-BowlesCL850M5A.docx
17.5 kB

Screen Shot 2026-03-04 at 1.59.59 PM.png
111.8 kB

Screen Shot 2026-03-04 at 1.56.39 PM.png
112.2 kB

Screen Shot 2026-03-03 at 9.13.41 PM.png
83.7 kB

Screen Shot 2026-03-04 at 1.58.41 PM.png
116.8 kB

Screen Shot 2026-03-04 at 2.0 .... PM.png
117.3 kB

Screen Shot 2026-03-04 at 1.53.32 PM.png
114.1 kB

Screen Shot 2026-03-04 at 2.38.16 PM.png
64.9 kB

Screen Shot 2026-03-03 at 7.55.38 PM.png
92.1 kB

Screen Shot 2026-03-03 at 7.56.03 PM.png
49.2 kB

Screen Shot 2026-03-03 at 3.51.21 PM.png
98.9 kB

SAS.png
119.2 kB

SAS Assistive Technology Proof.png
59.7 kB

Screen Shot 2025-11-06 at 8.11.18 PM.png
248.8 kB

UBEJuly2026.png
124.3 kB

NYCHA Section 8.png
109.7 kB

Screen Shot 2026-02-01 at 1.25.05 AM.png
15.2 kB

GPTZero Education Law Proof of Assistive Technology False Positive.png
60.8 kB

Lawtone-BowlesCL850M8A.docx
17 kB

Lawtone-BowlesCL850M13A.docx
16.9 kB

Lawtone-BowlesCL850M3A.docx
20.5 kB

Lawtone-BowlesCL850M5A.docx
17.5 kB

Lawtone-BowlesCL850M1A.docx
373.9 kB



71.2 kB

1A GPTZero AI Scan - Lawtone-BowlesCL850M1A.docx.pdf
166.6 kB

8AGPTZero AI Scan - Lawtone-BowlesCL850M8A.docx.pdf
62.1 kB

5AGPTZero AI Scan - Lawtone-BowlesCL850M5A.docx.pdf
65.3 kB

13AGPTZero AI Scan - Lawtone-BowlesCL850M13A.docx.pdf
64.8 kB

CL850 Academic Integrity Inquiry.pdf
104.2 kB

9780472900725.pdf
1.4 MB

TheAttack.png
2.8 MB

Brian Victor Questions.pdf
168.7 kB

2025-00308 - Appellate Division - 2nd Dept.pdf
138.2 kB

Plessy v. Ferguson.pptx
233.4 kB

Unofficial College Transcript 01_30_2026.pdf
926.7 kB

Koreen E. Thomas, FNP.jpg
412.3 kB