**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| NICOLE LAWTONE-BOWLES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:26-CV-28-PPS-AZ |
| | ) | |
| PURDUE UNIVERSITY GLOBAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Nicole Lawtone-Bowles was dismissed from the Purdue Global Law School after three separate investigations and findings of academic misconduct. Lawtone-Bowles claims in this lawsuit that her expulsion violated federal and state law. [DE 1.] She seeks damages as well as a temporary restraining order and preliminary injunction ordering Purdue Global to reinstate her to the law school so she can finish her final semester. [DE 3.]

Shortly after the complaint was filed, I held a telephonic hearing on her motion for a TRO. [DE 11.] I denied the request for a TRO but deferred ruling on the motion for preliminary injunction pending an evidentiary hearing, which took place a couple months later. [DE 49.] In the meantime, Lawtone-Bowles amended her complaint. [DE 94.] While the amended complaint asserts new claims and adds new defendants, the theory of the case remains the same—she claims that the disciplinary actions taken against her by Purdue Global were acts of race and disability discrimination.

Defendants disagree, explaining that each finding of academic misconduct was well supported by evidence and had nothing to do with her disability or race.

The amended complaint asserts disability discrimination and retaliation claims under the Americans with Disabilities Act and a disability discrimination claim under the Rehabilitation Act. Lawtone-Bowles also brings claims under 42 U.S.C. § 1983 and Title VI, and a state-law claim for breach of implied contract. Defendants moved to dismiss the amended complaint, and the motion is ripe for ruling. Separately, the parties submitted proposed findings of fact and conclusions of law following the hearing on the preliminary injunction.

I take up the motion to dismiss and the motion for preliminary injunction in turn.[1] For the latter, I will review the likelihood of success on the merits only for claims that survive the motion to dismiss. As I explain below, only the ADA retaliation claim survives dismissal, and the motion for preliminary injunctive relief will be denied because Lawtone-Bowles has not demonstrated a likelihood of success on that claim.

**Preliminary Matters**

Before I consider each motion, there are some ground rules to cover in light of the procedural posture of this case. For purposes of the motion to dismiss, I set out the facts as alleged in the amended complaint. I don't consider testimony or exhibits from the preliminary injunction hearing. Lawtone-Bowles cites some of those exhibits in her

[1] I held a hearing to address the procedural posture of the case after Lawtone-Bowles filed her amended complaint. [DE 92.] Counsel for Defendants declined my offer to supplement their preliminary injunction briefing to account for the new claims in the amended complaint. As

amended complaint, but she did not attach any of them to it. If I consider documents outside the pleadings, I must treat the motion to dismiss as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). Because neither side has asked me to do that, I look to the four corners of the complaint in ruling on the motion to dismiss.

To the extent Defendants raise additional facts from the preliminary injunction hearing in their briefing on the motion to dismiss, I likewise do not consider them. I will, however, address those facts when I turn to the preliminary injunction motion. To the extent Lawtone-Bowles provides new facts in her briefing, I'm permitted to rely on them "so long as they are consistent of the allegations in the complaint." *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015). With all that covered, I turn now to the two motions presently before me.

## I. Motion to Dismiss

### Facts As Alleged in the Amended Complaint

Nicole Lawtone-Bowles is a 54-year-old black woman diagnosed with obsessive-compulsive disorder and PTSD. [DE 94 at ¶ 19.] Purdue University Global is an Indiana public benefit corporation that operates Purdue Global Law School, a fully online law school. [*Id.* at ¶¶ 3, 5-6.] I'll refer to them collectively as Purdue Global. Lawtone-Bowles enrolled in Purdue Global's J.D. program and was a student in good standing until she was expelled from the law school a few months prior to her August 2026 graduation date. [*Id.* at ¶¶ 4, 46.]

---

a result, I find it proper to address the likelihood of success on the merits of Plaintiff's newly added claims in this Opinion, to the extent they survive the motion to dismiss.

As a disability accommodation, Purdue Global approved Lawtone-Bowles' use of a speech-to-text dictation software—Nuance Dragon Legal Anywhere—to complete her coursework. [*Id.* at ¶ 21.] Dragon advertises that its talk to text program can transcribe up to 160 words per minute and it has an auto-format function for legal citations as well. [*Id.*]

Lawtone-Bowles faced three separate academic integrity proceedings prompted by suspicions of cheating. The core dispute in this case is whether those investigations, and ultimate findings of academic misconduct, were premised on her approved use of Dragon or reasons completely unrelated to her use of the software. Lawtone-Bowles frames the issue as an "Accommodation Paradox." Purdue Global approved the accommodation but three times over penalized her for the "direct, foreseeable, and successful" results of using it. [DE 94 at ¶ 23.]

Here are the details that led to Lawtone-Bowles' expulsion: The first investigation came in May 2025, when instructor Victoria Vidt accused Lawtone-Bowles of misconduct related to how quickly she submitted an essay. Vidt wrote in her formal report that "it was not credible that she read the question, composed an answer including detailed case citations, and uploaded it in 8 minutes." [Id. at ¶¶ 25-27.] Purdue Global's Academic Appeals Committee upheld the finding on the basis that it was "unlikely that a student could have written so much, so quickly, without spelling or grammar mistakes, without unauthorized tools or assistance." [*Id.* at ¶ 28.] According to Purdue Global, this was an obvious case of a student improperly using AI to complete an assignment.

The second academic misconduct proceeding occurred seven months later in January 2026. Lawtone-Bowles received an unexpected phone call from Professor Brian Victor, who suspected her of cheating on the coursework she submitted in his class. From the conversation, he concluded that Lawtone-Bowles "was unable to demonstrate even a basic understanding of the content." [*Id.* at ¶ 29.] The Committee upheld his finding, citing her "polished syntax and error-free grammar" as evidence that she didn't author the work she submitted. [*Id.* at ¶ 31.] The Committee also said her work included fabricated sources, which Lawtone-Bowles disputes in the complaint. [*Id.* at ¶ 32.]

The third occasion—the one that led to Lawtone-Bowles' expulsion—happened in February 2026. Professor Sarah Diab opened an inquiry into her work, and Lawtone-Bowles responded by "assert[ing] her rights under the ADA" and filing "external civil rights complaints." [*Id.* at ¶¶ 33, 37, 66.] Lawtone-Bowles says that—in retaliation—Associate Dean Shaun Jamison took over the investigation. He then escalated the matter because Professor Diab "was the subject of disrespectful remarks, accusations, and threats" from Lawtone-Bowles. [*Id.* at ¶ 34.] Lawtone-Bowles says the "threats" were nothing more than an assertion of her rights under civil rights laws, and that Dean Jamison characterized her formal complaints as "supplied by her for the purpose of intimidation" and "as a shield against consequences." [*Id.* at ¶¶ 34, 37.] Lawtone-Bowles doesn't provide much detail about the accusations underlying the third investigation, but the complaint suggests it had to do with the speed at which she completed the course. According to Dean Jamison, the work in question would have required "nearly 36 straight twenty-four-hour days," which Lawtone-Bowles says is a

baseless calculation made without consideration of what the Dragon software enables its users to accomplish. [*Id*. at ¶¶ 37, 39.]

Provost Carolyn Nordstrom, as the final authority for appeals, upheld each of the three findings of academic misconduct. Lawtone-Bowles says she affirmed them with "rubber-stamp" reviews: Nordstrom simply wrote that she "found no compelling evidence to contradict the Appeals Committee." [*Id*. at ¶¶ 42-43.] According to the Complaint, Lawtone-Bowles notes that, for each of the three instances of alleged misconduct, every Purdue Global employee in the "decision-making chain that led to her dismissal" was white. [*Id*. at ¶ 20.] As a result of Defendants' "unlawful conduct," she says she can no longer get her J.D. or sit for the bar, and therefore has no shot at ever becoming an attorney. [*Id*. at ¶ 46.]

The amended complaint names Purdue University Global, Purdue Global Law School, the Academic Appeals Committee, and several professors and administrators. Lawtone-Bowles seeks $100 million in damages and an injunction ordering Purdue Global to reinstate her at the law school and wipe the academic dishonesty findings from her record.

**Discussion**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but

I don't need to accept threadbare legal conclusions supported by purely conclusory statements. *See Iqbal*, 556 U.S. at 678. The plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Making the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Finally, because Lawtone-Bowles represents herself, the amended complaint must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**A. Disability Discrimination Claims**

Lawtone-Bowles asserts claims under Title II of the ADA and Section 504 of the Rehabilitation Act. To state a claim under either statute, a plaintiff must allege that she "was qualified under the statute for a particular program and was discriminated against because of [her] disability." *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015). Defendants do not dispute that Lawtone-Bowles has a disability. They challenge her claims on the basis that she is not qualified and that she was not disciplined *because of* her disability. They further note that academic decisions are entitled to deference by courts. [DE 99 at 4-5.] *See, e.g.*, *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *Novak v. Board of Trustees of Southern Illinois Univ.*, 777 F.3d 966, 976 (7th Cir. 2015).

A student is qualified if she can "meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation." *Khan v. Midwestern Univ.*, 879 F.3d 838, 844 (7th Cir. 2018). Defendants contend that Lawtone-Bowles does

not meet this definition because "she did not independently complete her coursework." [DE 99 at 5.] That's their version of the facts, however, and Lawtone-Bowles says the opposite in her complaint. She alleges she was a student in good standing, and denies she ever cheated. [*See* DE 94 at ¶¶ 4, 21, 23, 27, 46, 57.] The parties agree that independent authorship is an academic requirement. [*See* DE 99 at 6; DE 103 at 3.] But whether Lawtone-Bowles actually authored her work or not is a question of fact that I cannot resolve at the pleading stage.

The statutes also require a plaintiff to allege she was discriminated against "because of" her disability. *Stanek*, 783 F.3d at 641. Defendants argue that the cause of her dismissal was not her disability but Purdue Global's conclusion that the explanations for her work "were not credible," which they call "an academic judgment, not disability discrimination." [DE 106 at 3.] But Lawtone-Bowles challenges those credibility findings in her complaint. Her theory for disability discrimination is that the law school based their findings on the direct outputs of her approved accommodation—specifically, "the speed, volume, timing, polish, and other characteristics associated with" her use of the Dragon software program. [DE 103 at 1-2.] At the pleading stage, my job isn't to determine which side is more credible; it's to determine whether the complaint plausibly alleges that Lawtone-Bowles was disciplined because of her disability. As I explain below, it does not.

Let's begin with the first academic misconduct proceeding. Professor Vidt reported Lawtone-Bowles because it was "not credible that she read the question, composed an answer including detailed case citations, and uploaded it in 8 minutes."

[DE 94 at ¶ 27.] Vidt also stated that "[n]one of my issues with the student's work involve the use of the Dragon software." Lawtone-Bowles describes these two statements as "facially irreconcilable." [*Id.* at ¶ 25.] The other allegations suggest otherwise. The Committee found it "unlikely that a student could have written so much, so quickly, without spelling or grammar mistakes, without unauthorized tools or assistance." [*Id.* at ¶ 28.] The complaint only answers for the writing speed, stating that this output was "mathematically consistent" with the software's advertised speed. [*Id.* at ¶ 27.]

But writing speed alone isn't what raised eyebrows. As alleged, Vidt and the Committee found it unlikely that Lawtone-Bowles could—in addition to writing the answer—read and analyze the question in only eight minutes and produce an answer free of typos as well. Taken as a whole, the decision-makers looked at the evidence and determined Dragon wasn't the explanation. Indeed, the complaint itself says the basis for the decision was the Committee's conclusion that Lawtone-Bowles used an "*unauthorized* tool or assistance"—not the approved Dragon software — and Vidt stated herself that the software was not the issue. The allegation that Purdue Global "penalized her for the direct, foreseeable, and successful results" of her accommodation [DE 94 at ¶ 23] is a conclusion I need not accept as true. *See Iqbal*, 556 U.S. at 678. The basis for the Committee's finding, however, is a factual allegation in Lawtone-Bowles' own pleading that I can't ignore. *See id.* at 682 (finding an inference of discrimination implausible in light of an "obvious alternative explanation").

Lawtone-Bowles' response brief adds more context to the first proceeding, and it

further hinders her claims. She says the law school dean, Martin Pritikin, wrote that "even with the use of talk-to-text technology, it is not credible that you would produce work at the speed and quality that you have." [DE 103 at 6.] She uses this statement as proof that her accommodation and Defendants' findings were "factually intertwined." [*Id.*] But that would only prove that Defendants considered her accommodation and did not believe it accounted for the speed and quality of her work. In other words, the findings weren't premised on her accommodation. Those involved in the matter considered it and still believed she didn't author her work. At this stage, I'll accept Lawtone-Bowles' version of the story that the decision-makers were mistaken, but I can't accept that they punished her for her disability accommodation when—by her own account— nearly everyone involved said the decision had nothing to do with it.

In the second proceeding, the Committee upheld a finding of misconduct, citing Lawtone-Bowles' "polished syntax and error-free grammar" as well as "fabricated sources" in her coursework. [DE 94 at ¶ 31.] Lawtone-Bowles refutes the finding of fabricated sources, noting that the author she cited is a well-known law school dean and legal scholar. She also says the Committee's review was "incompetent and fundamentally flawed." [*Id.* at ¶ 32.] Even if so, the findings, as alleged, have nothing to do with the Dragon software, her writing speed, or her disability.

As to the third proceeding, the complaint doesn't say much about the allegations prompting it. Lawtone-Bowles alleges it was initiated in retaliation for her "assert[ing] federally protected rights under the ADA" and notes Defendant Jamison's "baseless calculation that Plaintiff's work required nearly 36 straight twenty-four-hour days." She

says that calculation was derived "without ever consulting the technical specifications of her approved accommodation." [Id. at ¶ 39.] But none of this plausibly suggests the allegation and third finding of academic misconduct—which the complaint doesn't describe in any detail—were because of her disability. Indeed, that's the case for all three proceedings.

In sum, the complaint alleges that every decision-maker knew about the accommodation and each gave a reason for doubting that Lawtone-Bowles did the work herself that did not relate to her use of Dragon. She disagrees with those reasons and denies that she ever cheated. At this stage, I'll assume she's right and Defendants are wrong. But she hasn't plausibly alleged that but for her disability, she wouldn't have been disciplined. For the first two, she provided alternative reasons for the findings of academic misconduct. For the third, she doesn't tell us anything other than it was the result of retaliation. But retaliation is a separate claim, and I'll address it shortly. As it stands, the complaint doesn't support a claim for disability discrimination in any of the three proceedings. Lawtone-Bowles has therefore failed to state a claim for discrimination under the ADA or the Rehabilitation Act.

**B. Section 1983 Claim**

Lawtone-Bowles' next claim is brought under 42 U.S.C. § 1983, which provides a right of action against a person who, acting under color of law, has violated the plaintiff's constitutional rights. *Malhotra v. Univ. of Illinois at Urbana-Champaign*, 77 F.4th 532, 535 (7th Cir. 2023). Lawtone-Bowles claims that Defendants—acting under the color of law—violated her rights under the 14th Amendment because they deprived her of a

protected liberty interest without due process and denied her equal protection on the basis of her race and disability. [DE 94 at ¶¶ 59-61.]

Let's begin with the due process claim. "The Due Process Clause is not a general fairness guarantee; its protection kicks in only when a state actor deprives someone of life, liberty, or property." *Doe v. Purdue Univ.*, 928 F.3d 652, 659 (7th Cir. 2019) (internal quotation marks omitted). The threshold question is whether Lawtone-Bowles was deprived of a recognized property or liberty interest as a result of Purdue Global's disciplinary decisions that culminated in her expulsion. *See id.*

She alleges she has a protected liberty interest in her chosen profession and that her dismissal foreclosed her legal career. [DE 94 at ¶ 60.] To succeed on this theory, Lawtone-Bowles must satisfy the "stigma plus" test, "which requires [her] to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived [her] of a right [she] previously held." *Doe*, 928 F.3d at 661. I recognize that three findings of academic misconduct and an expulsion can inflict reputational damage, but the standard demands more than that. The "stigma" prong requires disclosure, and the defendant must be the one doing the disclosing.

In *Doe*, the Seventh Circuit found a protected liberty interest where Purdue told the Navy that it found the plaintiff guilty of sexual assault, and the plaintiff was legally obligated to authorize that disclosure. *Id.* at 661-62. Here, Lawtone-Bowles doesn't allege that Purdue Global disclosed her expulsion to any potential employers, bar examiners, or other law schools. Nor does she allege she is obligated to authorize Purdue Global to do so. What she does allege is "the permanent loss of her Juris Doctor

degree" and "the destruction of her eligibility to sit for any state bar examination." [DE 94 at ¶ 47.] To the extent Lawtone-Bowles is also pleading a protected property interest in her continued legal education, the Seventh Circuit does not recognize one. *See Malhotra*, 77 F.4th at 537 ("Our cases establish that students do not have a stand-alone property interest in their continued education at state universities.").

As to her bar exam eligibility, Lawtone-Bowles does not allege anywhere that Purdue Global has published this information to a state bar or that they will be required to do so. Her response doesn't identify a disclosure either. Her argument, instead, is that the proceedings were not "meaningful." [DE 103 at 8-9.] To the extent she's implying that she will need to disclose the misconduct to a prospective law school, or ultimately a state bar, a plaintiff can't "himself spill the beans and then blame the defendant for ruining his reputation." *Doe*, 928 F.3d at 661.

What's more, even if Lawtone-Bowles met the high bar of alleging a "stigma plus" claim, her due process claim would have to be dismissed because it seems clear that she received all the process that was due. Indeed, the Amended Complaint makes references to Lawtone-Bowles being provided notice of the allegations, opportunities to respond in writing, formal hearings being conducted before the Academic Appeals Committee, and a robust "appellate" process. [DE 94 at 8-14.] In sum, Lawtone-Bowles cannot proceed on her due process claim under Section 1983.

Next, Lawtone-Bowles alleges that Defendants' academic dishonesty findings and decision to expel her violated her right to equal protection. To state an equal protection claim, a plaintiff must plausibly allege that a state actor's decision was

motivated by discriminatory intent. *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012). "One way to allege intentional discrimination is to show that the state treated similarly situated individuals more favorably." *Charleston v. Bd. of Trs. of Univ. of Illinois at Chicago*, 741 F.3d 769, 775 (7th Cir. 2013). The complaint does more telling than showing. Lawtone-Bowles says her equal protection rights were violated because Defendants intentionally treated her differently from "similarly situated non-disabled and/or non-Black students because of her race and disability." [DE 94 at ¶ 61.]

The complaint offers nothing in support of this allegation, and a bare conclusion that others were treated more favorably isn't enough. *See Charleston v. Bd. of Trs. of Univ. of Illinois at Chicago*, 741 F.3d 769, 775 (7th Cir. 2013) (rejecting equal protection theory on a motion to dismiss because the plaintiff's "complaint tells us nothing about these similarly situated medical students") (internal quotation marks omitted).

The remaining allegations concerning discriminatory intent fare no better. Lawtone-Bowles alleges that she's a black student and "every individual Defendant involved in the decision-making chain that led to Plaintiff' s dismissal" was white. [DE 94 at ¶¶ 19-20.] But that's a description of the decision-makers—not the reasons for their decisions. If that were enough, every adverse decision made by someone of a different race would suffice to show discriminatory intent.

Lawtone-Bowles also alleges that Defendant Jennifer Fishman told her, in writing, that Dragon is a software "designed specifically for attorneys and legal professionals. You're not a professional; you're a law student and should not be using it." [*Id.* at ¶ 24.] She says this is "direct evidence of a discriminatory attitude that

Plaintiff, a Black, disabled student, was not entitled to use tools deemed above her station." [*Id.*] Fishman's statement may be ignorant, but it doesn't support an inference of racial discrimination. Her statement has nothing to do with race, and the complaint supplies no context suggesting that it does. In her response, Lawtone-Bowles concedes that Fishman did not "expressly use[] racial terminology." [DE 103 at 10.]

I'll give Lawtone-Bowles the inference that Fishman's statement was discriminatory with respect to her disability, albeit not facially. Lawtone-Bowles alleges that she was approved to use the software, and Fishman said she shouldn't be using it at all. But this statement alone doesn't support her claim. Putting aside the question of how discrimination based on disability is treated differently from race under the Fourteenth Amendment, Lawtone-Bowles must draw some connection between Fishman's statement and the law school's findings of academic dishonesty. The heart of an equal protection claim is a discriminatory decision by a state actor—not a discriminatory statement. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (noting that, "[s]tanding alone, simple verbal harassment" does not deny a person equal protection). The complaint does not plausibly allege that Fishman played any role in the allegations, investigations, or determinations of academic misconduct.[2] As a result, the

[2] Lawtone-Bowles names Fishman as a participant in the "decision-making chain" leading to her dismissal, but she doesn't explain anywhere in the complaint what role Fishman played. Without these facts, Fishman's statement is too tangential to the challenged conduct to support a claim. *See Iqbal*, 556 U.S. at 678 (explaining that "naked assertion[s] devoid of further factual enhancement" do not support a claim for relief) (internal quotation marks and citation omitted).

equal protection theory falls with the rest of her Section 1983 claim.

### C. Title VI Claim

Next, Lawtone-Bowles asserts a race discrimination claim under Title VI, which provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Notably, the statute prohibits only intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Her Title VI claim rests on the same race-based allegations as her equal protection claim—each defendant "involved in the decision-making chain" that led to her dismissal was white. [DE 94 at ¶ 20.] As just explained, this doesn't suffice to allege intentional discrimination on the basis of race.

### D. Retaliation Claim

Lawtone-Bowles' strongest claim is retaliation under the ADA. The ADA makes it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful" by the statute or "made a charge" under it. 42 U.S.C. § 12203(a). To succeed on a retaliation claim, a plaintiff must ultimately prove that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two." *Koty v. DuPage Cnty., Illinois*, 900 F.3d 515, 519 (7th Cir. 2018). As to the third element, a plaintiff does not need to establish a causal link between the protected activity and the adverse action at the pleading stage. It's enough to allege that the adverse action followed the protected activity. *See Stanek v. St. Charles Cnty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 643 (7th Cir. 2015).

Defendants dispute only the third element—causation. They say the timing doesn't work out because the academic dishonesty investigations began before Lawtone-Bowles asserted her rights under the ADA. [DE 99 at 11.] That's only partially true. It's true in the sense that the protected activity occurred after the first two investigations; but it did precede the third one. [DE 103 at 9.] According to the complaint, Lawtone-Bowles asserted her ADA rights to Professor Diab in February 2026 after Diab opened an inquiry and canceled a meeting with her. The "immediate response" was that Jamison took over the investigation, and "escalated" it because of "threats," which Lawtone-Bowles says were really the assertion of her rights. [DE 94 at ¶¶ 33-34, 68.] She further alleges that the third investigation and her dismissal from the law school—which are plainly adverse actions—resulted from the protected activity. [*Id*. at ¶¶ 67-68.] It is therefore plausible that the third investigation was an act of retaliation.

Her response adds two statements consistent with these allegations. First, Diab wrote that "[s]ince her offensive remarks and display of aggression, I have seized all communication with the student and decided to report her." She also adds that Jamison characterized her formal complaints as "revenge for perceived wrongs." [DE 103 at 10.] Defendants frame Diab's statement as a reaction to Lawtone-Bowles' conduct towards Diab rather than retaliation for protected activity. [DE 106 at 6.] But this sounds more like an argument that would be made to a jury. In other words, it's not clear which side is correct. At this stage of the proceedings, I must draw the inference in Lawtone-Bowles' favor and assume that the assertion of her rights is what prompted Diab to

report her, and that the third investigation and her dismissal followed from that report.

Defendants challenge the claim on two other fronts. They say it fails because the third investigation "continued pre-existing academic-integrity concerns arising from the same pattern that prompted the first two investigations." [DE 106 at 5-6.] The complaint doesn't say that anywhere. It says the third investigation was "escalated" (presumably to the Academic Appeals Committee) and that her dismissal followed because she asserted ADA rights. [DE 94 at ¶¶ 33, 67-68.]

Second, they say the statements identified in the complaint as evidence of retaliatory motive do not "establish that the subsequent investigation was motivated by a desire to punish protected activity rather than legitimate academic-integrity concerns." [DE 106 at 6.] But the complaint doesn't say that, and I don't draw inferences in Defendants' favor here. This argument, in any event, essentially confuses the standard of review by demanding *evidence* instead of allegations. In other words, contrary to what Defendants suggest, Lawtone-Bowles does not need to "establish" causation for the claim to survive; allegations suffice at this point. *See Stanek*, 783 F.3d at 643; *see also Freeman v. Metro. Water Reclamation Dist. of Greater Chicago*, 927 F.3d 961, 965 (7th Cir. 2019) (finding plaintiff stated an ADA retaliation claim where he alleged his employer fired him due to "his request to accommodate his condition").

The tell is the cases Defendants rely on when making this argument, all of which address proof of causation for retaliation claims at the summary judgment stage of litigation. *See* DE 99 at 11; DE 106 at 6 (citing *Klene v. Trs. of Indiana Univ.,* 413 Fed. App'x 919, 921 (7th Cir. 2011) (affirming summary judgment for university on ADA retaliation claim);

*Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 635 (7th Cir. 2022) (affirming summary judgment on Title VII retaliation claim); *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 495-96 (7th Cir. 2014) (discussing methods of proving causation at summary judgment)).

Whether the third investigation and Lawtone-Bowles' expulsion were—as a matter of fact—the result of her assertion of ADA rights isn't something I can decide on a motion to dismiss. Alleging that the adverse action occurred because of the protected activity is enough to survive dismissal. Lawtone-Bowles has done that, so her retaliation claim goes forward.

**E. Breach of Implied Contract**

Lawtone-Bowles' final claim is for breach of implied contract. She alleges Purdue Global's student handbooks, academic integrity policies, and AI guidance created an implied contract that Defendants were required to follow and that they breached it. [DE 94 at ¶¶ 70-72.] To state a claim, the "complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return." *Charleston*, 741 F.3d at 773.

Lawtone-Bowles alleges the policies contained "specific, identifiable promises," including promises that AI detection tools would not be the "sole determining factor" in an investigation and that she would be afforded a fair process. [DE 94 at ¶ 71.] The first promise may be specific enough, but Lawtone-Bowles does not plausibly allege Purdue Global breached it. The complaint never says that Purdue Global used AI detection tools in determining that she didn't author her work. As I explained in connection with her disability discrimination claims, Lawtone-Bowles alleges other reasons why Purdue

Global came to its conclusions that academic misconduct occurred. She says that those findings were based on the speed, polish, and volume of her work, but not an AI detection tool.

That leaves the "fair process" promise, and it fares no better. The allegation that Defendants breached the contract because they failed "to follow their own rules" and "deviated from their published standards" is not specific enough to state a claim. *Charleston*, 741 F.3d at 773 ("[T]he student's complaint must be specific about the source of this implied contract, the *exact promises the university made to the student*, and the promises the student made in return.") (emphasis added). The complaint doesn't tell me what those rules or standards are. Nor does it reference the promises she made in return. She therefore fails to state a claim.

* * *

To summarize: Lawtone-Bowles may proceed on her ADA retaliation claim, but only in connection with the third disciplinary proceeding. All other claims asserted in her complaint are dismissed. As a result, I only take up the ADA retaliation claim in ruling on the preliminary injunction motion.

## II. Motion for a Preliminary Injunction

Before I address Lawtone-Bowles' motion for a preliminary injunction, it's important to discuss how the standards differ from a motion to dismiss. The motion to dismiss was decided on the allegations in the complaint. The motion for preliminary injunction is decided on the evidence in the record, including the testimony and admitted exhibits from the hearing [DE 66]. In ruling on the preliminary injunction

motion, I consider facts outside the complaint, and some of them differ from those alleged in the complaint.

Because a motion to dismiss is decided on the four corners of the complaint, my findings of fact for the preliminary injunction motion have no bearing on my analysis for the motion to dismiss. Finally, although the surviving ADA claim is limited to the third investigation only, I recount the first two in my findings of fact because the claim turns on why that investigation happened, and the full story helps answer that question.

**Findings of Fact**

At Purdue Global Law School, students complete their coursework through a series of self-paced modules in each course. Each module contains assigned reading, a discussion assignment, and an assessment, and each includes an estimate of how long the work should take a typical student. Students must complete the modules in order. For example, Module 4 cannot be completed until the student completes Modules 1 through 3. All examinations are closed-book and, of course, completed and submitted online. Unlike a brick-and-mortar school, there's no proctor in the room to supervise students as they are taking their exams. Instead, Purdue Global uses software designed to detect academic dishonesty in students' completed coursework.

Purdue Global's academic integrity policy considers "[p]resentation of generative artificial intelligence (AI) or similar output as one's own, or as any other person's product without permission or proper attribution" as a form of academic dishonesty. [Ex. A at 8.] When a professor suspects that a student violated the policy,

she may resolve the issue informally with the student. If that fails, she may make a formal report to the school. [*Id.* at 9-10.]

Exams are timed, and students do not see exam questions until the exam is opened in the course portal. The clock starts as soon as the exam is opened. The exam platform keeps an attempt log that records when a student opened the exam and how many characters were saved at each point along the way. For each alleged breach of the academic integrity policy, these logs are the primary support on which Purdue Global defends its findings that Lawtone-Bowles didn't independently author her coursework and likely relied on generative AI. [*See, e.g.*, DE 67-1 at 3.]

Turning to the three proceedings, the first arose from Lawtone-Bowles' Criminal Procedure course, taught by Professor Victoria Vidt. The course began May 7, 2025. Within one week, Lawtone-Bowles submitted assignments covering roughly two-thirds of the entire course. [Ex. B at 1.] This confounded Professor Vidt. She couldn't understand how a student could complete so much of the course in such a short time. So Vidt asked Lawtone-Bowles whether she had taken the course before. Lawtone-Bowles said she had not. [*Id.*]

A closed-book, closed-note exam in Module 6, however, is what prompted Vidt to report Lawtone-Bowles on suspicion of cheating. Lawtone-Bowles completed the exam on May 11, 2025. The attempt log revealed that she wrote an essay of approximately 5,300 characters in 8 minutes. [DE 67-1 at 3.] She didn't submit the exam in eight minutes. Instead, Vidt claimed in an email to the school that Lawtone-Bowles let the essay sit for the remainder of the allotted two hours and then used an auto-

submit feature once the time expired. Furthermore, despite being a closed-book and closed-note exam, the essay contained full case citations, which Vidt found questionable given a student ordinarily wouldn't be able to memorize them. [Ex. B at 1.] Vidt discovered similar irregularities in Lawtone-Bowles' work when grading the closed-book exam in Module 10, which Lawtone-Bowles had completed that same day. [*Id.* at 2.]

Lawtone-Bowles' side of the story is that Professor Vidt mistook her use of the approved Dragon software for cheating. She says she was able to produce so many characters in short order because she was dictating the text through Dragon rather than typing it word-for-word. [DE 74 at 2.] Vidt assured her that her suspicions had nothing to do with the use of Dragon and instead were based on the amount of work Lawtone-Bowles completed in one week as well as essay responses she produced so quickly and with full case citations—despite the exam being closed-book.[3] [Ex. **B** at 2.]

Vidt issued a formal report to the school concerning the two exams, which Lawtone-Bowles appealed, and the Academic Appeals Committee upheld the finding. She received a grade of zero on both modules. [Ex. C at 1.] Lawtone-Bowles then appealed the decision of the Committee to the Provost, Carolyn Nordstrom, who affirmed it with a letter to Lawtone-Bowles explaining that she reviewed all material

[3] At the evidentiary hearing [DE 65], Lawtone-Bowles testified that Dragon would auto-fill case citations when she spoke the case name into the software, and she accepted those citation insertions by clicking tab. She conceded this was a mistake and she shouldn't have done that. After the first breach, she disabled the function when completing closed-book exams.

submitted to the Appeals Committee and did not find any compelling evidence to overturn the decision. [Ex. D.]

The second proceeding stemmed from Lawtone-Bowles' Community Property course, which began in January 2026 and was taught by Professor Brian Victor. When reviewing student work product, Victor noticed that Lawtone-Bowles had completed the entire course in *six days*. In fact, every essay required in the course (each of which required independent research) was submitted on the same day. Like Professor Vidt, Victor found the pace highly unusual. [Ex. E; DE 67-2 at 1.]

He called Lawtone-Bowles that day to discuss his concerns. During the call, he asked her a course-related question relating to how pensions are divided in California during a divorce. Victor said Lawtone-Bowles didn't have a clue. [Ex. E.] At the Court's July 10 evidentiary hearing, Lawtone-Bowles added some context to this call: she was driving in rush-hour traffic and wasn't prepared for what was essentially an impromptu oral exam.

Victor submitted a formal report of academic dishonesty upon recommendation from Associate Dean Shaun Jamison. [Ex. E.] As with the first proceeding, Lawtone-Bowles appealed. This time, however, she received a hearing on her own request. At the hearing, the Committee asked her questions of substantive law, and her responses did not reflect the high quality of her coursework. She was also given multiple-choice and short response questions, which she could not complete at a similar pace to which she completed comparable assignments in the course. [DE 8-1 at 15-16; Ex. F at 1.] The Committee determined she did not author her work and denied her appeal. Lawtone-

Bowles appealed the Committee's finding to Provost Nordstrom, who once again did not find any reason to disagree with the Committee's determination. [Ex. G.]

The third proceeding is the basis for Lawtone-Bowles' retaliation claim. It arose from her Education Law class, taught by Professor Sarah Diab in the same term she took Community Property. [Ex. H at 1; DE 8-1 at 19.] It was a four-credit course designed for 180 total study hours. Yet Lawtone-Bowles finished it in only sixteen days. [Ex. H at 1.]

Diab suspected the unauthorized use of AI by several students, including Lawtone-Bowles, and she decided to meet with each of them. Diab contacted Lawtone-Bowles on February 11, and they scheduled a meeting for the morning of February 14. Shortly before the meeting, Diab asked to reschedule it due to a conflict. Lawtone-Bowles reacted in a hostile way—she refused to reschedule the meeting and told Diab that they would meet at the scheduled time or not at all. She also told Diab that she was an "inconvenience to [her] schedule," and that she was "preparing [her] complaint to Purdue Global Law School." Lawtone-Bowles asserted her rights in that same message. Specifically, she said that her use of Dragon was an approved accommodation that could not be treated as proof of AI usage, that AI detectors "are biased against [the] disabled," and that "[l]abeling [her] work as inappropriate AI use is a violation of disability laws." [Ex. H at 1.]

Because matters had gotten a bit tense between Diab and Lawtone-Bowles, Diab passed the inquiry along to Dean Jamison, who took over from there. Jamison contacted Lawtone-Bowles telling her in an email that he was taking over the investigation

because Diab "was the subject of disrespectful remarks, accusations, and threats on your part." [*Id.*]

In a detailed follow-up email dated March 4, 2026, Jamison explained the reasons for the investigation. Lawtone-Bowles was taking 19 credits that term, and the school estimates 45 hours of study per credit. Within the first few weeks of the term, she had completed the coursework for *all* of her classes. That seemed preposterous to Jamison. By Jamison's calculation, that would require Lawtone-Bowles to have dedicated "36 straight twenty-four-hour days" to her classes without sleeping, eating, or working her job. [*Id.* at 2.] Jamison also noted that a detection software flagged several assignments for AI. [*Id.* at 2-3.] Lawtone-Bowles countered that the detection software was biased and produced a false positive based on her use of Dragon. [Id. at 3-4.] In his email, Jamison explained that the basis of the investigation is "not your use of approved assistive technology" and that no academic integrity determination is made "solely on the basis of an automated detection score" provided by the detection software. [*Id.* at 4.] He separately asked for evidence of authorship and responses to his specific concerns. [*Id.* at 5.]

In Jamison's report to the Appeals Committee, he characterized Lawtone-Bowles' external civil rights complaints as "supplied by her for the purpose of intimidation," "a shield against consequences," and "revenge for perceived wrongs." [*Id.* at 8, 14.] Following a hearing, the Committee found she had used generative AI in her coursework and denied her appeal. Two of her course submissions cited cases and statutes that did not exist or did not support the claim, and she conceded at the hearing

that for nearly every citation, the listed year was wrong. Furthermore, Lawtone-Bowles' explanations for the discrepancies were inconsistent. [DE 8-1 at 39; Ex. I at 1-2.] Lawtone-Bowles appealed the decision to Provost Nordstrom, who denied the appeal and stated in a letter that Purdue Global "has never disputed your approved accommodations or your ability to use assistive technology." Nordstrom also wrote that the whole matter arose from "allegations of the inappropriate use of generative AI to complete assignments and assessments." [Ex. J at 1.] She upheld the Committee's determination and dismissed Lawtone-Bowles from the law school.

**Discussion**

To receive a preliminary injunction, Lawtone-Bowles must demonstrate that she has some likelihood of success on the merits, that there is no adequate remedy at law, and that she will suffer irreparable harm absent an injunction. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). The inquiry doesn't end there. If that threshold showing is made, I must then weigh the harm to the defendants if I were to grant the injunction against the harm to Lawtone-Bowles if I don't. *Id.* If I were to grant Lawtone-Bowles' motion for injunctive relief, Purdue Global would be required to reinstate her to the law school. A mandatory preliminary injunction, like the one sought in this case, requires a defendant to affirmatively do something, and such injunctions are "cautiously viewed and sparingly issued." *See id.* (citing *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)). If Lawtone-Bowles fails to satisfy any prong of the threshold showing, the analysis ends there, and the motion will be denied. *Girl Scouts of Manitou Council, Inc. v.*

*Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *see also Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021).

As explained earlier, the only surviving claim is retaliation under the ADA. Because the other claims failed as a matter of law, they cannot support a preliminary injunction.

The retaliation claim is limited to the third investigation, which Associate Dean Jamison took over from Professor Diab. Lawtone-Bowles alleges that after she asserted her ADA rights to Diab, Jamison undertook a "subsequent investigation" and "escalated" it because of her discrimination complaints. [DE 94 at ¶¶ 35, 66-68; DE 103 at 9.] To show retaliation, Lawtone-Bowles points to Jamison's characterization of her complaints as "intimidation" and "a shield against consequences." [DE 94 at ¶ 68.] Standing alone, those statements certainly suggest Jamison was irritated by the complaints. But with the full picture in view, those statements aren't enough to carry her claim.

First, Diab's inquiry was not a response to anything Lawtone-Bowles said to her or anyone else. Recall that Diab set meetings with every student in the course to discuss the authorship of their work before she contacted Lawtone-Bowles, and she contacted Lawtone-Bowles three days before the February 14 message. [Ex. H at 1, 7.] What drove the inquiry was Lawtone-Bowles' rapid pace of work. And Jamison didn't conduct an investigation in response to any protected activity; he took over the investigation on Diab's behalf because Lawtone-Bowles' message made her uncomfortable. Put simply, the basis of Jamison's investigation started with Diab. It was a reassignment of an open

investigation, and that investigation started before Lawtone-Bowles asserted any rights. And Jamison told Lawtone-Bowles that the basis of the investigation was "not your use of approved assistive technology." [Ex. H at 4.] On this record, Lawtone-Bowles has not shown that the investigation would not have happened but for her assertion of ADA rights.

Second, to the extent Lawtone-Bowles argues that the disciplinary proceedings were tainted by Jamison's animus towards her, the record says otherwise. The decision that led to her dismissal was not Jamison's to make. His report went up to the Appeals Committee, who held a hearing, saw the evidence, and was in disbelief at the pace Lawtone-Bowles had completed her coursework. The Committee also cited her course submissions as being riddled with AI-hallucinated sources, which Lawtone-Bowles could not explain. Nordstrom, as the final authority on the charge, agreed with the Committee's findings, stated explicitly that the whole matter had nothing to do with Lawtone-Bowles' disability, and expelled her because the evidence showed she violated the student academic integrity policy.

Put simply, the Committee's and Nordstrom's findings were not motivated by Jamison's frustration with Lawtone-Bowles or any disability complaint. They based their findings of academic misconduct on a pile of evidence proving it. While a finding of academic misconduct and expulsion are certainly adverse actions, Lawtone-Bowles cannot show they were caused by any protected activity. She therefore has not shown any likelihood of success on her retaliation claim, and that's enough for me to deny her motion. *See Mays*, 974 F.3d at 818.

To be clear, this ruling isn't a final judgment on Lawtone-Bowles' retaliation claim. "The findings of fact and conclusions of law made by a court" on a motion for preliminary injunction are entirely provisional and do not bind anyone later in the litigation. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The claim still survives, and Lawtone-Bowles may seek to prove it at trial. But I will not order Purdue Global to reinstate her admission in the meantime.

**Conclusion**

Lawtone-Bowles sued Purdue Global and its employees after three findings of academic misconduct that resulted in her dismissal from the law school. She alleged the findings were the product of retaliation, race discrimination, and disability discrimination, and that they violated her constitutional rights and breached an implied contract. Only the retaliation claim survives Defendants' motion to dismiss. On the record developed at a July 10, 2026 evidentiary hearing, she has not shown a likelihood of success on that claim, so I will not grant preliminary injunctive relief in the form of ordering her reinstatement at the law school.

For these reasons:

1) Defendants' Motion to Dismiss [DE 98] is **GRANTED** as to Lawtone-Bowles' disability discrimination claims under the ADA (Count I) and Rehabilitation Act (Count II), the claims under 42 U.S.C. § 1983 (Count III) and Title VI (Count IV), and the claim for breach of implied contract (Count VI).

2) Defendants' Motion to Dismiss [DE 98] is **DENIED** as to Lawtone-Bowles' claim of retaliation under the ADA (Count V), which is hereby limited to the third

investigation and finding of academic misconduct.

3) Lawtone-Bowles' motion for a preliminary injunction [DE 3] is **DENIED**.

**SO ORDERED.**

ENTERED: November 2, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT